```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                     Case No. 11-60285-CR-ROSENBAUM
 3

 4   UNITED STATES OF AMERICA,)
                              )
 5            Plaintiff,      )
                              )
 6        -v-                 )
                              )
 7   BOBBY RICKY MADISON,     )
                              )
 8            Defendant.      )    Fort Lauderdale, Florida
                              )    August 7, 2012
 9   _____)    9:01 a.m.

10

11            EXCERPT TRANSCRIPT OF TRIAL PROCEEDINGS

12          BEFORE THE HONORABLE ROBIN S. ROSENBAUM

13             U.S. DISTRICT JUDGE, AND A JURY

14

15   Appearances:

16

17   For the Government:       MICHAEL E. GILFARB
                               MARK DISPOTO
18                             Assistant United States Attorneys
                               99 NE 4th Street
19                             Miami, Florida  33132

20   For the Defendant:        RANDEE J. GOLDER, ESQ.
                               P.O. Box 243756
21                             Boynton Beach, Florida  33424

22

23
     Reporter:                 Karl Shires, RPR, FCRR
24   (561) 514-3728            Official Court Reporter
                               701 Clematis Street, Suite 258
25                             West Palm Beach, Florida  33401
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1      (Call to Order of the Court.)

2           THE COURT:  Are we ready?

3           We talked last night about the possibility of

4    requesting an additional instruction.  What is the defense's

5    position with respect to whether that is desired or necessary?

6           MS. GOLDER:  I would love it, Judge.  The problem was

7    by the time I finished working on my closing and got home

8    through some very bad traffic and all, I tried to draft

9    something and I just was --

10          THE COURT:  Why don't you sit down and do it right now

11   if you think it is something that needs to be done.

12          MS. GOLDER:  I'm wondering if it is something we can

13   just add into the credibility of witness instruction?

14          THE COURT:  Let me see.  Where would you propose

15   putting it?

16          MS. GOLDER:  Let me just find that instruction.  I

17   think it is jury instruction No. 4.

18          THE COURT:  I don't think it would go there, but if

19   you think of someplace to put it, I'm receptive to hearing it.

20          MS. GOLDER:  What about in the 404(b) instruction?

21          MR. GILFARB:  Judge, regardless of when the jurors are

22   going to get here, we're not starting until 9:15?

23          THE COURT:  Right.  But we're doing the instruction

24   thing right now.

25          MR. GILFARB:  Yes.  Mr. Dispoto is going to do that.

1         THE COURT:  All right.  You mean No. 10?

2         MS. GOLDER:  Yes.  I'm wondering if we can fit it in

3    there somewhere.

4         THE COURT:  I think it is separate because this isn't

5    a similar act, and I don't think we should suggest that it is.

6    Whereas jury instruction No. 10 talks about similar acts.  So,

7    maybe during the trial, you heard -- is there a pattern

8    instruction?

9         MS. GOLDER:  You can say similar or bad acts.

10        THE COURT:  Just a minute.  Let me just check and see

11   if we can find an instruction.

12        MR. GILFARB:  Judge, can I suggest that we have a

13   separate instruction that specifically says, you heard evidence

14   that Bobby Madison was -- said that he did this, you know, that

15   he ran drugs with Davis and Brown.  That evidence is to be

16   considered by you only to show that he made a statement

17   different from that in court.  Something to that effect.

18        MS. GOLDER:  Well, I don't think you want to highlight

19   a particular piece of evidence in a jury instruction.

20        THE COURT:  All right.  Just one moment and let's see

21   if we can -- I can do that, though, if we're going to do it, I

22   could do it right when they got back, like we did with the

23   other one.

24        MS. GOLDER:  Yes.

25

1    THE COURT:  I can do it right when they got back.

2  When Mr. Madison -- when Mr. Starkey testified -- you may

3  recall Mr. Starkey testified that Mr. Madison was allegedly

4  involved in running drugs with Daryl Davis and Terrance Brown.

5  You are instructed that you may not consider any of this

6  evidence against Mr. Madison in relation to the charges

7  being -- in relation to the charges against him in this case.

8  This evidence is admissible only for the purpose of determining

9  or evaluating the truthfulness of Mr. Madison with respect to

10  whether he associated with Daryl Davis.

11    How about something like that?

12    MR. DISPOTO:  That's acceptable to us, Judge.

13    THE COURT:  We don't have to do an instruction at all

14  if you prefer.  I want to give you that option if you want to

15  do it.

16    MS. GOLDER:  You know, Judge, I'm thinking we might be

17  better off with no instruction.

18    THE COURT:  All right.  Well, why don't you go ahead

19  and I saw you consulting with Mr. Madison, if you want to take

20  a few more minutes and let me know what your conclusion is,

21  I'll be happy to hear it.

22    MS. GOLDER:  Right.

23    THE COURT:  And if you have a proposed different

24  instruction, I'll be happy to hear that as well.  I'm just

25  trying to sort of facilitate things.

1          MS. GOLDER:  I know.  I appreciate that, Judge.

2          THE COURT:  No problem.

3      (Defendant and counsel conferring sotto voce.)

4          MS. GOLDER:  Judge, I think at this point, we've

5   agreed we're better off with no instructions.  We feel it would

6   highlight a certain piece of evidence too much at this point.

7          THE COURT:  No problem.  That's certainly your right

8   and it is a strategic call and I will respect that.

9          MS. GOLDER:  Yes.

10      (Call to Order of the Court.)

11          THE COURT:  So, just for purposes of the record, I

12   have reviewed *Callanan versus United States*, which is 364 US

13   587, a 1961 decision from the Supreme Court, as well as the

14   dissent in that case, which was authored by Justice Stewart and

15   joined in by four other justices.

16          My understanding of the case is that at issue in that

17   case, there was no challenge to whether the defendant could be

18   separately charged with the offenses of conspiracy and Hobbs

19   Act substantively, but rather -- but rather whether the

20   defendant could be cumulatively punished for conviction on

21   both.  So, although I certainly understand the argument, I

22   think that it is a matter for sentencing, which may or may not

23   become a relevant issue.  And at that point, it really becomes

24   sort of that merger issue that we talked a little bit about

25   yesterday.  And I just wanted to put on the record, though, the

```
1    reasons for why I had concluded that Callanan does not require

2    that the Government elect between conspiracy and the

3    substantive count.

4            And it is, of course, the dissent that suggests that

5    the government should not be able to seek cumulative

6    punishment, but that's a separate issue from cumulative

7    charging, I suppose.  So, I will respectfully deny the motion

8    with respect to that.  However, of course, the record is

9    preserved and if there is ever a need to appeal, of course, you

10   can do so.

11           Mr. Bolivian has arrived, so we're going to go ahead

12   and start.

13       (Jury in at 9:23 a.m.)

14           THE COURT:  Welcome back.  And we especially

15   appreciate the diligence of the juror with the flat tire today

16   and still getting here pretty promptly.  So, thank you.

17           And I imagine everybody followed my instructions.  But

18   if there is anybody who did not, please raise your hand for me

19   now.

20           All right.  I see no hands.

21           We are going to begin with the closing arguments.

22           MR. GILFARB:  Thank you, Your Honor.

23           Good morning, everyone.

24           The trial has concluded.  All of the evidence that

25   you're ever going to see about this case is in.  You should
```

1   not, as the Judge is going to instruct you, base your verdict

2   on anything other than the evidence that was introduced at

3   trial in light of the instructions that the Judge is going to

4   give you.  What we're here to do now is to kind of piece

5   together what and argue to you what we believe the evidence

6   shows.

7           And the reason we get to do that is especially

8   important in a case like this because I will take the liberty

9   of guessing that when you go back into the jury room, and you

10  look at your notes, you're going to see a lot of things

11  scribbled in there, a lot of things.  Some things for which you

12  took notes and you don't know why you wrote it down.  Because

13  at the time you wrote it down, you didn't know if it was going

14  to be important or not.  You didn't know how it fit in.

15          So, part of what I want to do is explain to you why

16  you heard some of the things you did and how it fits in.

17          But again, what backdrop?  When you look at the

18  evidence in the case, what do -- what should you have in the

19  back of your mind?  The defendant, when you came in, was

20  presumed innocent.  He has to be proven guilty beyond a

21  reasonable doubt.  He has to be proven guilty beyond a

22  reasonable doubt of the things and only the things that are

23  charged as the Judge will instruct you.  The Judge, through her

24  jury instructions, sets what the law is, what we have to show.

25          But what is a reasonable doubt?  Well, you have to be

1  convinced of the defendant's guilt.  You have to be convinced

2  of the defendant's guilt.  I like to think of it this way.

3  Some of my colleagues, they compare it to a puzzle piece or a

4  puzzle book, and that's what I would like to do for you right

5  now.

6          When you were children, you had these puzzles that you

7  would put together, but you wouldn't know how to put it

8  together.  You wouldn't know what it was if you just opened the

9  box and you didn't have the cover.  You need to have the cover

10 to make the puzzle.  So you put together those pieces.

11          So a reasonable doubt is, after you're done making the

12 puzzle, after you've put it altogether, how many pieces can you

13 remove from the picture before you cease to recognize what it

14 is?  That's what a reasonable doubt is.  How many pieces can

15 you remove before you cease to know that's a picture of a scene

16 in Africa with a lion and a tiger, or that's a picture of a

17 brook, you know, running through a meadow or whatever.  How

18 many pieces can you remove?

19          Now, no doubt, throughout the trial, you will

20 experience something that every parent has experienced whoever

21 bought their kid a puzzle.  There are pieces that are going to

22 be missing at the end.  And if you've ever seen your small

23 child put together a puzzle, there's going to be a couple

24 pieces jammed in where it doesn't belong, maybe even a couple

25 pieces from a different puzzle thrown in.

```
 1              But what is a reasonable doubt?  Does that change your
 2    perception of what that is, of what that picture is?  That's
 3    how you should look at the case.
 4              So, against that backdrop, let's first talk about some
 5    things that don't matter, that you probably wrote down, that
 6    you probably thought was a big deal, but that really don't
 7    matter.
 8              Number one, the color of the gun.  You heard some of
 9    the witnesses say it was shiny and silver.  Ms. Golder
10    cross-examined on the gun.  It is irrelevant.  The shooter took
11    the stand and said, I shot him with this gun.  The color of the
12    gun doesn't prove or disprove anything.
13              The number of shots fired, same thing.  How many
14    people were in Ms. Plaza's yard?  Irrelevant.  The color of the
15    hoody that soldier was wearing.  Irrelevant.  You have a video
16    of it.  What was all that cross-examination about whether it
17    was green or gray?  You're going -- you can see it for
18    yourself.  These things at the beginning of the trial because
19    they were the subject of direct testimony and the subject of
20    cross-examination may have seemed important to you because we
21    made it look important, but at the end of the trial, it means
22    nothing, it means nothing.
23              Ms. Plaza, when she said that first time that I was
24    there doing my nails or sorry, she was at her sink, looking
25    through the window, she saw three people jump the fence with
```

1    construction vests.

2          Now, you know from the testimony that that's not what

3    happened.  Three people jumped the fence and at least one

4    person had a construction vest because Moss told you that

5    that's what happened.  But this is -- these are things that

6    really should not play into your decision about whether there's

7    a reasonable doubt because they mean nothing.

8          So, let's talk about the witnesses because way back

9    when, and you probably don't remember Mr. Dispoto's opening

10   statement where he explained how we were going to present the

11   case.  So you probably started off pretty good about writing

12   notes about what was important and what wasn't important, but

13   let me just briefly go through the witnesses and what they were

14   called for and what they were offered to show.

15         Ms. Knight, the woman who saw the murder occur.

16   Ms. Plaza, the yard into whose -- the yard into which Moss

17   escaped into, and Mr. Thompson, the person who saw the second

18   getaway vehicle take away on 10/1.  You know why they were

19   called?  It is very simple and for one and one reason only.  We

20   had to give you some context about what Mr. Moss was going to

21   talk about.  We didn't want to put Mr. Moss on the stand and

22   just say, what did you do on 10/1?  You had to hear about 10/1

23   first.

24         They offered no evidence into the record that is for

25   or against Mr. Madison.  And yet, they were cross-examined at

1   length.   And we'll talk to you about what that means.

2                MS. GOLDER:   Objection.

3                THE COURT:   Sustained.

4                MR. GILFARB:   Okay.   Then we called Mr. Moss.   And I

5   want to talk to you about Mr. Moss very briefly right now and

6   then more at length toward the end of my statement.

7                For some reason, our country is obsessed with

8   celebrity endorsements.   Right?   You see Shaq touting a Buick

9   LaCrosse.   You know he doesn't drive a Buick LaCrosse.   He

10  looks ridiculous sitting in it.   They gave him that Buick

11  LaCrosse in the hopes that if you saw Shaq in a Buick LaCrosse,

12  you would say, well, if Shaq liked it, it's got to be good.

13               But Shaq knows nothing more about a Buick LaCrosse

14  than you or me.   But they hoped that when you see that, you'll

15  like Shaq enough to go, well, if he likes it, it must be good.

16               We got Olympic medalist who are suddenly getting

17  endorsement for Wheaties.   Is that what you think they eat in

18  the morning?   But they give you the celebrity endorsement

19  whether it's for political advertisement or anything else that

20  you see on TV.   Why?   Because we tend to look at whom the

21  messenger is when we listen to a message.   And we make a

22  judgment because it makes us feel good when Shaq likes a Buick

23  LaCrosse.   It gives us comfort.

24               What's another thing that we always fall prey to?   For

25  awhile, the smartest man in the whole world ever to have

1   existed was Einstein. So anything that Einstein said, people

2   believed. Well, Einstein said it; it must be true. Einstein

3   was against the proliferation of nuclear weapons. He helped

4   with the theory that enabled the nuclear weapon, and then he

5   came out against it. Well, if Einstein doesn't like nuclear

6   weapons, that must be the right thing. Einstein is a fantastic

7   physicist, but what does he know about foreign policy? So

8   what? Einstein said it, it must be true.

9          How about the opposite? The anti-Einstein: Hitler.

10  Well, that's what the Nazis did. Well, suddenly, whatever the

11  Nazis did is wrong. Well, if you asked Hitler if Berlin was in

12  Germany, it wouldn't be wrong just because Hitler said it or

13  believed it.

14         So, when you are going to decide whether to believe

15  Mr. Moss, do not fall into the trap of saying, well, he killed

16  somebody; therefore, I cannot believe him automatically because

17  we don't expect you to like him, but that's not a reason to

18  disbelieve him just because of who the messenger is.

19         We called Steve Alvarez to the stand. This was the

20  employer of Mr. Davis. Why was he called? He explained about

21  the loaner vans. He explained that they had a white loaner van

22  from the county in September. They even found the exact one

23  that they had, 704. We're going to talk about that later on.

24  And that there was no control about who would take that van.

25  There would be no signing in and out for it.

1          We showed you the employment records.  Actually, we

2     introduced the employment records of Mr. Davis, but we didn't

3     show them to you.  And what you'll see is that on 7/26, 9/17,

4     and 10/1, he's not at work.

5          We called him to show that they had vests like the one

6     that you saw in his van and the ones that were used.  We

7     introduced transponder records.  Why?  Because it shows

8     Mr. Davis, you remember that kind of funny call when he finally

9     figured out his PIN number, he was putting money into his

10    account because as the records show, he goes up North, past

11    Leesburg, Florida, with the Ritz Carlton records in evidence

12    showing that he was expected in Atlanta at the Ritz Carlton on

13    10/1.  He beat feet.  He got out of town on 10/1.

14         And you look at the records for 10/1 with regards to

15    that SunPass call, you'll see he is loading up his transponder

16    right around the same time that Brown is not showing up to his

17    residence that afternoon.

18         We showed you the Facebook.  Why is the Facebook

19    important?  Because it shows that it has Davis' phone number on

20    it.  We have to prove the phone number in order to get into

21    evidence and make relevant all of the documents.  It also has

22    his black van.

23         Why did we introduce the Florida Department of

24    Professional Regulation certificate about makeup?  Because it

25    shows that Daryl Davis has an interest in this field.  So that

 1   when Mr. Moss tells you it was Davis who applied the makeup,

 2   you can see that that would have to be a remarkable

 3   coincidence, that of all of the conspirators to apply makeup,

 4   he picked Daryl Davis.

 5          We called Mr. Verga to the stand, the retired police

 6   officer, to show you that, in fact, there was a Brink's car

 7   robbery in February of 2005.  He told you what happened.  He

 8   gave you the three people.  He gave you the person in the

 9   getaway Jeep sitting in the front, did not have a vest.  The

10   two people in the back did have a vest.

11          There was some cross-examination about whether he said

12   Jeep or didn't say Jeep or what he saw or what he didn't see.

13   And frankly, I ask you to challenge what the purpose of that

14   cross-examination was.

15          MS. GOLDER:  Objection.

16          THE COURT:  Overruled.

17          MR. GILFARB:  What is that examination supposed to

18   show?  That 2005 didn't happen, that he was lying.  He doesn't

19   make an identification of Mr. Madison.  That witness was called

20   only to corroborate that, in fact, a crime did occur in 2005.

21          Then we go to Ms. Kostrub, the woman who had her car

22   stolen, and Vassilakis and Ku, the officers involved in that

23   red stolen car.  We had to do that because we have to prove

24   that it was Mr. Madison in the car, a fact which he later took

25   the stand and admitted, but all that was to just prove that

1    fact, that it was Mr. Madison who took that car.

2            Crum, Officer Crum, a rather large deputy from

3    Broward, from the Broward Sheriff's Office who interrogated

4    Mr. Williams, why was he called?  Well, the interrogation is

5    important because it shows on videotape, Mr. Williams wiping

6    makeup off his face.  The interrogation is important because of

7    all the places where he could make up that he met somebody and

8    unexpectedly just got into a car that had a gun, didn't know it

9    was stolen, the place where they met was the Swap Shop.

10           What else is important about that?  It is important to

11   show that obviously as you were watching that video, you knew

12   Mr. Williams was lying.  You knew he was lying.  You could see

13   it.

14           And to show that he only knows the area, that he only

15   knows the area of 95 and Sample, that area where the bank is.

16   We had to -- we made a decision to recall Agent Nau, the one

17   who found the gun, to explain why it doesn't look silver.  And

18   there was still cross-examination about the gun being exposed

19   to the elements and does this look like a silver gun.  It means

20   nothing.  It means nothing.

21           We called Mr. McCormick to explain that when they were

22   following the car on 7/26, there were two people in the car.

23           We called Officer Bell, he was the one who arrested

24   and found the gun on Mr. Williams.

25           We called Antonio Johnson, the gentleman who came in

1   with the tie to explain to you that the Charger is his.  But

2   what was important about that?  We had to link that Charger to

3   Mr. Toriano Johnson.  That's all he did.  He also put into the

4   car, using that car Johnson, Williams, and Parish.

5           Then we called Agent Perez, who laid a foundation for

6   all the surveillance photographs and videos that you saw.  He

7   confirmed the Traverse license plate.  He corroborated Moss

8   about the fact that Madison has nothing to do with that group

9   and has never been implicated in the drug organization.

10          And lastly, he was used to establish another telephone

11  number, that belonging to Toriano Johnson, something we had to

12  do to legally be able to talk about the records.

13          Then we called David Rodriguez.  Same reason.

14  Provided Brown's phone number, Johnson's other phone number,

15  Moss' phone number.

16          We called Mr. White, the agent who saw what happened

17  on 10/1 when Mr. Madison was at Brown's residence.  And we

18  don't need to go over all that because Mr. Madison took the

19  stand and admitted all of that.

20          Then we called Lisa McCarty.  Why?  She needed to give

21  us Brown's other telephone number, which we read into the

22  record, and she said some very interesting things on

23  cross-examination.  She never called Madison on Brown's phone

24  and she never called Brown on Madison's phone.  This is the

25  ex-wife of Brown who has a lot of contact with Mr. Brown

1   because they share custody of a child and yet, in all of her

2   time, she had never came into -- she never called Brown and had

3   Madison answer, and she never called Madison and had Brown

4   answer.   Never.

5          Then we called Agent Magnuson.   We spent a good part

6   of a full day going through the phone records.   And what does

7   it show?   That on 7/10, Moss had five calls to Madison and on

8   that same day, there were calls from Moss to Brown and Moss to

9   Madison.   All around the same time.

10          On 7/12, Moss was calling Brown and Moss was calling

11   Madison.   7/19, the tag reader date.   Johnson was in Lighthouse

12   Point.   7/26, and we'll talk about that at length, Bruce

13   Woerner, the guy from Brink's, this is a very technical reason

14   why he was called.   You'll hear that, as part of the

15   instructions, we have to prove that these robberies did or

16   could have affected interstate commerce.   That's why we were

17   talking about the money and the effect on the business and

18   things like that.   That's it.

19          There were also the Brink's records, which he

20   introduced and kind of explained when Brink's was at certain

21   locations and on certain times.

22          Then we called Agent Starkey, the case agent, so that

23   you would understand how the case developed and understand what

24   we learned from Moss that we were later able to prove and what

25   we knew already that Moss told us that we knew to be true, but

1  he would have no way of knowing that we knew it to be true.

2  That's what that was about, and to get out the statements of

3  Mr. Madison, which we'll talk about, also.

4       Then the defense called Mr. Lamons.  And I'm going to

5  speculate here that Mr. Lamons was called by the defense to

6  prove to you that you can do a robbery with less than seven or

7  six or five people, and that Brown was part of that crew and

8  that Mr. Madison wasn't.  That's it.

9       But we learned a heck of a lot more on

10  cross-examination.  You don't necessarily -- you don't have to

11  limit it.  It is up to Brown.  He doesn't know what Brown is

12  doing.  Brown can make his own decisions about what car to

13  steal, how many people to involve and to involve his friends.

14       He told you about at least one of the robberies

15  involving makeup and construction vests.  Where do you think

16  Brown got those ideas?

17       Now, let's talk about Mr. Moss.  As you can tell by

18  now and already, he has never seen the videotapes.  He was not

19  shown the stills.  He was not shown any phone records or maps

20  prior to him giving us information that is reflected in them.

21  And yet, everything that he said is corroborated by video

22  evidence and telephone evidence.

23       There were things that he told us that we didn't

24  possibly know, which we later found out to be true:  The 2005

25  case, the use of the construction vests, the women's clothing,

1    a whole host of things, which hopefully are in your notes.

2          If he were lying, as it's been suggested to you, it

3    would not have matched the phone records so perfectly.  If he

4    had been lying, it would not have matched the videos so

5    perfectly.  So, let's talk about whether to believe Mr. Moss or

6    whether to believe Mr. Madison.

7          The first thing I want to discuss is the motive to

8    lie.  The motive to lie issue is Mr. Moss is lying to you

9    because he has a motive to lie, that he has something to gain.

10   So does Madison, doesn't he?  Doesn't Madison have something to

11   gain by lying?

12         So, instead, let's look at the incentive to tell the

13   truth, not the motive to lie, which we talked about in jury

14   selection.  Just because somebody has a motive to lie, doesn't

15   mean they lied.  So, let's forget about motive to lie.  Let's

16   talk about incentive to tell the truth.

17         Mr. Moss has an incentive to tell the truth because if

18   he's caught in a lie, he stays in prison for life.  So think

19   about the risks he might have taken if he had decided to

20   implicate him, if it wasn't true, and we found out through the

21   phone records or through some video or some other fashion.

22   Moss would be cooked.  That's it.  Over.  Life.

23         He wants out.  That's an incentive to tell the truth.

24   That's how you know that just because he has a motive to lie,

25   that he is not lying.

1   But how about Mr. Madison?  Does he have an incentive

2   to tell the truth or does he have an incentive to lie?  He's

3   the defendant on trial.  If he tells you the truth and the

4   truth is what Moss says it to be, he goes to jail.  He has a

5   motive to lie.  But has it been shown that he has motive to

6   tell the truth?  No.

7   Let's talk about motive number two.  Moss is lying on

8   me because of the whole Irih Small situation.  He's lying on

9   me.  Well, what did we learn?  That even though that is a high

10  motivation, even if it -- and we're assuming that all of that

11  is true because remember, he denied the paternity of the child

12  to the agent, and there's been no evidence other than his

13  non-credible testimony regarding that issue.  But let's assume

14  that it's true.  Moss has a huge incentive to frame him, as you

15  heard in opening statement, to get him out of the way, to get

16  back at him.  Mr. Madison admitted this is a huge, powerful

17  incentive.

18  So, how does Mr. Moss frame him, screw him?  Does he

19  make him the murderer?  Does he make him a gunman?  Does he

20  make him a planner?  Does he make him a lookout?  Does he

21  implicate him in the thefts of the car for 10/1 and 9/17?  No,

22  no, no, no.

23  Does he make him a member of the drug conspiracy?  No.

24  Does he make him the leader?  No.  If he really had an

25  incentive to lie, why not even implicate him in the smallest

1  way that could hurt him, that we could never corroborate and

2  they could never undermine.  That didn't happen either.  So,

3  ask yourselves why.  Because even though he's motivated

4  potentially by this, that didn't happen.  That motivation

5  doesn't apply to Mr. Madison.

6        You might be asked to not believe Mr. Moss because he

7  lied in the past.  Well, was that shown?  Just because his

8  lawyers tell him not to answer questions in a debrief, that

9  doesn't mean he lied.  He was -- he answered the questions he

10 was asked.

11       And I want you to think back, at any time did

12 Ms. Golder, while she was cross-examining Mr. Moss, ever

13 impeach him, ever say didn't you on a prior occasion say this

14 where it was shown that he did make inconsistent statements?

15 Did that ever happen?  No.

16       Did it happen with Mr. Madison, that he was shown to

17 have made a lie in the past?  Yes.  He lied to agents on 10/1.

18 He lied to Detective Starkey when they met on 2/4 because he

19 didn't tell them about the lie on 10/1.  He just repeated it.

20 He lied to Starkey about the paternity.  He lied by omission to

21 the arresting officers on 5/28.  He lied to the Court when he

22 pled guilty to dealing in stolen property because you heard him

23 say, I did not steal that stuff, I -- excuse me, I did not sell

24 that stuff.  I did not deal in property that I knew to be

25 stolen, but I said that just to get out of jail.  Those were

1    all ---those were some of the lies that Mr. Madison told in the

2    past.

3           Did Mr. Moss or Mr. Madison lie in court?  Did the

4    defense ever show that Mr. Moss lied in court?  That didn't

5    happen.  Now, she's going to argue to you that some of the

6    phone records show that, but they don't.  And we went through

7    7/26 specifically to show that.  So there was no evidence that

8    he lied in court.

9           But how about Mr. Madison?

10          Well, with regards to the dealing in stolen property,

11   he never told you he confessed on tape.  Right?  He says he

12   stayed in Lauderhill.  There's no evidence of that other than

13   what he says.  But when Mr. Brown is going to bond him out,

14   what address does he give David Rodriguez, the bondsman.

15   Miami.

16          Madison said when he was questioned about Brown's

17   numbers and his own numbers by Agent Starkey, never said like

18   he said here in Court, that he shared a phone with Brown.  That

19   would be important.  If you're cooperating, right, and you say

20   I know something you probably don't know, you can find out

21   where Brown was on those days because just look for 7001.  That

22   didn't happen.  The first time he said that was here in court.

23          He was impeached on his motivation to cooperate.

24   Here, he said this was done out of the goodness of his heart

25   and denied, denied that it was for money when you know from the

1    agents that he had previously said that it was partly motivated

2    by the money.

3         He was impeached when I asked him, did you ever have

4    Davis' number?  He said no.  I don't socialize with him.  I

5    never had his number.  Well, how did Agent Starkey get it?  He

6    asked Madison to open his phone and look it up under A for

7    Atlanta.  That's what the agent testified to when we had to

8    call him in rebuttal.  So, that was an impeachment.  He lied to

9    you in Court about not having Davis' number.

10        He flat out lied to you about 7/26, the date of the

11   car and the Riva Motorsports and bailout and all of that.  You

12   could see it happening on the stand, could you not?  You could

13   see it happening on the stand.

14        Mr. Brown was calling me at 3:00 o'clock in the

15   morning, telling me he is going to come bring me my phone.

16   Then there's the frantic calls because of the bailout.  But

17   still Brown is going to come -- Mr. Madison in his mind, Brown

18   is going to come bring me the phone.  But frantic call after

19   frantic call, calling Williams and all of the other people at

20   the same time that he's calling his girlfriend, who is in the

21   area as you heard him testify, calling the restaurant.  He has

22   to get picked up.  He is panicked.  He's running scared.  And

23   he's calling those numbers all of the time.

24        But he tells you on the stand, Mr. Brown is going to

25   come bring me the phone.  And then you could just see

```
 1   Mr. Madison absolutely deflate on the stand.  He had been
 2   caught.  What?  Mr. Madison or Brown is calling himself.  4240
 3   is calling 7001?  7001 is calling 4240?  Brown is like this?
 4          We specifically asked Mr. Madison, it was only Brown
 5   who had the phone?  But when we pointed that out, well, he must
 6   have given it to somebody else.  And yet not a single time did
 7   we hear about Ms. McCarty or anybody else calling the defendant
 8   and saying, dude, somebody else answered the phone.
 9          And then the worst part, absolutely gave up when we
10   pointed out to him that 56 number.  That was all those numbers
11   being picked up in the area of Davis' house.  That -- by the
12   way, that witness doesn't lie.  That is a record that doesn't
13   forget.  It has no motivation.  It tells you what it is.  And
14   that phone was being picked up in the sector that covers Davis'
15   house.  Not Brown's house.  Not the pool.  Davis' house.
16          That witness doesn't lie.  I'm not talking about
17   Magnuson.  I'm talking about the phone, the phone records.  And
18   when we point out to him that he is calling 561, an uncle in
19   law enforcement or the cousin of that, or the son of that
20   person, then he knows it is over.  You saw it happen.  He knew
21   it was over.
22          Well, I guess I was down in Norwood pool.  Well, I
23   don't understand.  How did Brown -- Brown was on his way up to
24   come bring you the phone.  It's over.
25          He was impeached about how he knows Davis and Brown.
```

1   That's the only reason that drug running evidence came in.

2   That's the only reason it came in.

3         We can't ask Agent Starkey on the stand, hey, tell us

4   all of the bad things about Mr. Madison because that's not what

5   the case is about.  That evidence was offered not to show that

6   Mr. Madison is a bad guy or that you should convict him in this

7   case because he probably did other bad things.  That's not the

8   point.

9         The point when I asked him how is it that you know

10  these people and when he denies knowing and socializing with

11  Mr. Davis, we're showing that at a different time, he made a

12  different statement to Agent Starkey.

13        And this wasn't just a general statement.  He gave

14  details.  So, if the agent is lying, why make up those wacky

15  details, why make up those towns in Alabama that nobody has

16  heard of except maybe the Court's clerk.  He is from Alabama.

17        So, I mean, is that what you believe, that Agent

18  Starkey sat there and said, well, I don't really have enough on

19  Bobby Madison, let me make him a drug dealer even though that

20  evidence is not going to come in, and let me make up these

21  wacky facts?  So he lied about that.

22        He would not even admit to you that at one time, he

23  told a police officer that he worked as a barber.  Now, I'm not

24  saying that he actually worked as barber.  All I'm saying is,

25  he denied saying it.  And of all of the professions that that

1   officer could pick, isn't that weird, a barber given what we

2   know in this case?

3          And then he lied to you most poignantly when he tells

4   you about why he left Brown's residence.  He said, well, I was

5   done, you know.  Although I was motivated to stay because there

6   was probation issues, suddenly even though there was still

7   probation issues, now he's not motivated to stay and so he

8   decided to leave.  And for no other reason, he said.

9          We had to call the agent to the stand to explain that

10  on a prior occasion, he said Vesta, the wife of Brown, after

11  speaking to Brown, said, you got to get out of here.

12         So he lied about all of those things.  So, who should

13  you believe in this case?  Mr. Moss, for all of the reasons

14  we've discussed, or Mr. Madison?

15         Now, I do want to address one more thing before I

16  continue on.  I imagine that during his direct testimony, some

17  of you, maybe all of you or maybe none of you, I can't ask for

18  a show of hands at this stage, liked Mr. Madison.  He was

19  articulate.  He appeared on direct examination to be telling

20  the truth.  He sounded reasonable, all of those things.

21         We would suggest that Mr. Moss, maybe you didn't end

22  up liking him, but had all of those same qualities except for

23  he couldn't pronounce Art or Ott and some other things.  Okay.

24  But we talked about this in jury selection, did we not, how

25  somebody can look you right in the eye and just lie, just look

1   you right in the eye and just lie?  And they can appear the

2   nicest of people and just lie.

3          So, when we're balancing Moss and Madison because you

4   cannot believe them both, I want to talk to you about something

5   called Occam's razor.  It is a theory that when you're trying

6   to decide what happened or what to believe, the less holes you

7   have to fill in, the less logical leaps you have to make,

8   that's probably what happened.  That's likely what happened.

9   Because you have to assume less.  And we all know what happens

10  when you assume.

11         So that's why people generally go with, and why I

12  suggest you think about, what is the more simple explanation

13  about what's going on.

14         Moss tells you Madison stole the car for Lighthouse

15  Point, that he was the getaway driver for Lighthouse Point,

16  that he was the getaway driver for 9/17, that Madison was going

17  to receive a cut from 10/1 for his participation in the

18  conspiracy.

19         How many logical leaps do you need to take to draw

20  those conclusions?  How many gaps do you have to fill in?  I

21  suggest to you that in this case, almost none.

22         But what do you have to do to believe Mr. Madison?

23  Because his only defense is Moss is lying, whenever Moss says

24  something bad about me, whenever he says something that

25  incriminates me, that's a lie.  And whenever the phone records

1   show that I'm guilty, Brown had my phone.  But think of all of

2   the crazy connections you have to make in your mind for those

3   things to be true, that these best friends can't get in touch

4   with each other at that time, that Mr. Brown has to or

5   Mr. Madison has to call from a land line, from the house.

6   There's all this crazy switching of phones, coming at 3:00

7   o'clock in the morning, 6:00 o'clock in the morning.  And then

8   when it doesn't work out, there's some other crazy explanation

9   or is it just very simply the plan was, we're meeting at Davis'

10  house in the morning, we go steal the cars, or we go to the

11  robbery, or you bail out of a stolen car and people are looking

12  for you.  What's the easier thing to believe?

13          We had to establish for you the telephone numbers.

14  Now, when I go through these slides, I want you to understand

15  that I cannot ask you, do we need to address the phones, so I

16  have to address things that may not even be an issue for any of

17  you.  So, I apologize in advance for taking up your time if

18  this is not an issue.

19          We know Moss' telephone number because that's what the

20  bail bondsman told us, and we also heard it from Joe Perez, the

21  agent who was investigating the drug organization.

22          We know Johnson's number because of the connection

23  with the direct connect number listed under Bro in Moss' phone

24  comes back to Johnson.  We also got it by the way from the

25  bondsman.

1    We know Brown's numbers were established through Lisa

2 McCarty and the bail bondsman.  Madison's number was

3 established by the bail bondsman.  It is subscribed to Swim

4 Club Madison or Madison Swim Club and he admitted it.

5    Davis' number was established by Facebook and his work

6 records.  There is one document in evidence and the Facebook.

7 That's his number, the 404 Atlanta number.

8    And Williams' number was established through the

9 telephone account notes, where it is customer, Hasam Williams;

10 customer, Hasam Williams.

11    And so what do we learn?  What happened in this case?

12 Lamons, Paul, and Clark, starting in 1998, robbed a check

13 cashing store, drugstore, Wachovia Bank in South Carolina, the

14 Brink's truck at First Union, and the check cashing store.

15    And even though that group was successful, Lamons

16 started with Paul, McCarthy, and Brown.  And leading up to

17 2004, did the Wachovia Bank, the Washington Mutual, the Brink's

18 at Sky Lake Mall.  They discussed the Bank of America at

19 Miramar where that guard was killed on 10/1.  They did the

20 Brink's in South Carolina.

21    But all of that came to an end when Lamons, McCarthy

22 and Brown got arrested in 2004.

23    In 2005, Lamons and McCarthy were held in custody, but

24 Brown was not.  And it is at this time that we learn from

25 multiple sources at this trial that Johnson introduced Moss to

1    Brown, Davis, Madison, and Williams.  Moss told you he had

2    never seen those people until 205.  But that's, I guess, just a

3    coincidence.

4            So a new crew is constituted:  Brown, Johnson, Davis,

5    Madison, Williams, Moss, and Maurice.  Johnson is going to

6    jail.  So, even though they planned the February 22, 2005, he

7    doesn't actually participate.  And there's a stipulation in the

8    record that shows that during February 22nd, 2005, Mr. Johnson

9    was actually in jail.

10           Another piece of evidence that corroborates Mr. Moss:

11   That Daryl Davis used a white van, and you're going to see in

12   the evidence that goes back with you that Daryl Davis did own a

13   white van back in 2005.  That Madison drove Hasam Williams and

14   Mr. Moss in a Jeep, that Mr. Moss was armed, that they had

15   traffic vests, and that Hasam Williams was armed and they made

16   their getaway in a second car.  And who stole those cars?

17   Brown and Madison.

18           The defendant practically admitted as much.  He would

19   steal cars with Brown.  Now, he gives you an explanation that

20   they would all end up at some chop shop.  Not a single car that

21   was used in this case ended up at a chop shop.  There is no

22   evidence that any car he stole ended up in a chop shop.

23           So brown, after the commission of this offense, he

24   goes into custody in South Carolina.  But Johnson gets out.

25   And what does Johnson do?  Suddenly, he has his cut.  He's got

1  a barbershop now.  He's got the Back Blues apartment.  He has

2  people selling drugs out of the barbershop.  He has Moss and

3  others acting as lieutenants in the Back Blues, and now he has

4  established his drug organization.  That's what's happening in

5  2005.

6          Who gets out in March of 2010?  Terrance Brown.  And

7  what's one of the first things he does?  He buys Mr. Madison

8  his phone, 7001.  What's one of the first things Toriano

9  Johnson does when Brown gets out?  He gives Nathaniel Moss

10  money to give to a police officer in exchange for three

11  bulletproof vests.  All of that happened before Bobby Madison

12  stole the car on 5/25, to which he has admitted.

13          What are they doing?  Is this a chop shop going on or

14  are they getting ready?  And why not?  Why not reconstitute the

15  same group?  They were extremely successful the first time.

16  Why change anything?

17          So, we have Brown, Johnson, Davis, Madison, Williams,

18  and Moss.  And like before, now they need stolen cars.  Who

19  stole the cars before?  Brown and Madison.  So, who's going to

20  steal the cars this time?  Brown and Madison.

21          What's the target?  Poor Ms. Kostrub's car.  Freshly

22  painted, stolen in Coconut Creek, just like the other cars for

23  10/1 were stolen, just like the license plate on the Infiniti

24  was stolen.

25          They need another car because Mr. Madison gets caught.

1   Remember what Mr. Madison said after he got caught, just like

2   Moss said, he never stole another car.  So who has to go steal

3   this car?

4          They go to a Walmart.  They buy some of the same

5   equipment that Madison has now given to the police department

6   when he got arrested.  And who's there?  Brown, Madison, and

7   Moss.

8          Now, understand that we do not have to prove as an

9   element of the case that Mr. Madison was there or any of that.

10  That was the testimony.  You can believe it or disbelieve it on

11  that point.  That doesn't mean you should throw out the rest of

12  the testimony.  But the strong implication is with the phone

13  records of the theft of that car, that Madison was involved.

14  He was there.

15         They needed a second car, the Infiniti.  That one,

16  they didn't need any tools.  It had a hide-a-key that somehow

17  they were able to find and now everybody is locked and loaded.

18         Mr. Brown has his green Nissan Maxima, which you saw

19  that everybody used.  Mr. Johnson has his Charger, which

20  everybody used.  Mr. Davis used his black van for work, and we

21  have the two stolen cars.

22         But first some other things have to occur.  There has

23  to be some surveillance of the bank.  And what do we know about

24  when the Brink's truck was at the Lighthouse Point bank?  On

25  the 12th of July, 10/17 to 10/22, July 13th, a little bit

1    later, July 14, even later, July 16th, even later.  Where was

2    it on July 19th?  At 12:37, it arrived and it left at 12:41.

3    And where was Mr. Johnson at 12:38?  He's at the tag reader

4    right next to the bank.  At 12:38, he is at the tag reader next

5    to the bank.

6         I'm sure you remember this, the cross-examination that

7    some member of the bank might have the same Chevy Traverse.

8    And we had to call Agent Perez on the stand to say, no, that is

9    the Traverse that belongs to Jermaine Parish's mother-in-law.

10        And what do the phone records show?  It is all

11   consistent.  The bank is being cased.  On July 20th, we've got

12   a little shift in time now, 11:42 to 11:43.  And what happens

13   on 7/21, the next day?  Back at the bank.  At what time?

14   11:15 and 11:16, the truck is there, and that car is still

15   circling.  Same car.

16        Now, just because we only have two tag readers or to

17   days of tag readers, we want you to understand that we do not

18   believe and we don't believe the evidence shows that there were

19   only two times that they went up there.  This is what the tag

20   reader caught.

21        You remember, Mr. Moss said that they would all drive

22   very close to each other.  And so maybe on other days, that's

23   what was happening or maybe on other days, Mr. Johnson didn't

24   just go on 29th Street; maybe he parked out across the street.

25   It is not important.  The important thing is that we know the

1   bank was being cased.

2          So what happens on July 26th?  Mr. Williams dresses up

3   like a woman.  Mr. Moss gets a traffic safety vest from Mr.

4   Davis.  Mr. Davis does the makeup on Mr. Williams.  They each

5   have guns.  They're going to use the Infiniti as a getaway car,

6   and they're going to use the second car, the Camry, as a second

7   getaway car.

8          Mr. Moss drives the Infiniti to the bank.  Mr. Madison

9   and Mr. Williams are in the Toyota Camry.  This is what Moss

10  said happened.

11         And sure enough what do we find?  That on July 26th,

12  the Camry is picked up at the tag reader at 1:43.  You heard

13  Mr. Moss say they had been there for a long time.  The Brink's

14  truck never came.  That morning, it came early in the morning

15  like it had never done before.

16         So, in a discussion about shall we go, shall we leave,

17  Mr. Madison and Mr. Williams at some point are outside of the

18  car and Brown and Moss both think that the way the police

19  spotted that stolen car is when Mr. Madison was using his

20  sleeve to get in.  You heard that testimony.  So that means

21  Madison at some point was out of the car.

22         So who gets back in the car?  The same people that

23  drove it up.  That was the plan.  Moss back in the Infiniti,

24  these two guys back in this car.  But the tag reader picks it

25  up.

 1          And what happens?  This is the Riva Motorsports video
 2   still, and I just want to draw your attention to the car dump.
 3   So we know that that happened.  Let's focus in.  How many
 4   people got out of the car?  One, two.  The person who got out
 5   first, out of the driver's, jumped over the fence.  You'll see
 6   from the maps that that's headed right toward the Riva
 7   Motorsports parking lot.  And then what do we see?  Somebody
 8   running through the Riva Sports parking lot, who matched that
 9   description.
10          Now, it has been argued to you that the video shows
11   nothing.  But I would argue to you that this video and these
12   stills do show something.  You can see from this last still
13   that the person is tall and skinny.  You can see that the
14   person has what appears to be long dreads, tied in the back,
15   just the way Mr. Madison wears it.
16          And what a coincidence that in the morning,
17   everybody's gathered at Mr. Davis' house, just like Moss said;
18   that Mr. Moss says it is those two in the car; that Moss said
19   Williams was dressed as a woman, and we found women's clothing;
20   that Mr. Williams was rubbing the makeup off his face; that
21   Moss saw Madison running through the parking lot.
22          And what do we know happened?  He ran through a
23   parking lot.  The cellphone data put 7001, which is Madison, in
24   the sector covering Riva Motorsports, and the call detail
25   record reveals Madison is calling Brown or if you were

1   believing the defendant, Brown is calling himself.  He's also

2   calling Davis and Williams frantically, frantic.  But at the

3   same time, he's also calling his girlfriend, the girlfriend's

4   restaurant, and then later in the day, his law enforcement

5   uncle.

6          We also know that Moss said that Madison said the only

7   reason Williams got caught was that they went in different

8   directions.  And what do we know from the video and from the

9   police?  They went in different directions.

10         Williams' statements about meeting this person at the

11  Swap Shop here is also relevant to identify the person who got

12  away.  All of this identifies the person that got away.  And if

13  Madison is in that car on 7/26, and you know that Williams and

14  the rest of the crew were going to do the Lighthouse Point,

15  then Bobby Madison was involved in the Lighthouse Point in

16  light of all the evidence.

17         7/26 is absolutely devastating to this individual.

18  That's why you have that crazy explanation, trying to explain

19  it away.

20         So on 7/26, things go bad.  They lose a car.  So on

21  July 26th, who stole that car, the Infiniti?  Moss and Madison.

22  I'm sorry.  Moss and Brown.  Who stole the Camry?  Brown and

23  Moss.  They don't have that car anymore.  What are they going

24  to do now?  What are they going to do now?  They just have the

25  Infiniti.  We know where we can get one.  The Miami-Dade worker

1   van.

2          But first we have to do surveillance, right?  You

3   can't just show up to Bank of America with nobody knowing the

4   plan.  Remember, they have to surveil because only Brown had

5   been there before prior to going to jail.

6          The Brink's truck gets to the bank on 9/10 at

7   approximately -- between 12:04 and 12:15.  And lo and behold,

8   what do we see?  The Charger is there.  The cellphone records

9   says that Brown is there.  And remember the time difference?

10  It is 11 minutes slow.  So we add 11 minutes, 12:16.  That's

11  pretty compelling stuff.

12         The Traverse is there, too.  Add 11 minutes to that.

13  And what does the phone records show?  Johnson is in the area.

14         So, now, we go to 9/17.  Moss has his vest, the gun.

15  They have all of their cars ready to go, but there's going to

16  be a change made here because Hasam Williams has to go to Court

17  in the morning, so they substitute Soldier.  And that would

18  make sense, right?  If Hasam Williams has to go to court, he's

19  got to fill the hole.  He brings in Soldier, just like you

20  heard Moss saying.  And what did we hear?  That, in fact, Hasam

21  Williams did have court that day.

22         So what's the plan?  He doesn't want a safety vest.

23  He is going to use his green hoody, and he has his own gun.

24         Let's look at Daryl Davis' van.  We talked about this

25  a little bit.  This is the surveillance picture.  Remember to

1    add 11 minutes.  This is a blowup.  This is the van that we

2    found.  That was the only van there at the time that this crime

3    occurred.  We tracked it down.

4         And what is similar about it?  You see that little

5    dent under the door?  There's the dent under the door.  That is

6    the van.  That van was there.  Daryl Davis was involved.

7         Now, I am going to admit, you do see a difference in

8    the turn signal there, but you would expect the county to fix

9    the turn signal that might have been different or broken in

10   2010 as compared to when this picture was taken just recently.

11        THE COURT:  One hour.

12        MR. GILFARB:  I'm wrapping it up, Judge.

13        On 9/17, that's when the Brink's truck is there, the

14   Charger is there, but there's no location data, but we see the

15   truck there.  We see the -- we see the Charger there.  And

16   there is Toriano Johnson as well.

17        Well, because of the panic, they have to get rid of

18   the Infiniti.  They get rid of the van.  Now, they get to two

19   more cars, which Brown and Moss steal.

20        But there's this new guy involved now, Parish, because

21   Madison is not allowed to drive.  He messed it up.  And what do

22   we see, just like Moss said?  Johnson took Parish to the scene

23   so he could check it out.

24        And what do we know?  That at 12:18, there is that

25   Traverse, and Johnson's at the scene.  No call data for Brown

1   and coincidentally, you also don't see the Charger.

2         10/1, we know how that's going to go down.  We've been

3   over that.  Parish is now the driver.  On 10/1, what do we see?

4   That's when the Brink's truck is there.  There's the Charger.

5   Add 11 minutes.  There's Brown.  And look at all of those calls

6   Brown is making.

7         This is the famous picture of -- that's the Charger --

8   I'm sorry, that's the Traverse.  You can see that's the

9   Traverse?  Remember that questioning?  If you look at the

10  video -- well, if you want to look at the video, I don't want

11  to take up precious time with going back over that, but you'll

12  see that you can clearly see the Traverse -- sorry -- the Chevy

13  insignia and the same shape of the front fender, not in this

14  picture, but as it turns a little bit and the sun is not

15  glaring directly into the front of the car.

16        But more importantly, what do we know?  There it is

17  leaving and making a right at 11:51.  I'm sorry, at 12:01.  And

18  what do we know about where Johnson is?  He is in the sector

19  covering 67, 69 Arbor, which is the pickup point for where they

20  dumped the second car.

21        Members of the jury, the evidence in this case is

22  overwhelming.  The evidence, for a lot of reasons, corroborates

23  what Mr. Moss told you.  Some of it came from the defendant's

24  own mouth.  Some of it came to light in ways that ensure that

25  it's the truth.  He told us go look for this, you'll find it,

1   and we did.  There were some things that he told us that we

2   already knew and it was true.  And then we have witnesses who

3   are incapable of lying, incapable of showing bias, incapable of

4   forgetting.  Phones and video.

5          Mr. Madison is also charged in this case with carrying

6   a gun.  Now, there's been no testimony that he carried a gun.

7   Under the legal theories that the Judge is going to give you, a

8   person can be charged with having a gun under certain

9   circumstances, which the Judge will instruct you.  He doesn't,

10  under the law, have to physically have it.  It doesn't event

11  have to be next to him under the law.

12         So when the Judge instructs you on possession, you'll

13  see that if Mr. Madison intended to exercise some control over

14  it in some way, did something to further the use of the gun, he

15  could have shared that gun with somebody even though he never

16  touched it, he could jointly possess it with somebody else.  So

17  we're not saying that he ever had a gun in his hands.

18         We are confident that at the end of this case that in

19  light of the overwhelming evidence, in light of all the reasons

20  we've given you about why Moss should be believed and why

21  Mr. Madison should not, that you will return a verdict of

22  guilty on all counts.

23         Thank you for your time and attention.

24         THE COURT:  All right.  Thank you.  We are going to

25  take a 10-minute break, and then we will return and hear the

```
1    closing statement from the defense.  So we will be back at --
2    well, let's make it even.  We'll be back at 10:45.
3         (Jury out at 10:32 a.m.)
4              THE COURT:  All right.  Just a couple of things before
5    I let you go.  First of all, did everybody have a chance to
6    review the jury instructions that were distributed last night?
7              MR. DISPOTO:  Yes, Your Honor, we have.
8              MS. GOLDER:  Yes.
9              THE COURT:  Any objections to the current form of
10   them?
11             MR. DISPOTO:  No, Your Honor.
12             MS. GOLDER:  Just the ones previously voiced.
13             THE COURT:  All right.  But they're in accordance with
14   what you understood that I said I was going to do?
15             MS. GOLDER:  Yes.
16             THE COURT:  All right.  Very good.  And Mr. Dispoto,
17   Mr. Gilfarb used an hour and five minutes, so you have 25
18   minutes remaining.
19             MR. DISPOTO:  Yes, ma'am.  Thank you.
20             THE COURT:  All right.  We will be in recess until
21   10:45.
22        (Recess at 10:33 a.m.)
23             THE COURT:  All right.  All rise for the jury, please.
24        (Jury in at 10:49 a.m.)
25             THE COURT:  Welcome back.  Please be seated.
```

1    Was there anyone who did not follow my instructions?

2  If you did not, please raise your hand for me now.

3    I see no hands, and I thank you for complying with the

4  instructions.

5    And with that, we'll hear the closing argument of the

6  defense.  Ms. Golder, you may begin whenever you're ready.

7    MS. GOLDER:  Okay.  Some of you, I've hardly seen.

8  You're hidden behind monitors and I'm seeing faces.  So I'm

9  going to try to position myself where I can see all of you and

10  you can see me.

11    First of all, Bobby and I both want to thank you for

12  your attention.  You've been a wonderful jury.  We know you all

13  take your jobs very seriously.  You've put your time into this.

14  You've been here every day for us, and we just want to thank

15  you.  We know that it's time out of your lives and it is an

16  important service you perform.

17    Let me start out by addressing a couple of matters

18  that Mr. Gilfarb brought up.  Who is the messenger?  He says it

19  doesn't matter who the messenger is.  Well, the Judge is going

20  to tell you, it does matter.  It matters very much who the

21  messenger is.

22    You're going to be asked to decide the credibility of

23  witnesses.  Not just Mr. Moss and Mr. Madison, but all

24  witnesses.  And it matters very much, and you're going to get

25  the special jury instruction that tells you kind of some of the

1   things that you can consider in that regard.  And you may

2   decide a witness is telling the truth about some things and not

3   about others.  You may decide that some people have more of a

4   reason to lie than others.  You may decide that some people

5   just weren't -- don't make very good observationists.  They

6   just don't observe very accurately.  And so it may not be

7   because they're lying; it may be because they didn't have a

8   good opportunity to observe the facts or they don't have a good

9   basis from which to be able to draw the conclusions they have

10  drawn.

11          And we all know with witnesses, things people see,

12  especially under times of stress, what they observe is not

13  always accurate.  And we've seen that here in this trial with

14  the people that came in and testified at first.  So credibility

15  matters.

16          Now, it seems Mr. Moss has become the Government's

17  best buddy.  I guess being a killer doesn't seem to matter

18  much.  Being a cold-blooded person, who executed a hard-working

19  man, doesn't seem to matter because here he is on the stand,

20  expecting that his sentence is going to be reduced, and they

21  know that and here they are, so to speak, in bed with the

22  devil.  But that's the case they have.  That's where they are.

23          This is the one person that they know was there and

24  did it on October 1st, 2010.  And it all starts on that date.

25  We're going to talk about who may have done things with Moss or

1    not.  But one thing I will tell you right up front, I believe

2    Mr. Moss did all of the things he told you he did, and that he

3    was present, and in some cases more involved maybe than he's

4    willing to tell you, but that he was there for all of this.

5    That's how he knows.

6          But you know what is seriously lacking?  Descriptions

7    of the meeting, the planning, the organization, getting

8    together, who's going to do what.  We haven't heard that, have

9    we?  Because I submit to you, this isn't as big a group as

10   Mr. Moss would have you believe.

11         Now, I don't represent anybody else but Bobby Madison.

12   He's my client.  And I'm sure you've all heard of

13   attorney/client privilege, and Mr. Madison and I get to talk

14   about what he does or doesn't know.

15         And this is a very difficult case because if he was

16   not there and part of all of this, he doesn't know.  And we can

17   go back after the fact and look at these call records and

18   everything else and talk about specific dates, but the first

19   time Mr. Madison was called upon to figure out where he was on

20   July 26th or September 17th or whatever was two years later.

21         Think about it.  Think about if you were asked today

22   to figure out where you were on March 3rd, 2010.  Now, unless

23   it is your birthday or your son's birthday or maybe, you know,

24   something big happened to you that day, you're not going to

25   know.  Nobody would.  Because that's reality.  That's just

 1  human.

 2         We don't tend to remember every little detail

 3  unless -- I know there was a TV show I used to watched, called

 4  Unforgettable.  Unfortunately, most of us are not like her

 5  where she could remember every little thing of every little

 6  detail if you ever saw the show.  Most of us can't do that.

 7         If it is not some important day or some event, I mean,

 8  and the older we get, it gets worse.  Some of us have trouble

 9  remembering what we did last week, let alone two years ago.

10  So, it is a difficult position to be put in if you're an

11  innocent person.  Because all of a sudden, you're being brought

12  to court, accusations are being made against you, and you're

13  sitting here trying to figure out, put the pieces together of

14  what happened.

15         I don't have the knowledge to know what Daryl Davis

16  says about all of this or Terrance Brown says about all of this

17  or any of the other people that are accused in this case.  I'm

18  not their lawyer.  I don't get to talk to them.  They're not

19  before you.  We don't know if they have other defenses or they

20  have other evidence.  We don't know.

21         All we can look at is what we do have, and in this

22  case, two very important concepts really prevail.

23         One is that the government always has the burden of

24  proof.  They have to prove guilt.  We don't have to prove

25  innocence.

1          And No. 2 -- so there's this presumption of innocence,

2    that they have to overcome.  And No. 2, they have to overcome

3    it with proof beyond a reasonable doubt.

4          And in the end Judge Rosenbaum is going to instruct

5    you on what that means.  But if you think about it, a

6    reasonable doubt means there's a answer for it.  It really is

7    not a hard concept.  But before you can convict somebody, you

8    have to find that there is absolutely no reasonable doubt left

9    in your mind.

10          Now, she says it is not beyond all possible doubt

11    because we can't get really farfetched.  Maybe he was on the

12    moon that day.  Well, you know, it is a funny thing about the

13    truth and reality.

14          Did any of you see the movie Fargo?  That was a big

15    movie that was out.  It was kind of a ludicrous story about

16    what happened.  It was a true story.  I was always a big fan of

17    Law and Order episodes, and some of them were just amazing the

18    stories.  You're thinking this could never happen.

19          I remember there was one story about a woman suffering

20    from a syndrome.  I can't think of the name of it, a German

21    name, where she was strangling her own babies.  And I think in

22    the Law and Order episode, they had her strangling like nine

23    babies before they ever caught up with her.

24          I kept thinking, this can't possibly happen.  And I

25    looked up the true case.  In reality, the woman killed

1   something like 16 babies before they found her.   Truth can be a

2   strange thing.   Reality can be a strange thing.   So just

3   because something seems unusual, it doesn't mean it is not

4   true.

5          In this case, the Government mentioned, and I'm just

6   going to touch on a few things quickly to get them out of the

7   way.   Very briefly, the Government mentioned on the stolen

8   property case with Mr. Madison, and he talked to you about what

9   happened and how it happened.   He bought the trains.   He sold

10   them, and the trains were stolen and so forth.

11          Keep in mind in that case when you understand

12   Mr. Madison's testimony and yes, he pled guilty, after sitting

13   in jail for 98 days, and confronted with a choice, and this

14   happens unfortunately a lot in our justice system, 98 days

15   you've been sitting in jail, plead guilty today, you get out or

16   sit there another three weeks, four weeks, two months, three

17   months until you wait for your trial, until we can all get to

18   you.

19          Most people are going to say at that point, especially

20   for Mr. Madison, he had already been a convicted felon from his

21   previous car theft, most people are going to say, I'll admit

22   whatever you want me to admit; I just want to get out of here

23   at this point.

24          And that's what Mr. Madison told you happened, is,

25   yes, he went before the judge and he admitted, he admitted what

1    he had to admit.  Okay?  It is really a nonissue.

2           Did he sell the stolen trains?  Yes.  And did he agree

3    to pay the person back?  Yes.

4           The Walmart receipt is a funny thing because when you

5    look at that, there's something on there for $7.98 that says

6    mini mag.  I assume that's a flashlight.  But then there are

7    two other items on there for like 57 cents and a dollar

8    ninety-eight.  Those are the cheapest screwdrivers I ever heard

9    of in my life.  And, of course, where are the gloves and where

10   are the other things that were supposed to be there that were

11   bought that day?

12          I don't know what that receipt is.  And I submit to

13   you for whatever it is worth, it is worth nothing.  It doesn't

14   corroborate anything.  It is not evidence of anything.  Maybe

15   Moss did go to a Walmart with Brown and buy things, but you

16   know what?  Every time he told the Government about it, Bobby

17   Madison was not a part of it.  And yet, somehow he comes into

18   trial before you and all of a sudden, Bobby Madison is there.

19          So how do you know he is lying?  Because he's making

20   that up.  But do they care?  No.  Because the truth is what the

21   Government wants it to be.

22          Who is going to decide whether Mr. Moss gets that

23   motion before the judge to reduce his sentence?  They are.  I

24   went through this with him.  He doesn't get a time cut unless

25   the Government certifies to the judge that he supplied

```
1   substantial assistance.  So they are the ones initially that he
2   has to please.  They decide if he is telling you the truth.
3   And the truth is what works for them.
4         So, he could be totally lying, but if the Government's
5   like all for it, he is going to roll with it.  And here, he
6   suddenly threw Madison in where he wasn't.
7         Another time he threw Madison in where he wasn't.  We
8   talked about -- talked about the car thefts and how it was Moss
9   and Brown who stole all of the cars that were used for every
10  incident that we know about.  The cars that were used were
11  stolen by Moss and Brown.  I believe Mr. Moss did all the
12  things he said he did.  I'm not going to comment on whether he
13  did them with Mr. Brown or not.  Maybe he did, maybe he didn't.
14  That's for Mr. Brown and another day.
15        Mr. Moss stole those cars.  I have no question about
16  it.  Okay?  Was Bobby Madison over there?  He never told him he
17  was.  When is the first time he ever mentions Bobby Madison
18  being somewhere?  Here in court.  After he's been prepared for
19  trial and he's probably confronted with phone records that say,
20  well, Madison's phone was there, all of a sudden, Madison is
21  there.  How did he come to meet with the agents?  They said
22  hundreds of photographs.  We went through at least like half a
23  dozen debriefings where he met with agents to go over facts and
24  we discussed.  Never does he put Madison there.
25        He's lying.  He lied.  He lied for your benefit
```

1  because whose trial is this?  Madison.  And, obviously, he has

2  a reason to want to get back at Madison.  But you know he

3  didn't tell the truth because he's never put Madison there

4  before in all of the debriefings and all of the information.

5          Another comment very quickly.  The Government showed

6  you a video of the person running through Riva Motorsports.

7  You saw the arrest pictures of Mr. Madison.  His hair was

8  like -- his dreads were up here.  His dreads were not long.  I

9  mean, you're looking at Mr. Madison two years later.

10          But they're in the evidence and the photographs of

11  Mr. Madison that Mr. Gilfarb put up on the slides, his dreads

12  are up here.  They're not hanging down his back.  In 2010, he

13  didn't have long dreads that hung down his back.  And I am

14  requesting to submit to you as we go through and walk through

15  this, that the person in the car, Hasam Williams that day, is

16  Nathaniel Moss and we'll get to why in a few minutes.

17          The Government also put up on the screen during their

18  closings, Mr. Gilfarb, the calls that Brown made on

19  October 1st, the day of the robbery/murder.  All of these calls

20  to Daryl Davis and all.  You will see almost an exact pattern

21  of phone calls that they put up there to what's being done on

22  Bob Madison's phone on July 26th.  So that corroborates the

23  fact that this is Brown.  For some reason Brown is in touch on

24  a really regular basis.  And they're all like 20, 30 seconds.

25  These are not conversations going on.  It is like 20, 30

1    seconds of Daryl Davis' phone, Daryl Davis' phone.  On

2    July 26th, it may be Madison's phone doing it, but on

3    October 1st, it is a different phone doing it.

4         And one of the things we heard is that Brown changes

5    phones all the time.  Because think about it.  Let's think

6    about who the group is.  And Mr. Gilfarb put it up on the

7    screen because this group formed in 2005 when Toriano Johnson

8    gets out of jail and he forms the group that becomes the

9    barbershop in the Back Blues.  And it is a group of people.

10        And Agent Perez testified about it, with the wiretaps

11   and the surveillance they did.  You saw some of the photos.

12   This was a group of people that hung out together, that had

13   common interests and purposes, including drug distribution out

14   of the barbershop and the Back Blues down in Opa Locka.

15        And you heard over and over and over again, Bobby

16   Madison was never part of that crowd.  He never ran with that

17   crowd.  He never hung with that crowd.  He wasn't part of that

18   group.  But a lot of the others we've talked about in the case

19   were, in fact, most of them.  The only other one who really

20   wasn't part of that group is Daryl Davis.

21        Mr. Gilfarb made a lot of what Officer Starkey says

22   happened in a meeting with Bobby Madison when he asked him

23   about certain things.  Well, one thing we know that was

24   confirmed by numerous witnesses is that Brown and Madison and

25   Davis all met while working at Norwood Park.  Brown and Madison

1   were lifeguards.  Daryl Davis did the maintenance there.

2   That's where they all met.  And I think even Mr -- it may have

3   been Moss, it may have been some of the others, that verified

4   that that's what happened.  They all worked there and they all

5   met there.

6          Officer Starkey, at the end, came in to say, oh,

7   Madison was really running drugs, which is, of course,

8   inconsistent with what you heard about the drug running that

9   went on.  He was not part of that group.  And he was really

10  running drugs with these people.

11         But when?  Well, it could have been six weeks ago, it

12  could have been 15 years ago.  He didn't bother to ask?  He

13  didn't bother to check.  He cared so little about whatever the

14  statement was that was made that there was no follow-up about

15  it.

16         Now, look, none of us like to think that police

17  officers lie.  I certainly don't.  I would never assume that a

18  police officer is lying to me, and even though we know some do.

19  But most, I think, are good law enforcement officers.  But

20  they're human.  They make mistakes.  And when you're

21  interviewing hundreds of people and, of course, we know the

22  extent of what the investigation that went on in this case,

23  plus there's the ongoing drug case, and this isn't his only

24  case, I guarantee you, all of the hundreds of people that

25  they're talking to and interviewing with, just mistakes get

1    made.

2         I asked him about one mistake because the very -- one

3    of the initial interviews of Moss lists a Bobby Davis.

4    Remember, I asked him about that?  Was this Bobby Madison?  Was

5    this Daryl Davis?  The report listed a Bobby Davis.  And he

6    admitted that was somebody's mistake, and he claims recently

7    they went back and corrected it.  But there's a report that I

8    asked him about that he acknowledged where they talk about a

9    Bobby Davis, and there is no Bobby Davis.

10        So they make mistakes.  There was another incident

11   when I was questioning Moss and I was using a report and we

12   were trying to figure out what date that interview was because

13   it wasn't on the report.  And I had to go to the prosecutors

14   and we all finally figured out what day it was that the

15   interview occurred.  But once again, there were mistakes made.

16        And nobody is here to crucify police officers or

17   whatever, but when you look at information that's being said

18   and all of the work that's being done, you have to understand

19   mistakes get made, things get misunderstood.  And that's what

20   we submit to you probably happened there.

21        Now, the Government -- the Government has done what it

22   can to try to confirm the stories of Nathaniel Moss.  There's

23   just one problem.  There's a lot that they just can't confirm.

24   And as I said, I have no dispute that Nathaniel Moss was

25   involved and did all of these things.  The question is who did

1   he do them with.

2           He knew, he knew what cars would be at the bank

3   because he was there.  There's no question.  He was there and

4   he did these things, so he would be able to say what cars are

5   at the bank.

6           He knew that prior to October 1st, there were other

7   incidents.  He knew.  That doesn't prove who was with him doing

8   those things.

9           He knew about the stolen cars because he's the one

10  that stole them.  Remember, every car that was stolen, he's the

11  one that stole it.  So he would know.

12          He knew what cars everybody drove.  He knew about the

13  Charger and the Traverse and everything else because he was at

14  the barbershop all of the time.  He cut hair.  He was part of

15  the Back Blue crew.  He was a lieutenant, which is pretty high

16  up in that drug distribution organization.  He knew what cars

17  everybody drove.  So he knew all of that.  None of that proves

18  that Bobby Madison was part of that crew.

19          And the Walmart receipt, as we've discussed, doesn't

20  support anything.

21          Now, remember his whole story about, well, Madison

22  couldn't steal the cars because he got caught stealing a car

23  before?  Let's talk about that a little bit.  We know that

24  May 25th, 2010, Bobby Madison gets caught stealing a car.  Not

25  exactly the kind of car this group was using for getaway cars.

1   Their cars were white or silver, something muted.  And we

2   called Mr. Lamons because he's an interesting witness.  He's

3   the origin of it all.  If, in fact, Terry Brown was doing this

4   and organizing this, everything Terry learned, he learned from

5   Mr. Lamons and working with that crew.  And so there were

6   certain kind of cars that they would use, cars that would blend

7   in as Mr. Lamons told you.

8          You're not going to want a big flashy car because it

9   is going to draw attention.  You're trying to get away

10  unnoticed.  They would use SUVs just in case they had to jump a

11  curb or something like that, but then they didn't go far in

12  that.  And in Mr. Lamons' group, they would burn that car.

13         Here we've heard of them just abandoning the car, but

14  getting into basically a neutral car to drive away, in a white,

15  silver.  You saw.  July, September, October, the cars are

16  white, silver.  None of them are bright red like the car stolen

17  in May.

18         Why would you steal a car in May to be used in July?

19  And the Government claims, well, they were getting these

20  ballistic vests and things like that.  Well, you didn't hear

21  one piece of testimony, even from Mr. Moss, that anybody was

22  meeting back in May to organize an armored car robbery.

23  Nothing.  Not a single meeting, not a single telephone record,

24  not a single observation of the group, including Bobby Madison,

25  meeting in May.

1      May 25th is when Bobby gets arrested for stealing a

2   car.  And I submit to you that that had absolutely nothing to

3   do with this.  It had nothing to do with armored car robberies.

4   It had nothing to do with what happened in July or September

5   and October.

6      Another curiosity here is, we heard from Mr. Lamons

7   how Terry Brown was kind of interested in this Miramar

8   location.  And Mr. Lamons told you why it was not a good

9   location to rob.  And kind of interesting because everything he

10  said turned out to be true, didn't it?  About how out in the

11  open it was, how quickly it could be accessed by law

12  enforcement, all the things that made him say that is not a

13  good spot.  That's not where they first go, according to Mr.

14  Moss, to rob anything.

15     He claims the first thing happens in Lighthouse Point.

16  And there's no question that we see these cars in Lighthouse

17  Point, and that Hasam Williams gets arrested near there.  But

18  what Nathaniel Moss and Hasam Williams were doing there, we

19  really don't know.

20     The only way Nathaniel Moss and, remember, what he

21  told law enforcement every time he was debriefed in an

22  interview, was that he saw the police car get behind the silver

23  car and that was the last thing he saw.  Every interview before

24  trial, that was his story.  Police car got behind the silver

25  car; that's all he knows.  That's what he told law enforcement.

```
1    Until he was here in trial where he found out he may not have
2    seen it, but at that point, he knew about this Riva Motorsports
3    video and all the other stuff because, of course, we all have
4    discovery.  He knows what's going on because it's him.
5          He's the one with Hasam Williams in that car.  He's
6    the one that went with Hasam Williams to commit some sort of
7    robbery.  The reason the car gets picked up by the tag reader
8    is because there is no car behind it like you heard him talk,
9    you know, where it was so the tag readers can't see it; we get
10   in and sandwich the stolen cars so they can't pick us up.  That
11   doesn't happen.
12         And the reason he knows what's going on is because
13   he's the one jumping the fence, he's the one running through
14   the Riva Motorsports, and he is the one escaping that day to
15   leave Hasam Williams getting arrested.
16         Now, Hasam Williams may not be willing to testify
17   against whoever it is that was with him that day.  But one
18   thing you know is, there's absolutely no relationship between
19   Hasam Williams and Bobby Madison.  None.  Nobody has ever
20   claimed there was.
21         Hasam Williams has no reason to protect Bobby Madison.
22   There is a relationship between Hasam Williams and Nathaniel
23   Moss.  Those two were at the barbershop shop together.  They
24   were in the Back Blues together.  They're both part of that
25   group.  And Hasam Williams, if he's going to protect anybody,
```

1    that's who he's going to protect.

2          So, how does Nathaniel Moss know these things?  He's

3    there and it's him.  But to admit that doesn't help the

4    Government in the prosecution of anyone else, does it?

5          So another strange thing:  He claims that Bobby

6    Madison gets arrested stealing a car, and that's the reason

7    Bobby Madison didn't steal these other cars.  He got caught

8    stealing a car so he can't steal another car.  But he can be a

9    getaway driver in an armed robbery?  Does that make sense to

10    you?  How does that make sense?

11          Okay.  Bobby Madison is a car thief.  And Bobby has

12    admitted that.  He has history of stealing cars.  Okay.  No

13    violent crime ever.  He has a history of stealing cars.  So, he

14    gets arrested for stealing a car.  And we know Moss knows about

15    it because he and Toriano Johnson are like this.  He is working

16    in the barbershop and everything else.  And we know from the

17    bondsman, that the bondsman is contacted by Brown, Terrance

18    Brown and Toriano Johnson to bail Bobby out.  Every time Bobby

19    has a court hearing, they call Toriano Johnson.  And the agent

20    who was monitoring the wiretap even confirmed at one point,

21    they picked up a call where the bondsman is calling Toriano

22    Johnson to say, hey, tell Terry Brown, Bobby has to be in court

23    whenever.

24          So, Moss knows about Bobby Madison's arrest.  He may

25    not have known about it right on May 25th, but he knew about it

```
 1   shortly thereafter from hanging out at the barbershop.

 2           There's nothing about that arrest that would prevent

 3   Bobby from stealing a car as opposed to being the getaway

 4   driver in an armored car robbery.  That story doesn't pass the

 5   common sense test, just like Moss had claimed that Hasam

 6   Williams' arrest on July 26th would prevent him from being a

 7   robber later on, but he could still be there as part of the

 8   group.

 9           And the other thing that's really bizarre that truly

10   doesn't pass the sense test, the reasonableness test, is he

11   claims that Madison screwed up.  Every time Madison screws

12   everything up.  July 26th, it is Madison's fault that Hasam

13   Williams gets arrested.  But yet, they use him again.

14           September, oh, Madison screwed up because there are

15   police all over the place.  There's an accident on the corner

16   and the police cars are sitting there.  There is a police car

17   in the IHOP, which is in the parking lot of the bank.  So the

18   cops are right there.  But Bobby Madison screwed up because he

19   didn't want to go through with the robbery right in front of

20   police officers.  And so they kick him out of the group, but he

21   is such a screw-up because he's messed this up every single

22   time and he hasn't stolen any of the cars because he can't

23   steal the cars and nothing he's done has been right, but

24   they're going to pay him.  They're going to pay him from

25   October 1st.  They're still going to pay him.
```

1          Pay him for what?  What are they paying him for?

2    They're not paying him for stealing cars because he didn't

3    steal the cars.  They're not paying him because he did such a

4    good job because nothing ever worked out.  So, what are they

5    paying him for?

6          Now, the Government will say, well, if Moss was going

7    to burn him, he would have just, you know, put him there on

8    October 1st.  Moss knew better.  First of all, Moss had eight

9    months to figure out what he was going to tell the Government.

10   Remember?  He gets arrested October 1st.  His very first

11   debriefing happens June, 2011.  He has eight months to figure

12   out what he's going to tell them.

13         He has eight months to review discovery in his own

14   case, which is all what happened October 1st and the killing of

15   that guard, forensics, everything else.  It is a little hard to

16   put Bobby Madison in that day.

17         It is a huge risk because the Government -- somebody

18   got killed.  The Government's on that.  The Government's there

19   the day it happened.  They have all of the information on that

20   case.  So, if he puts somebody else in there who wasn't, that's

21   going to raise flags.  But he doesn't have to.  Because all he

22   has to do is say, well, he was going to get paid and that makes

23   him part of it, you see, because you're going to hear all these

24   instructions from the Judge about federal law and aiding and

25   abetting and conspiracies.  And how, as long as you do any

1  little thing, you become responsible for what everybody else

2  does.  And Moss knew all of this because he is sitting in jail

3  for eight months, going through all of this with his lawyers.

4         DNA evidence, DNA evidence linked with Nathaniel Moss

5  to what happens on October 1st.  Remember, they tested the

6  clothing that they found and everything else.  And there's a

7  stipulation that we entered into saying Moss' DNA came back on

8  that stuff.

9         But the things they found from the July 26th arrest of

10 Hasam Williams -- and you'll see actually -- you can see on

11 here the holes where they checked the DNA.  These garments were

12 all tested.  No matches, not even to Hasam Williams.

13        So, once again, we don't know who did what on

14 July 26th.  I can't tell you, I wasn't there, who was wearing

15 the ladies clothing.  Was it Hasam Williams or was it somebody

16 else?

17        That video of Hasam Williams, I'm not going to take

18 your time up now, because we're limited on time, playing it for

19 you, but if you play it a little further on beyond, you know,

20 where he is wiping something off his face, you'll see he's

21 wearing a pair of pants that's -- you can fit two of him in

22 there.  The pants are like out to here.  They are at least

23 three or four sizes too big, and it is in evidence.  You can

24 look at it.  I'm not going to spend your time now.  But it is

25 in evidence and you'll have the ability to look at it and

1    confirm what I'm telling you.

2            He's wearing a pair of pants.  I don't know whose they

3    are, where he got them.  I can't imagine trying to run away

4    from the police in them because they don't even stay up.  He

5    stands up at one point, and the pants are like out to here.

6    And so it's bizarre.  It is just bizarre.  And I don't have the

7    answers for you as to what happened that day, but there are

8    more questions than answers about what happened.

9            Let's talk about the telephone records because I agree

10   with Mr. Gilfarb:  There's one thing that doesn't lie, and it

11   is phone records.  The July 25th to 26th records, we spent a

12   lot of time on those.  What it shows -- and, of course,

13   Madison's phone, you know, it is only on for about -- it is

14   on -- it is activated in April and by September, it gets turned

15   off.  So, it makes sense if you use your common sense that

16   after -- that Brown bought the phone, gave it Bobby to use, but

17   it is there for his purposes as well.

18           After Hasam Williams gets arrested, he doesn't pay the

19   bills on that phone any more.  He is onto his next phone or

20   group of phones.  And we heard about how this group, the whole

21   barbershop crowd, Back Blues crowd, constantly were rotating

22   and switching phones.  Why?  Because they're drug dealers and

23   they don't want phones associated with them.  When you're in

24   the drug business, you're not going to maintain your phone a

25   long time.  It kind of makes it difficult for law enforcement

1    because they have to get a wiretap.  You have to get it on a

2    phone.  And so if that phone is shut off and the next phone is

3    turned on, it makes it a little hard for the Government to keep

4    up with them.

5            Plus we heard from the agents how Brown's always using

6    other people's phone, making phone calls on Toriano Johnson's

7    phone, walks off with another guy's phone.  Using different

8    phones so that one phone cannot be associated with a particular

9    person.  It makes it a lot harder to get wiretaps and so forth

10   if you're a drug dealer.

11           Matrix shows that that phone, the 7001 phone, is where

12   Madison lives in Inverrary on 7/25, the day before until 1:00

13   o'clock in the afternoon.  By 2:15, that phone is in Miami

14   Gardens.  Three things are in Miami Gardens in very close

15   proximity:  Daryl Davis' house, the Norwood Park and pool, and

16   Brown's house.  And you saw in the map how close together they

17   all are.

18           The phone is down there from 2:15 in the afternoon

19   until almost 10:30 at night.  10:23 at night.  By 10:52, the

20   phone is at Oakland Park Boulevard on its way to Lauderhill.

21   And at that point, the phone, it looks like it is on its way

22   back.  At 2:00 o'clock in the morning on July 26th, that phone

23   gets a phone call.

24           Now, when it was down in Miami Gardens, like I said,

25   it is hard for us to know exactly what happened with the phone

1    that day because this wasn't a date that was etched in

2    anybody's mind.  I can't tell you if Brown had the phone or if

3    Bobby was down at the pool hanging out at Brown's house and

4    whatever.  We don't know.

5         But the phone is down in that area.  At 2:00 o'clock

6    in the morning, that phone is back in Inverrary and it gets a

7    phone call from Brown's phone, the 4240 phone.  Bobby tells you

8    this is Brown saying he needs to get the phone.  We don't know

9    what else happens.  The phone is not real active at two in the

10   morning, but what we know is that at 9:50 a.m., the phone is

11   still in Inverrary.  Okay?

12        So, almost 10:00 o'clock the next morning, July 26th,

13   the date Hasam Williams gets arrested, the phone is at

14   Madison's house until almost 10:00 o'clock in the morning when

15   he says Brown picks it up.  And then there is like no activity

16   on the phone, nothing, until it gets into the Deerfield area.

17        This looks like the phone is being used as what they

18   called a drop phone because what did Moss say was part of the

19   plan and Lamons told you the same thing, they were using

20   walkie-talkies, you do not use your personal phone when you're

21   doing this.

22        So, it -- I mean, Bobby Madison would have to be the

23   stupidest person in the world.  Moss says, oh, we all had drop

24   phones.  We didn't use our personal phones.  So, how stupid --

25   and he says specifically that, oh, Madison had a drop phone.

1   Well, how stupid would Madison be to use his own phone?  And

2   that phone does nothing except, all of a sudden, start calling

3   Daryl Davis, just like it does on October 1st when you know

4   Madison isn't there because he is, thank God, in court and

5   something happened that day where we're able to track where he

6   was, you know, because when he goes to Brown's house, he's

7   alerted October 1st is a big day.  So, the phone is behaving

8   the same way that Brown's phone behaves on October 1st.

9          It's Brown.  It's Brown using the phone.  Do I have to

10  convince you positively?  No.  You just have to have a question

11  in your mind, could this be Brown?  And if the answer is yes,

12  then you cannot find Bobby Madison guilty.

13         From there, the phone goes back to Miami Gardens after

14  the Deerfield area, and it doesn't go back to Madison's house

15  in Inverrary until 9:30 at night.  This fits with Brown's still

16  is having the phone and using the phone.  Now, whether I -- I

17  can't tell you whether he referred -- returned the phone

18  Madison at Norwood Park or whether he drove the phone back.  We

19  don't know because there's no activity on the phone to be able

20  to track it back and forth.  But we know that 9:34 p.m. is the

21  next time we see it back in the Inverrary area.

22         What does this prove?  What conclusions can you draw

23  from this?  Not enough, not enough.  We just don't know.

24         During this period of time, Brown's phone is inactive.

25  If you look at the phone records of Madison, there are only two

1    times in those phone records where that phone ever talks to

2    Daryl Davis.  And that is on July 19, when Brown is supposedly

3    here doing surveillance and in this July 26th time period.

4    That phone never ever talks to Daryl Davis other than those two

5    time periods, once again, confirming Bobby's story that he and

6    Daryl Davis are not good buddies.  He told you he and Brown

7    are.

8         If Bobby's lying about that and he is such good

9    friends with Daryl Davis, we should see communications on a

10   regular basis, just like you will with Brown.

11        Hasam Williams, the Hasam Williams video, he tells a

12   story about where he was before he gets arrested.  I don't know

13   whether he's telling the truth or not.  Do you?  Do you really

14   know he's telling the truth or not?

15        You may not like the way he looks.  I mean, we say he

16   is a pretty disgusting guy.  There are things happening there,

17   but there's nothing about that video that puts Bobby Madison

18   anywhere.

19        And this business about the Swap Shop.  Who in

20   Fort Lauderdale hasn't been to the Swap Shop?  Everybody goes

21   to the Swap Shop.  It is like common thing.  And bobby told

22   you, he is very close to a guy that sells the fishing tackle

23   there.  He goes to that store all the time.  He doesn't work

24   there.  He is not employed there, but he is there frequently.

25        I mean, if that was such a big key piece of

1  information, why would he suggest that the agents meet him

2  there?  He has to be the dumbest guy on earth.  I mean, really.

3        We talked about the gaps in time and the Lighthouse

4  Point incident, and then it is like another two months before

5  anything happens.  Well, there's no robbery that occurs in

6  July.  I mean, Hasam Williams gets arrested, but there is like

7  no law enforcement interest.  There's no nothing.

8        So, I have a couple questions for you.  Why don't they

9  go back to Lighthouse Point and why do they wait two months?

10  We don't know.  We don't know.

11        And, of course, Moss talked about all of the lookouts

12  in September.  Remember, they didn't go through with it because

13  Bobby screwed up?  Why would you have all those lookouts?  I

14  kept asking him why would you have all those lookouts if their

15  whole purpose is to look out for the police, and then wouldn't

16  go through with a robbery when the police are right there?  So

17  once again, the story doesn't make a whole lot of sense:  This

18  whole business of that's why we kicked him out, that's why he

19  is not there on October 1st.

20        Madison had to have some reason for why, all of a

21  sudden, Madison is part of the group and then he is not.

22  Because we know he is not on October 1st.  But his explanation

23  doesn't make any sense.  And the reason is because Bobby was

24  never part of the group.

25        And if you're going to replace Madison with someone

1    else, then you got to give that other person a cut.  And what

2    did Robert Lamons tell you very clearly?  The more people you

3    have, the more people have to be cut in, the fewer -- you're

4    taking all this risk to commit a crime that can be done with

5    three people.  Lamons told you, three people initially could

6    commit this crime.  And all of a sudden, you're going to use

7    seven or eight people, all being cut in?  Why?  Why?  And if

8    they're there to look out for police and police are there

9    anyway, why?

10         And I submit to you because Moss is including people

11   in the group that he might -- maybe he has reason to have

12   vendettas against some of these other people, too.  I just

13   don't know.  I just know he has real good reason for wanting to

14   get back at Bobby Madison, and that concerns the whole

15   situation you heard about Irih Small.

16         By the way, that wasn't just made up.  Moss pretty

17   much admitted it on the stand.  He didn't admit that he knew

18   Bobby slept with her, but he admitted that in 2008 or 2009, he

19   and Bobby got into it and he found out about Irih and Bobby and

20   he got mad, and he acknowledged that.

21         The 2005 robbery, I have no doubt Moss committed a

22   robbery in 2005.  He probably did.  He probably did rob that

23   armored car in 2005.  That doesn't mean Madison did.  The poor

24   guard who got robbed, he sat there and got a good look at his

25   assailant, stared Bobby Madison in the face just as he stared

1   the driver of that car in the face that day, and never said,

2   hey, you know, what I'm sitting here, I recognize that guy.   It

3   wouldn't be the first time that happened, but it didn't.

4   Because he didn't recognize Bobby Madison because Nathaniel

5   Moss may have very well robbed that armored car, but Bobby

6   Madison did not and you have no corroboration that Bobby

7   Madison robbed that armored car.

8         And they have the green Jeep, which should have the

9   DNA in it.   Right?   No DNA.

10        And the timing of that robbery, let's talk about the

11  timing of that robbery.   That robbery occurs February 22, 2005.

12  The stipulations are in evidence.   Terrance Brown starts trial

13  in North Carolina -- South Carolina on March 1st.   Now,

14  remember, February only has 28 days.   So six days after this

15  robbery, Brown begins trial in South Carolina for this exact

16  same kind of conduct.   Awfully ballsy if Brown did this.

17        And you know, we sit here and look at did Brown do it,

18  didn't Brown do it?   Maybe he needed the money for legal fees.

19  But Moss contradicts that because he talks about this whole

20  thing about hiding money in the wall of Toriano Johnson's

21  mother's house and Toriano Johnson gets out and gives Brown

22  money for legal fees.   Well, why would he have to give Brown

23  money for legal fees if Brown just committed this armored car

24  robbery where they got almost $600,000?

25        So, once again, I have no doubt that Moss did this,

1    but who was with him when he did it, we don't know.

2          The only thing I can tell you is there is no proof

3    that Bobby Madison was there.  And, of course, Bobby's not

4    charged with that robbery here.  That robbery is only being put

5    before you for very limited purposes, which is to say there's a

6    common scheme and plan here or some sort of similar modus

7    operandi or whatever that you can consider as to whether it was

8    not a mistake or accident, that somebody really did participate

9    in this because they knew how it all worked and they did it

10   before.

11         But this wasn't the only crew doing robberies like

12   this.  You heard from Lamons how he had a crew that had nothing

13   to do with any of these people initially.  They were doing

14   robberies with the disguises and the construction vests and

15   everything else.  It is not a unique thing what they were

16   doing.  They are not the first and only crew to rob armored

17   cars this way, unfortunately.

18         And talking about the 2005 robbery, remember, the

19   trial in South Carolina is like six days later.  And

20   Mr. Gilfarb asked Bobby Madison whether he was up at that trial

21   and sat and heard the testimony against Brown, and he was.

22   Well, he would have to be, once again, the dumbest person in

23   the world to have just committed an armored robbery and then go

24   up there and sit in that trial with law enforcement who are

25   Brown's buddies, who are Brown's friends.

```
 1                And when you look at the documents of what went on in
 2   that case and what ultimately Brown pled guilty to, the crime
 3   itself has to do with transporting money across state lines,
 4   but what you'll see, he pled guilty to was stealing the cars
 5   that they used, including stealing the car that they used to
 6   transport the money across state lines, and that's what he pled
 7   guilty to in that case.  He never pled guilty to being part of
 8   that robbery crew in committing those robberies.
 9                So, when they talk about Bobby Madison should have
10   known he was a robber, no.  Bobby Madison knew he was a car
11   thief.  But the robberies, it is perfectly believable that he
12   believed his friend that he had nothing to do with robberies.
13                Let's look at this, when cars be being stolen, because
14   somehow the Government is trying to connect the May 25th arrest
15   of Bobby Madison for stealing a car to attempted robbers that
16   occur at the end of July and the end of September and then, I
17   guess, October 1st.  It doesn't make sense.
18                Forget about even the color of the car, that you would
19   steal a bright red car, let alone you would steal a car in May
20   that's not going to be used for two months.  It is a stolen
21   car.  Where is it going to sit?  Where is it going to be?  What
22   are you going to do with it for two months?  What's going to
23   happen to it?
24                It is not like the Infiniti that they use where they
25   had a key.  This thing had the steering column busted out.
```

1   Where is it going to be for two months?  There's no talk.

2   There's absolutely no evidence that anybody was going to rob

3   any banks in May.  Absolutely nothing before you about that.

4   No planning meetings, nobody getting together to discuss it,

5   nothing in May.  So, here we have the car being stolen in May,

6   and nothing happens until July.

7           Look at when they stole the other cars.  And it is all

8   in evidence.  There are stipulations giving you the dates.  In

9   that 2005 robbery that Moss did, that Jeep that they used was

10  stolen the night before the robbery.  The Honda Accord they

11  used as the second getaway car, that was stolen five days

12  before the robbery.  The July, 2010, incident, that silver

13  Camry they were driving, that was stolen about two weeks

14  before.  The burgundy Infiniti, about two weeks before.  The

15  September incident, the white Camry that they used, about ten

16  days it was stolen before the robbery.  The October incident,

17  October 1st, the silver Civic, stolen two to four days before

18  the robbery and homicide.

19          You're not going to steal a car two months before,

20  especially one with a busted out steering column and all to

21  have it sit around for two months.  You're going to steal it

22  shortly before you're going to commit the crime.  I mean, it

23  just -- that incident is not related.

24          You've heard a lot about when Bobby Madison showed up

25  at Brown's house that afternoon October 1st.  It was a Friday.

1   We all know that that's when they play the high school football

2   games and the peewee football games and all of that.  And

3   Bobby's there at a time when it makes sense that he's going

4   down there to go to the football game with Brown, and he walks

5   into a mess.  He walks up initially and he sees these police

6   cars.

7        Does he walk away or just keep walking by like not me?

8   No.  What does he do?  He sits down in Terrance Brown's front

9   yard for a half hour to wait in front of the police.  Is that

10  the actions of somebody who knew what was going on and had a

11  guilty mind?  He sits there in front of the cops waiting for

12  Brown.  And when Brown doesn't show up to go to the football

13  game, and you'll hear that Brown is off that afternoon at 3:30

14  in the afternoon, approximately.  He also at the state

15  courthouse paying a traffic ticket.

16       And Daryl Davis, Daryl Davis, as the Government said,

17  he is on his way up to Atlanta.  He has reservations at a hotel

18  and he is going up to Atlanta for the night.  So, he is not

19  down there meeting with Daryl Davis.

20       Terrance Brown is off paying a traffic ticket before,

21  but should have been home by now.  And there Bobby sits.

22       Now, when you look at his actions that day, it makes

23  sense that his phone didn't work.  That's why he eventually --

24  he knocked on the door.  Nobody answers.  He goes to the

25  neighbor's house.  He makes some phone calls.  Nobody answers.

1   He finally knocks on the door again because he hears them

2   inside.  Brown's wife answered the door.

3          Was Brown involved?  Why didn't his wife answer to

4   begin with?  Did she know?  I can't tell you.  But Bobby's

5   actions are that of somebody who truly doesn't know what's

6   going on or that he's going to become the subject of anything.

7   And then you look at how he is treated.  For absolutely no

8   reason they come and handcuff him.  They had -- what had he

9   done wrong?  What law had he violated when they went to that

10  bus stop and slapped handcuffs on him and brought him back?

11         Now, we all want to think law enforcement, well,

12  they're doing their jobs and they had a bad situation.  But

13  this guy hadn't done anything.  I could understand going up to

14  him and saying, we want to search you.  No weapons on him or

15  anything, but they left him handcuffed.  And they brought him

16  back and now they want to know why he's not forthcoming with

17  all of the information that maybe he could have given them when

18  he is standing there handcuffed, being accused of who knows

19  what.

20         Is that really an atmosphere getting somebody to tell

21  you the truth?  You're going to tell somebody as little as

22  possible because you don't know what's going on.

23         Let's talk about some of the jury instructions the

24  Judge is going to read you.  And she is going to talk about

25  reasonable doubt and proof beyond a reasonable doubt because

1    we're going to come back now to where we start, which is they

2    have to prove it.  We don't ever have to prove our innocence.

3    That is what makes this country, the United States of America,

4    land of free.  And we know that even with these safeguards,

5    we've all read about in the newspapers about innocent people

6    who still get convicted.  Because I think as much -- as hard as

7    jurors try, sometimes when you're confronted with crimes, for

8    example, as horrendous as this one is where they, you know,

9    that man shot and executed a guard and to ride around with

10   guns, you want to hold somebody responsible.  We all do.  And

11   unfortunately, innocent people can get caught up in that net.

12         So, for that reason, you must really take that burden

13   seriously.  They have to prove guilt beyond a reasonable doubt.

14   And until you can really sit there and say, you know what,

15   there is absolutely no way that Terrance Brown could have had

16   that phone.  There is no explanation.  There is no other

17   reasonable explanation of what happened or even kind of

18   strange, but just can't possibly be a true explanation for what

19   happened.  Unless you can get to that point, you just cannot

20   convict.

21         The judge is going to tell you there are some

22   witnesses whose testimony you have to view with more caution

23   than the testimony of others.  And that includes people the

24   Government makes an agreement with because they have a strong

25   motive to lie.  Now, there's nothing illegal or wrong with plea

1    bargaining.  The Judge is going to tell you that goes on.  Most

2    cases get resolved by plea bargaining.  There is no question.

3    It has it to for our system to function.  We can't try every

4    case.  There's nothing wrong with plea bargaining.

5          But when somebody is testifying because they've struck

6    a deal with the Government and they're hoping to get, you know,

7    in this case, this guy wants to get his life sentence cut, he

8    wants you -- he wants to get out, back on the street, he has a

9    lot of reason to want to help the Government convict others

10   because that's how it happens.  Not just admitting your own

11   conduct.  That doesn't get your substantial assistance.  You

12   have to help them convict someone else.

13         You also heard about certain bad acts in this case,

14   bad things that Bobby Madison may have done in the past.

15   You've only heard about those things for certain limited

16   purposes.  Sometimes, it is because of credibility.  Sometimes,

17   it is because, well, is there a similar pattern here, has this

18   person been doing this kind of thing for a long time.

19         And the crimes themselves, there are basically three

20   types of crimes that are before you.  The first and probably

21   the most dangerous crime on the books in this country is the

22   federal law of conspiracy.  It is the thought.  What it says is

23   if two people get together and agree, two or more people get

24   together and agree that they're going to accomplish something

25   illegal, even if they never do anything to try to actually do

1    it, they're guilty of a crime.  And the law makes no

2    distinction between that and actually doing the crime.

3            So, conspiracy is the most dangerous charge because

4    all it requires you to find is that two people tried to agree

5    to accomplish a shared and unlawful plan, and that the

6    defendant, Mr. Madison, knew of the unlawful purpose of the

7    plan and willfully joined in.

8            He doesn't even have to have done anything.  He just

9    knew what they were planning, and he agreed to be part of it.

10           Now, we submit to you, he did not do that.  He never

11   agreed to be part of the unlawful plan in this case, which is

12   to commit armored car robberies.  And we will get into the

13   elements of that later, but for simplistic sake, I'm going to

14   call them armored car robberies.

15           That instruction is going to tell you simply being

16   present at the scene of an event or merely associating with

17   certain people in discussing common goals and interest, doesn't

18   establish proof of a conspiracy.  A person who doesn't know

19   about a conspiracy, but happens to act in a way that advances

20   one or advances some purpose, doesn't automatically become a

21   conspirator.

22           So, for that crime, Bobby Madison would have had to

23   know that this was the goal to rob these armored cars, using

24   firearms and using force, violence, and intimidation, and he

25   agreed that he was going to be part of the group doing that.

1    And we submit to you that beyond a reasonable doubt, the

2    evidence does not prove that.

3           The other kind of crime charged against Bobby Madison

4    are two attempted robberies, and these are what we call Hobbs

5    Act robbery.  Hobbs Act being the federal statute that creates

6    it.

7           What the Government has to prove there is that

8    Mr. Madison knowingly acquired somebody else's property, which

9    he did not, that he took the property against the will of the

10   victim, using actual or threatened force, violence or causing

11   the victim to fear for harm or immediately in the future, which

12   he did not, and that his actions obstructed, delayed or

13   affected interstate commerce.

14          Now, the attempt part, that's what a Hobbs Act robbery

15   is.  The attempt part of it says, if he intended to commit that

16   crime, the crime of robbery affecting interstate commerce, and

17   his intent was strongly corroborated by his taking a

18   substantial step toward committing that crime, then he's guilty

19   of an attempt.

20          And a substantial step is an important action leading

21   up to committing the offense, not just an inconsequential act.

22   It has to be more than simply preparing.  It has to be an act

23   that would normally result in committing the offense.

24          And that's what the attempted robbery counts are

25   about.  There are two of those for July 26th and I think the

1   date is September 17th.

2          And we submit to you, once again, you do not have

3   proof beyond a reasonable doubt of every single one of those,

4   what we call elements, that the Government has to prove.

5          There's also probably the worst charge, the motion

6   serious charge of all of the charges, and that is using or

7   carrying or possessing a firearm in furtherance of a violent

8   crime.  And he can only be found guilty of that if you find he

9   committed the crime of violence, this armored car robbery, that

10  he knowingly used, carried or possessed a firearm, and that it

11  was used, carried or possessed in relation to a crime of

12  violence or in furtherance of a crime of violence.

13         And the Judge is going to instruct you that there are

14  laws of aiding and abetting.  There are laws of possession

15  about how, hey, if two people go up to rob somebody and one

16  guy's got a gun and the other guy doesn't and the other guy is

17  right by his side, holding the man, while the other puts a gun

18  at his head, the guy who is holding him is just as guilty as of

19  carrying a -- of using a gun.  Okay?

20         What you can do for yourself, you can do through other

21  people.  If you've directed them and you show control over them

22  and you've agreed that you're participating in being a part of

23  this.

24         The aiding and abetting instruction will tell you that

25  finding that a defendant is criminally responsible for the act

1   of another person, because we know in this case, Bobby Madison

2   never possessed a gun, he's accused of being responsible in

3   this case for what other people did, finding a defendant

4   criminally responsible for the acts of another person requires

5   proof that the defendant intentionally associated with and

6   participated in the crime, not just proof that he was simply

7   present at the scene of a crime or knew about it.

8           So this whole business of did he know what his buddy,

9   Terry Brown, was doing, did he give him the phone and know,

10  that's not the issue.  That doesn't make him guilty of the

11  crime.

12          He would have had to actually participate, agreed to

13  participate.  He would have had to do basically what they've

14  accused him of, being the getaway driver.

15          I don't want put you to sleep.  I don't want to bore

16  you anymore.  It is almost like noontime.  You've become very

17  kind listening to our argument and our view of the evidence.

18  You have probably the most difficult job coming up in the

19  courtroom because you now have to go back and decide the fate

20  of someone's life, what's going to happen to him.  You're going

21  to have to decide whether the Government proved -- not just

22  proved this case, but proved it beyond a reasonable doubt.

23          And I submit to you, they just haven't.  They've

24  done -- and I'm not faulting them.  They have done what they

25  could.  There are times when you just can't be sure.

1        Mr. Moss, we know about him.  He was caught red-handed

2    basically.  But Bobby Madison and really possibly some of these

3    other people, too, we can't really be sure that they were

4    involved.  You cannot trust what Mr. Moss is saying.  His

5    motivations are too great.  He has to supply information that

6    results in convictions of someone else in order for him to get

7    his time cut.  And he has a lot of reason to want to get back

8    at Bobby Madison.

9        And what's the downside for him?  The Government

10   thinks he isn't telling the truth.  What are they going to do?

11   Give him another life sentence?  Perjury?  Perjury is laughable

12   in the face of -- the man is doing life, plus 20.  So he's got

13   every reason in the world to try to make things fit.

14       Just like the first time you met with him, he was

15   cagey.  He didn't provide any names.  And he had eight months

16   to think about it.  Well, number one, did this and, number two,

17   did that and, you know, it was over a year after this crime

18   before he started even identifying anybody.  So, think about

19   how long he had to sit in his jail cell, looking at his

20   discovery, thinking about all he knew about the crimes he had

21   committed.  You need more.  You just need more.

22       And the phone records don't provide it, not the way

23   these people shuffled phones around, not what you know about

24   Terrance Brown and his propensity to use different phones,

25   different phones here and there.  You just don't have enough.

1    And that can be the hardest thing sometimes when you're dealing

2    with a crime this seriously to say, you know what, we think

3    maybe he did it, but we just don't have enough.  But that's

4    what the law requires you to do.

5            I'm going to ask you -- I'm going to thank you again

6    for your time, and ask you to go back in that verdict room,

7    jury room, discuss it amongst yourselves, look at all of the

8    evidence and come back with verdicts of not guilty because

9    that's what you are required to do in this case.

10           Thank you.

11           THE COURT:  All right.  Let's have a quick sidebar.

12       (The following proceedings were held at the bench:)

13           THE COURT:  Okay.  Listening to your closing statement

14   about conspiracy caused me to review the instruction once more.

15           MS. GOLDER:  Okay.

16           THE COURT:  And I note that the instruction was taken

17   from the general conspiracy instruction, except that the two

18   last provisions were dropped because it is a Hobbs Act

19   conspiracy.  So, I double-checked the instructions on the

20   Westlaw, and there is a 1998 case from the Eleventh Circuit

21   that I would prefer to use the instructions of if it's okay

22   with you just to make sure we haven't missed anything.

23           It would say, one, two or more persons agreed to

24   commit a robbery encompassed within the Hobbs Act; two, they

25   knew of the conspiratorial -- the defendant knew of the

1    conspiratorial goal; and, three, the defendant voluntarily

2    participated in helping to accomplish the goal.

3            And that's from this case of *United States versus To*,

4    144 F.3d 737, 747 to 748, from the Eleventh Circuit in 1998.

5    Instead of just short, make-shifting our own, I would rather

6    use one that was approved.  Is that all right with you?  The

7    reason I'm telling you now, in case you want to --

8            MS. GOLDER:  The opening thing, I would suggest

9    instead of -- not -- you might want to say voluntarily and

10   willfully because willfully is a defined term.

11           THE COURT:  Any objection to that?

12           MR. GILFARB:  Whatever the statute requires as far as

13   the mens rea.  It is willfully or knowingly, whatever is

14   required to be in there.

15           MS. GOLDER:  I checked all of those.  The willfully

16   and knowingly --

17           THE COURT:  I don't know off the top of my head.

18           MR. GILFARB:  I think it is willfully and knowingly.

19           THE COURT:  All right.  It will be willfully and

20   voluntarily.

21           Is that okay with everyone?

22           MS. GOLDER:  Uh-huh.

23           THE COURT:  Do you need to add anything to your

24   statement based on this?

25           MS. GOLDER:  I don't think so.

1          THE COURT:  I don't think so either.

2          MS. GOLDER:  It is frankly almost identical to this.

3     Instead of two elements, it separates it into three, but I

4     think the language is almost the same.

5          THE COURT:  I would rather go that way if that's okay

6     with you.

7          MR. DISPOTO:  Are you going to give the jury another

8     break or start rebuttal?

9          THE COURT:  We're going to start rebuttal now and give

10     them a break, so I can make this change.

11          MR. DISPOTO:  That's fine.

12          MS. GOLDER:  Do you want to send them to lunch before?

13          THE COURT:  No.

14          MS. GOLDER:  Or you're going to read the jury

15     instruction first?

16          THE COURT:  I have a full 1:00 o'clock calendar.

17        (The following proceedings were held in open court:)

18          THE COURT:  Thank you for your patience.  The

19     Government, because the Government has the opening statement

20     and the defense has the opportunity to respond, the Government

21     has an opportunity to what's known as rebuttal.  This will be

22     much shorter than the original opening statement.

23          Whenever you're ready, Mr. Dispoto, you may proceed.

24          MR. DISPOTO:  Thank you, Judge.  I just need one

25     minute.

1          Judge, may I ask the Court for a five-minute --

2          THE COURT:  Certainly.

3          MR. DISPOTO:  -- warning.

4          Ladies and gentlemen, it is not to be in front of you

5  again.  This is our last opportunity to talk to you about the

6  evidence in this case.  And I would like to begin my remarks

7  this afternoon with discussing with you a piece of evidence in

8  this case that really tells you a lot of what you need to know

9  about the defendant's involvement in this conspiracy.

10          The entire defense in this case is predicated on his

11  ability to explain to you in his efforts that he has embarked

12  upon when he took that stand to explain to you his phone

13  records as they relate to the incident that occurred on

14  July 26th of 2010.  Because if the evidence proves that the

15  defendant had his phone on that day, then it would prove that

16  he was there with Hasam Williams at the time that the silver

17  Toyota was abandoned by the Riva Motorsports, and they ran from

18  the police.  It would prove that he was the driver of that

19  getaway car.  It would prove that he was present at the Bank of

20  America only minutes earlier when that car was seen leaving the

21  area.  It would prove that he and others participated in an

22  effort to rob that bank that afternoon because we know from the

23  phone records of both Mr. Moss and Mr. Davis' phone records are

24  hitting off the sector in the area of that bank.  It would

25  prove that he was a part of this conspiracy.

1        So, Mr. Madison has chosen to take the stand in this

2   case in an effort to explain to you why it wasn't him because

3   on its face, the evidence proves it was him.  The evidence

4   proves that 7001 is his phone.  And Mr. Gilfarb went through

5   some of this during his closing argument.  7001 is subscribed

6   to Swim Club Madison.  Not Swim Club Brown, not Swim Club Boss,

7   but Swim Club Madison.

8        We know from Mr. Rodriguez that that's the number that

9   was given to the bail bondsman to get in touch with

10  Mr. Madison.  We know from Mr. Moss that Mr. Madison was the

11  getaway driver on 7/26 and he was with Mr. Williams.  We know

12  from the phone records that 7001 is having contact with the

13  defendant's girlfriend throughout 7/26.

14       So, on its face, the evidence proves that 7001 belongs

15  to that man and nobody else.  But Mr. Madison has chosen to

16  take the stand, and he has tried to explain to you that it

17  wasn't me.  He has to do that because the evidence proves it

18  was him.  It proves to you his involvement in 7/26.  It proves

19  to you he attempted to rob that bank that afternoon with all of

20  his coconspirators before realizing that, obviously, the

21  Brink's truck didn't show up.  It proves that he was involved

22  in this conspiracy.

23       So, what does he say to you about the phone records?

24  Because that was a critical part of his testimony.  And Mr.

25  Gilfarb cross-examined him extensively on that.  And, ladies

1   and gentlemen, he could not provide a plausible explanation for

2   his phone records.  Let's take a look at what he said about

3   this.

4          Here are the phone records from 7/26.  And Mr. Gilfarb

5   first asks Mr. Madison about the phone calls that are

6   highlighted in blue.  And he first directs his attention to the

7   calls at 3:26 and 3:27.  Those are phone calls that are being

8   placed to the defendant's girlfriend in the middle of the

9   night.

10          And what does the defendant say in an effort to

11   explain that that's not me?  He says, I'm never awake.  I'm

12   never out in the middle of the night.  That's not me.  It had

13   to be Mr. Brown.  I'm not up at that hour.  I'm not out at that

14   hour.  That was his explanation.

15          And you know what, folks?  We know that that's not

16   true.  How do we know that's not true?  Because the car that he

17   stole in May of 2010 was stolen at 3:30 in the morning.  We

18   know he is out in the middle of the night.

19          Now, does that make him a bad person because he is out

20   in the middle of the night?  Of course not, but don't come in

21   here and tell you all folks that ain't me because I'm never out

22   in the middle of the night when we know that he is out in the

23   middle of the night.

24          So, he attempts to explain to you, well, that must be,

25   that must be Mr. Brown trying to reach my girlfriend to let her

1    know or to let me know that Brown is delivering the phone back

2    to me.   That was his explanation.   That's why he's called.

3         And then there is another call at 3:40 in the morning.

4    This is an outgoing call placed to Mr. Brown.   That's his

5    explanation.   Mr. Brown is bringing the phone to me.   He's

6    calling me in the middle of the night to tell me that.

7         So, what do we see next from the phone records?   A

8    six-hour gap in time.   I submit to you the compelling inference

9    to be drawn are those are the hours that Mr. Madison is asleep

10   and not using his phone.   So, presumably, if Mr. Brown is

11   telling Mr. Madison, I'm going to bring you your phone by 9:00

12   o'clock in the morning, the phone has been delivered to him.

13   Right?   Because Brown called and said, I'm going to bring you

14   your phone.   So, now, at 9:00 o'clock in the morning, he has to

15   have his own phone.

16        So, what do we see at 9:06?   We see an outgoing call

17   to Mr. Brown.   We see at 9:14 an outgoing call to Mr. Williams.

18   Two of the participants in the 7/26 incident that's going to

19   take place later that day.   But still Madison won't admit that

20   to you.   He still won't admit to you that Mr. Brown has brought

21   me the phone.   Okay?

22        We then get to 9:50 in the morning, and at 9:50, there

23   is a call on an 800 number that is of no moment.   We then have

24   our gap in time.   And now we see the calls all relative to the

25   Daryl -- the Davis phone, the 404 area code.   And the

1    significance of this time frame, once again, is this is right

2    after Mr. Williams gets arrested.  There are eight phone calls

3    from his phone to Mr. Davis, and there's one phone call at

4    13:58 from his phone to Mr. Williams.

5            I submit to you, ladies and gentlemen, that the only

6    reasonable and rational interpretation of this evidence is that

7    this man is frantically calling Mr. Davis because the

8    proverbial dirt has hit the fan.  They got caught.  The car has

9    been abandoned.  I don't know where Mr. Williams is.  I'm

10   running through Riva Motorsports.  Now I need a ride, and he is

11   calling Mr. Davis.  This is not Mr. Brown.  And let's think

12   about this for a second.  Okay?

13           We know from the evidence that has been presented,

14   okay, that the only two people who were in the area of where

15   the car was abandoned was Mr. Williams and the driver of that

16   car because don't forget, they fled because the police are

17   chasing them.  None of the other guys, not Mr. Moss, not

18   Mr. Johnson, none of the other guys went to the sector where

19   the car was abandoned.  So whoever is holding 7001 is the

20   driver.  It can't be anyone else.  Okay?

21           So, all of these phone calls are placed, and

22   Mr. Madison would have you believe, despite the fact that

23   Mr. Brown called him some seven hours earlier, saying, I'm

24   bringing your phone, that somehow Mr. Brown still has his phone

25   according to him.  And he asks you to speculate and to guess

1   that it is Mr. Brown calling Mr. Davis.

2        Well, what do we see at 2:02 in the afternoon after

3   all of those eight calls were placed?  We see a call to his

4   girlfriend.  Okay?  His girlfriend at the restaurant.  Why

5   would Mr. Brown be calling his girlfriend?

6        Now, Mr. Madison will say, well, he was trying to

7   reach me.  Mr. Madison, if you're not involved in 7/26, why is

8   Brown trying to reach you?  If Mr. Brown is the one who, by his

9   testimony, he would have to be the one driving the car, right,

10  because he is the only person in the sector?

11       If Mr. Brown is the one running from the car, why is

12  he calling you if you are not involved in any of this?  He

13  wouldn't be calling you.  He would be calling Mr. Moss or he

14  would be calling Mr. Johnson or he would be calling Mr. Davis.

15  He wouldn't be calling you.  But that phone calls his

16  girlfriend.

17       And the reason why that phone calls his girlfriend is

18  because he was calling his girlfriend.  He is running from the

19  spot of where that car was abandoned.  He is frantically trying

20  to reach Mr. Davis for his ride and as we look down in the

21  records, we will see several additional phone calls to his

22  girlfriend.

23       His girlfriend.  Mr. Brown.  Mr. Brown again.

24       Okay?  These are from him, not anybody else.

25       So, that brings us to the afternoon at about 3:00

 1   o'clock.  And once we get to this 3:03 time frame, Mr. Brown is

 2   now -- I'm sorry -- Mr. Madison is now down in the sector of

 3   Daryl Davis' residence.  He can't admit to you that that's

 4   where the phone is located because that would suggest that he's

 5   hiding out at Daryl Davis' residence.

 6          So, instead, he testifies, oh, I must have been at the

 7   pool.  Really, you must have been at the pool?  That's your

 8   explanation?  We don't even know if the pool is in the sector

 9   of Mr. Davis' residence.  He says, I must have been at the

10   pool.  When, in fact, what we really know, ladies and

11   gentlemen, is 7001 was at Daryl Davis' house.

12          The reason it was at Daryl Davis' house is because

13   Hasam Williams got arrested, and we don't know if he's going to

14   start talking and he's going to identify Mr. Madison as the

15   driver, so he's got to lay low.  While Mr. Moss and Mr. Brown

16   go meet over at the barbershop, this man hangs low at Daryl

17   Davis' residence.  And he is there all day.

18          And as we look down here, we see numerous, numerous

19   inbound and outbound calls to his girlfriend.  His girlfriend

20   (indicating).  His girlfriend (indicating).

21          He cannot explain this evidence.  Ms. Golder tries to

22   explain this evidence and provides to you a completely

23   different, completely different explanation because when she

24   got up here in front of you, she didn't say it was Mr. Brown.

25   Now, she is saying it is Mr. Moss.  Right?  That's what she

1    argued to you in closing.  She said to you that the guy wearing

2    the dreadlocks must have been Mr. Moss.

3         Well, if it was Mr. Moss, then Mr. Moss had 7001.  Her

4    arguments are not even consistent with her own client's

5    testimony.  In fact, when she started addressing the records,

6    the very first thing she said to you all is in hindsight, two

7    years later, we don't know exactly where he was and what he was

8    doing.  Well, Mr. Madison testified.  Mr. Madison seemed pretty

9    sure to know where he was.

10        Yet, Ms. Golder apparently doesn't even believe her

11   own client because she --

12        MS. GOLDER:  Objection.

13        THE COURT:  Sustained.

14        MR. DISPOTO:  She's telling you that it must have been

15   Mr. Moss.  And Mr. Madison was convinced, it must have been Mr.

16   Brown.

17        So, ladies and gentlemen, the evidence that's been

18   presented by the defense has been inconsistent and it has been

19   unpersuasive.

20        The only reasonable interpretation of the facts that

21   have been presented to you from -- regarding this evidence is

22   that it was Mr. Madison, and it wasn't anybody else.

23        So, after not being able to sort of explain 7/26,

24   despite Mr. Madison's best efforts to do so, Ms. Golder argues

25   to you about the other incidents that you heard about, starting

 1    with 5/25.  And she says to you, well, why would they steal a

 2    flashy car to be used in a subsequent robbery, right?  The red

 3    car apparently is flashy.

 4           Well, do you remember what Mr. Moss said to you about

 5    that car?  He told you that Mr. Brown told him that Mr. Brown

 6    told Mr. Madison to stay away from that car.  I told him to not

 7    mess with that car.  That's what Mr. Brown told Mr. Madison

 8    according to Mr. Moss.  So, there certainly was some type of a

 9    discussion about that car, but he insisted on taking it anyway,

10    which he did.

11           And Ms. Golder.  Also said to you, it doesn't make any

12    sense that this car would be used in any robbery that occurred

13    on 7/26, right, because that's two months; they're going to

14    have a car for two months.  Why would they steal a car and have

15    it sitting around for two months?

16           Well, but Ms. Golder's argument in that regard is not

17    consistent with the testimony because Mr. Moss never said that

18    they stole the car on 5/25 with the intent to use it in a

19    subsequent robbery, which they already decided was going to

20    take place on 7/26.  They didn't schedule the robbery on 7/26,

21    two months in advance.  They took the car on 5/25 with the

22    intent on using it in a subsequent robbery.  The date of that

23    robbery was unknown at the time they took the car.  But

24    Mr. Madison got arrested and everything got off schedule.

25           So the suggestion that it was predetermined that the

1    robbery was going to take place on 7/26 is not supported by the

2    evidence.

3           And she also argues to you about, well, there is no

4    evidence that it was going to be used in a subsequent robbery.

5    The defendant himself gives you the story about some type of a

6    chop shop.  As Mr. Gilfarb reminded you in his closing

7    arguments, there is no evidence that any of these cars were

8    involved in a chop shop.

9           In fact, to believe the chop shop story, you would

10   have to discount the defendant's own witness, Mr. Lamons, who

11   testified that Mr. Brown was the car thief going back to the

12   early 2000s when he stole cars for the Lamons crew.  That's

13   what Mr. Brown did.  He stole cars to use for the robberies.

14          There was no previous chop shop.  There was no

15   previous chop shop after May of 2005.  In fact, do you remember

16   Mr. Madison himself talking about the chop shop?  He would

17   say -- he made it sound as if this is what they did, that this

18   was a freak occurrence.  He talked about, you know, Brown would

19   bring me in.  He would call me and we would take a car and we

20   would bring it to the chop shop and they would inspect it as if

21   this happened on multiple occasions.

22          Well, Mr. Brown was incarcerated going up to two

23   months before this car was stolen.  When was all of these chop

24   shop jobs that Mr. Madison talks about?  There weren't any.

25   Because as soon as Mr. Brown got out of jail, he reconstituted

1    his crew and continued to plan armored car robberies as he had

2    done back in 2005.

3            Speaking of 2005, Ms. Golder argues to you, and these

4    are her exact words, she says, Mr. Verga looked the driver

5    right in the eye and couldn't identify the defendant.  There

6    was no testimony that Mr. Verga looked at the driver right in

7    the eye.  Just the opposite.

8            In fact, what Mr. Verga told you is he wasn't able to

9    identify anyone.  Sure, he ran up to the car and he saw that

10   there were three people inside, two of whom were the robbers,

11   but he never testified that he looked at the driver right in

12   the eye and couldn't identify the defendant.

13           Once again, Ms. Golder's argument in that regard is

14   completely unsupported by the testimony that was presented to

15   you in this case.

16           So, Mr. Madison, despite the evidence regarding 7/26

17   and despite the evidence regarding 5/25 says, ladies and

18   gentlemen, don't believe the evidence that's been presented in

19   front of you, believe me.  Right?  Forget 7/26 and what my

20   phone records show, believe me.  Forget what Mr. Moss says to

21   you about 5/25 and about 2005, believe me.  Well, let's look at

22   Mr. Madison as a witness.

23           Mr. Gilfarb spoke at length about credibility, and I'm

24   not going to repeat any of that.  But I do want to point out a

25   couple of things that haven't been mentioned yet.  This is a

1    six-time convicted felon.  Okay?  That's who he is.

2          He comes to this court and acknowledges to you he has

3    been convicted of stealing cars, of burglarizing cars, and

4    receiving stolen property, of cocaine and marijuana.  He is a

5    multiple-time convicted felon.  I think we can all agree that

6    multiple-time convicted felons have credibility issues.  I

7    think that's a fair statement, that this is not a person that

8    we can necessarily believe.  They have credibility issues.

9    Their testimony needs to be scrutinized in light of the fact

10   that they've broken the law many times before.

11         Okay?  But what does he tell you about some

12   significant pieces of his testimony?  We talked at length on

13   cross-examination about him stealing the car.  And Mr. Gilfarb

14   cross-examined him about the fact that he comes into court and

15   readily admits to you he stole the car in May of 2010, right?

16   And Mr. Gilfarb questioned him, wait a second, Mr. Madison, you

17   were charged with that back in May of 2010.  Have you pled

18   guilty yet?  Have you admitted your stealing the car in that

19   case?

20         And what does Mr. Madison's explanation?  He says to

21   you, well, I can't because of the pending federal case.  That

22   was his explanation.  This case is preventing him from pleading

23   guilty in state court.

24         Well, wait a second.

25         MS. GOLDER:  Objection, not rebuttal.

```
 1            THE COURT:  Sustained.
 2            MR. DISPOTO:  Officer Starkey's first involvement with
 3   Mr. Madison was in 2011.  Right?  2011.  And that was nine
 4   months --
 5            MS. GOLDER:  Okay.  Not rebuttal.
 6            THE COURT:  All right.  Overruled.
 7            MR. DISPOTO:  That was nine months after the defendant
 8   stole the car in May of 2010.  This federal case didn't prevent
 9   Mr. Madison from stealing the car in May -- going back to May
10   of 2010.  He has right to plead not guilty.  He has a right to
11   go into state court and put the state to its proofs.
12            THE COURT:  Five minutes.
13            MR. DISPOTO:  But he doesn't have a right to come in
14   here -- thank you, Judge -- and tell you all that the reason
15   why he hasn't pled guilty is because this pending case is
16   preventing me from doing so.  That's just not true.
17            Just like it is not true when he tells you that he had
18   no reason to believe Mr. Brown was a violent person.  Really?
19   He attended the trial where he heard all of the evidence about
20   Mr. Brown and Mr. Brown's involvement in this 2003 South
21   Carolina case.  And you heard from Mr. Lamons about what that
22   case involved.  He never knew that Mr. Brown was a violent
23   person?  That's completely untrue.
24            And he gives you -- he testifies and he tells you
25   about these phones and about the fact that, first, he tells
```

1    you, Mr. Brown gets me this high-tech phone, I think was his

2    word, right, high-tech phone that had the capabilities of

3    storing all this information.  Right, he has all of these

4    contacts that he used for his swim club business.  In fact, his

5    phone is so important to him that even after the phone gets

6    discontinued or inactivated, he still uses it for his contacts.

7    Yet, he wants you to believe that in the height of the swim

8    club season, in the middle of the summer, he doesn't have his

9    phone because Mr. Brown takes it from him?  Who doesn't have a

10   cellphone, especially somebody who runs a business or at least

11   claims to run a business and needs his phone to do that?

12          So, I submit to you, ladies and gentlemen, that

13   Mr. Madison's testimony in this case is completely incredible.

14   Contrast that with Mr. Moss.  And Mr. Gilfarb explained to you

15   a lot about that, about Mr. Moss, but a couple things that

16   Ms. Golder has said about Mr. Moss.

17          And let's be clear about something.  The testimony

18   about the discovery in this case, the discovery that was

19   provided to Mr. Moss, that being all of the reports and

20   documents and everything, that discovery only related to 10/1.

21   Okay?  Because that's all Mr. Moss was charged with initially.

22          So, all Mr. Moss had at his disposal, what is the

23   evidence the Government has against me regarding 10/1.  He

24   doesn't have anything regarding the past incidences.  I agree

25   with Ms. Golder.  Mr. Moss knew what happened in those past

1  instances because he was there, but what he didn't know is what

2  did we know about everybody else's participation.

3        He didn't know what evidence we had against

4  Mr. Johnson and Mr. Brown and Mr. Madison and everybody else.

5  And what have you heard in this case?  You've heard that his

6  testimony regarding all of those prior incidents was

7  corroborated, from the phone records to Mr. Davis' employment

8  records, to everything else that you've heard in this case.

9        So, Mr. Brown didn't know what we had regarding those

10 past incidents.

11       I'm sorry, Mr. Moss.

12       THE COURT:  Two minutes.

13       MR. DISPOTO:  Thank you, Judge.  When you weigh and

14 you evaluate Mr. Moss' testimony against Mr. Madison, it should

15 be clear to you who was the much more persuasive -- who

16 provided the much more persuasive testimony, and clearly,

17 ladies and gentlemen, it was Mr. Moss.

18       Now, in a few moments, you are going to go back into

19 the jury room and you are going to deliberate this case.  And I

20 submit to you, ladies and gentlemen, that this is not a complex

21 case.  It is a very easy case.  Because having the benefit of

22 hearing the testimony from not only the Government witnesses,

23 but from Mr. Lamons himself who was called by the defendant, it

24 should be clear to you what this case is about and what

25 happened here.

1    Mr. Brown, after his previous crew got locked up,

2    decided to go on his own and in 2005, he got his buddy, Bobby

3    Madison, and got his buddy, Nathaniel Moss, and others and they

4    successfully robbed that Brink's truck back in 2005.

5    And after Mr. Brown goes to prison and comes out in

6    2010, within two months of getting released, he brings the

7    group back together again to continue to do robberies.  He

8    provides a phone to Mr. Madison, and they go out and steal a

9    car, and they continue to plan to rob banks -- rob Brink's

10   trucks thereafter.

11   It was Mr. Madison who was present on 7/26.  It was

12   Mr. Madison who was there on 9/17 and jumped over the wall and

13   fled.  And, fortunately, for him, they replaced him prior to

14   10/1 to avoid a murder wrap on his head.  But ladies and

15   gentlemen, unfortunately, for him today is the day that you all

16   have an opportunity to dispense justice.  Today is the day you

17   have an opportunity to tell that man, we do not believe you, we

18   do not believe your testimony despite the horrible things that

19   Mr. Moss has done.

20   THE COURT:  Time.

21   MR. DISPOTO:  He told you what happened.

22   Thank you, Judge.

23   THE COURT:  Thank you.

24   All right.  Let me just explain what's going to happen

25   now.  We're going to take a short break.  When you return, I

1  will read your jury instructions to you.  This can be a little

2  bit lengthy and I will do the best to get through it as quickly

3  as I can.

4          I will be providing you all with a written copy of the

5  jury instructions so you will be able to review them in the

6  jury room if you need to see exactly what I said.  But it is a

7  good idea to just listen to the jury instructions and try to

8  absorb what it is, the ideas that I'm telling you.  All right?

9          So we're going to return in 10 minutes.  We will be

10 back at 12:40.  I'll give you the jury instruction and then

11 we'll send the case to you for your deliberation.

12          All rise for the jury.

13     (Jury out at 12:30 p.m.)

14     THE COURT:  All right.  We're just getting new

15 versions of the jury instruction, having replaced instruction

16 No. 13 as we discussed at the sidebar.

17          MR. GILFARB:  Thank you, Your Honor.

18          MS. GOLDER:  All right.

19     (Recess at 12:31 p.m.)

20     (Jury in at 12:43 p.m.)

21     THE COURT:  Welcome back.  Please be seated.  If there

22 is anyone who did not comply with my instruction, please raise

23 your hand for me now.

24          Very good.  I see no hands.  Thank you.

25          As I indicated previously, I'm going to read these

1   instruction to you.  You will have a copy.  You will each have

2   your own copy back in the jury room.  So there's no need to

3   take notes and it's probably better if you sit and try to

4   listen and absorb a little bit.  And then, as I said, you can

5   always go back to the written instructions that I will be

6   providing each you a hard copy of.

7        (Jury instructed but not herein transcribed.)

8            THE COURT:  All right.  And so now, I'm going to

9   release you to go ahead and conduct your deliberation.  I

10  believe if you haven't done so already, we'll be ordering lunch

11  for you.  So, you can go ahead and if you wish to do so,

12  deliberate over lunch.

13           If one of you needs to take a break, then all of you

14  should break.  Deliberations should not proceed in the absence

15  of all jurors being present at once.

16           And at this time, let me go ahead and I'm going to

17  thank Ms. Tucker and ask if you would sort of don't discuss the

18  case with anyone and don't disseminate information about the

19  case and don't investigate any aspect of the case on your own.

20  But if you would just -- I'm going to release you from the jury

21  today with the idea that if, and I hope nothing would prevent a

22  juror from being able to continue to deliberate, but if

23  something does, that we would have the possibility of recalling

24  you since you have sat through all of the evidence.  So, I

25  would ask you specifically to continue to follow my

1   instructions.  And in the meantime, we'll go ahead and release

2   you and certainly if you want to return to hear the verdict,

3   you're welcome to do so.

4        I thank you very much.  We all thank you for your

5   presence and your attention, especially knowing that you were

6   serving as an alternate.

7        So we very much appreciate it.  You are released.

8   Thank you.

9        At this time, I'll go ahead and release the jury and

10  you can conduct your deliberations.  All rise for the jury.

11       (The Jury commenced their deliberations at 1:10 p.m.)

12       THE COURT:  All right.  If counsel would just please

13  provide phone numbers where they can be reached immediately and

14  stay within about a 10-minute radius of the courthouse, I would

15  appreciate it, just in case we need to address any questions.

16       And other than that, we'll see you when we see you.

17       MS. GOLDER:  Judge, so you know, I did pick up on two,

18  like, typographical errors or whatever in the jury

19  instructions.

20       THE COURT:  All right.  You want to just grab Ronald

21  real fast before he distributes them.

22       MS. GOLDER:  Yes.

23       THE COURT:  Thank you.

24       MS. GOLDER:  They're not substantive, but just one

25  word's missing and another word is duplicated.

 1          THE COURT:  I saw that as well.  If you want me to, we

 2   can certainly reprint the instructions.  If you don't think

 3   that it really makes a difference and you want to leave the

 4   instructions as they are, that's fine, too.  I'll leave that to

 5   you.

 6          MS. GOLDER:  You know, instead of reprinting them, I

 7   think the one -- the duplicate, we can just cross out where it

 8   says the defendant twice.

 9          THE COURT:  All right.  Yes.

10          MS. GOLDER:  And the other one, you can write in the

11   word means.  That was missing in No. 13, element one.

12          THE COURT:  Let's make sure we're on the same pages.

13          MS. GOLDER:  Yes.

14          THE COURT:  Which ones?

15          MS. GOLDER:  Okay.  The first one is No. --

16          THE COURT:  As long as we're doing it, let's make all

17   the corrections.  The first page should be defendant, singular,

18   instead of defendants, plural.  The second page --

19          MS. GOLDER:  Right.  Count 4 is where it is.

20          THE COURT:  All right.  Let's start at the beginning.

21   The first page should be defendant, singular, instead of

22   defendants, plural.  Instruction No. 1 should likewise be

23   defendant, singular, in the first paragraph instead of

24   defendants, plural.

25          What was the next one?

1          MS. GOLDER:  I missed those, Judge.

2          THE COURT:  That's all right.  What was the next one?

3          MS. GOLDER:  Instruction No. 12.

4          THE COURT:  Okay.  And what is the correction?

5          MS. GOLDER:  Where it says Count 4, the defendant --

6  it says the defendant twice.

7          THE COURT:  Right.  Okay.  And the next one?

8          MS. GOLDER:  Is instruction No. 12.  I'm sorry.  Not

9  12.  Sorry.  13.

10          THE COURT:  Okay.

11          MS. GOLDER:  The first element.

12          THE COURT:  Two or more persons agreed.

13          MS. GOLDER:  The very end should have the word means,

14  M-E-A-N-S.

15          THE COURT:  What did you say?

16          MS. GOLDER:  The very end of that first element,

17  within the Hobbs Act means.

18          THE COURT:  Yes, it should.  Okay.

19          And it's your preference just to make the handwritten

20  correction and send it back like that; is that correct?

21          MS. GOLDER:  That's acceptable.

22          THE COURT:  Is that agreeable to the Government as

23  well before typographical errors?

24          MR. GILFARB:  Yes, Your Honor.  Yes.

25          THE COURT:  All right.  Here are the corrections if

1   you would, please.  Thank you.

2          MR. GILFARB:  One more thing.  Also, for the record, I

3   have gone through the Government's exhibit notebook and removed

4   those exhibits, which were not entered into evidence.  We need

5   to make some typographical changes to Government's 92, which is

6   the stipulation because like it will be off by a letter or so

7   as far as what it is referring to.  Like, for example, it might

8   say 35C and it should be 35E or 35D.

9          THE COURT:  Did you change the numbers or something?

10          MR. GILFARB:  I don't know.  I guess it must be like

11  the second to last version as opposed to --

12          THE COURT:  All right.  As long as the parties agree,

13  go ahead and make the combined changes.  Also, if you would

14  agree on the exhibits, and we can send all of it except the

15  guns back there.

16          MR. GILFARB:  I think everything on the table has been

17  admitted, and I think it might be easier for the defense to go

18  through the exhibit list and see that I have taken out those

19  that have not been.  I do want to make one more thing a part of

20  the record.

21          THE COURT:  Yes.

22          MR. GILFARB:  Government's Exhibit -- I believe it is

23  8A, which is the combined videos of all of the days.  Only

24  difference is that there's a separate video as part of 8A, a

25  separate disk, excuse me, that contains the longer version of

1   9/17.  When I went back and looked at that disk, I saw that the

2   longer version, from which we have stills, did not make it onto

3   that disk with the copy and paste.  So it is just on its own

4   separate disk.

5         THE COURT:  All right.  And there's no objection from

6   the defense?

7         MS. GOLDER:  No, Judge.

8         THE COURT:  All right.  And so just to be clear once

9   again, if the parties would get together, correct the

10  stipulations they want to do and if you could do that now, so I

11  can send it back to the jury room.  And also double-check and

12  make sure all of the exhibits that are supposed to be admitted

13  are admitted and if there are none that are not supposed to be

14  admitted.

15        If you all agree on that, as I said, we'll send them

16  all back to the jury room except for the guns.  If there's not

17  an agreement on that, you'll need to notify me of that as soon

18  as I finish with my other hearings.  All right.

19        MR. GILFARB:  Very good, Judge.

20        THE COURT:  If you would stick around and take care of

21  those things.  If you're in agreement on everything, then you

22  can go ahead and head out to lunch.

23        MR. GILFARB:  Yes.

24        MS. GOLDER:  Okay.

25        THE COURT:  All right.

```
 1        (Recess at 1:15 p.m.)

 2        (Call to Order of the Court.)

 3        THE COURT:  Thank you.  Please be seated.  Let's wait

 4   for Mr. Madison and then we can get started.

 5        All right.  Are we ready?  Anything we need to discuss

 6   before we bring the jurors back in?

 7        MR. GILFARB:  No, Your Honor.  Thank you.

 8        THE COURT:  Ms. Golder, anything we need to discuss?

 9        MS. GOLDER:  No, Judge.

10        THE COURT:  All right.  Thank you.  Let's go.

11        (Jury in at 5:06 p.m.)

12        THE COURT:  All right.  Welcome back.  Please be

13   seated.

14        And let's see here.  So, here is what's going on.  As

15   you may recall from when we were selecting the jury, Court will

16   not be in session for the next three days.  So we will bring

17   you all back here or actually more accurately, you all will

18   come back here at 9:00 o'clock on Monday morning and resume

19   your deliberations.  But do not discuss this case any further

20   amongst yourselves or with anybody else, of course, until all

21   of you are present once again on Monday morning.

22        Is there anybody who does not understand that

23   instruction?

24        All right.  And, of course, once again, I need to let

25   you know, please to not discuss this case with anybody else and
```

1   please do not disseminate any information about the case and,

2   of course, please do not conduct any independent investigation.

3        Mr. Barry is distributing letters to the four people

4   who indicated that they need them.  If you would just take a

5   moment to review them and if it is not going to be sufficient,

6   let me know, and I will be happy to try to accommodate you.

7        And other than that, is there anything else I need to

8   address with the jury?

9        MR. GILFARB:  No, Your Honor.  Thank you.

10       MS. GOLDER:  That's it, Judge.

11       THE COURT:  All right.  And, once again, thank you --

12   Yes.  This isn't a question about your deliberations, right?

13       THE JUROR:  No, ma'am.  A technical question regarding

14   our jury duty.  We don't have to call in over the next three

15   days, do we?

16       THE COURT:  No, you're part of an ongoing trial and we

17   wouldn't want you to have a conflict in your timing where you

18   would have to be at more than one trial at a time, so you need

19   not call into the jury code-a-phone for the next three days;

20   instead, if you would just please appear here at 9:00 o'clock

21   on Monday.  And, of course, unless you all want to agree to a

22   little bit later time, we have flexibility up to about 9:30,

23   but that's about it because we need to get this done.  But all

24   of you must agree.  If you cannot all agree, then you must be

25   here by 9:00 o'clock.

1          And the deliberation cannot begin until all of you are

2    present.  So, please do be timely as you have been throughout

3    this trial and we all very much appreciate it.

4          Everybody I hope has had an opportunity to look at the

5    letters.  Is it sufficient?  Does anybody need anything

6    further?  If you do, raise your hand.

7          Okay.  Great.  You all have a wonderful rest of your

8    week.  We thank you very much.

9          Yes.  And it is not about your deliberation, right?

10         THE JUROR:  It's private.

11         THE COURT:  All right.  Come up or you can just wait

12   until everyone else leaves and we will discuss it.

13       (Jury out at 5:10 p.m.)

14         THE COURT:  Let me just ask, is there any reason I

15   can't do this in front of the attorneys?

16         THE JUROR:  No.

17         THE COURT:  All right.  Let's bring the attorneys --

18   do you want it go in open court or rather have the attorneys?

19         THE JUROR:  That's fine.

20         THE COURT:  Have the attorneys come up.

21         THE JUROR:  No, that's fine.  I can speak from here if

22   they can hear me.

23         MR. GILFARB:  Yes.

24         THE JUROR:  I put a lot of effort into this, and I'm a

25   schoolteacher, and we have a juror out there playing with --

1    everything is a joke for her in there.  As you can tell, I'm

2    very upset.  I did not put all of this time here to waste my

3    time to convince this girl that fell asleep here over and over.

4    She has no clue what we're talking about.

5            THE COURT:  Okay.  Let me -- I very much appreciate

6    what you're saying.

7            THE JUROR:  I'm very upset right now.

8            THE COURT:  We all take this --

9            THE JUROR:  I'm sorry.

10           THE COURT:  No, you have nothing to be sorry about.

11   This is a very important proceeding.  We all take this

12   seriously.  I will tell you that throughout the trial, you

13   might have noticed me looking over repeatedly.  That's what I

14   was doing.  Making sure that people weren't falling asleep.

15   That's why we had the instruction.

16           And it may -- I don't know what you may have seen, but

17   sometimes, depending on the angle one is sitting at, it can

18   look like someone might be sleeping.  I checked to see if the

19   hand is moving with the pen.  It was moving with the pen.  So,

20   I feel confident that no one was sleeping through the actual

21   trial.

22           If there's some kind of a problem in the

23   deliberations, what I can do is, I can -- well, let me do this.

24   Let me ask you to step outside for just a moment, and we'll get

25   back with you in just a moment.  All right?

```
 1              THE JUROR:  Thank you.

 2         (Juror out at 5:12 p.m.)

 3              THE COURT:  All right.  Here is what I propose to do.

 4    I would propose to bring in the full jury at 9:00 o'clock on

 5    Monday morning and instruct them that they -- obviously, this

 6    is a serious matter.  They need to take this seriously.  There

 7    should be no game playing in the -- we respect the work that

 8    they're doing.  We understand that many of them are working

 9    quite hard, but there should be no game playing here and that

10    people should be giving their full attention and their full

11    effort, and I think that's what I should do.

12              Is there anybody who has a different suggestion?

13              MR. GILFARB:  I do, Your Honor.

14              THE COURT:  Yes.

15              MR. GILFARB:  I think it is important to know -- I

16    don't know what she meant by game playing.  I don't know if

17    that means literally playing games.  I don't know if that means

18    she is playing mind games.  I don't know if she is goofing off.

19              I think the real question is, does this juror have an

20    ability or a desire to deliberate.  And if that is what this

21    complaining juror is saying, that there's somebody who's

22    refusing to or does not have the capacity to deliberate because

23    they don't know enough to deliberate or because they haven't

24    participated or they're not participating because they're

25    taking it as a joking matter, that's different than telling
```

1  them they need to take it seriously.

2        Because this juror also said that she's at least

3  confronted, and I use that word in the nonaggressive way, that

4  she has confronted this juror about taking it seriously.  If

5  you instruct them as a whole that this is not a game, we

6  believe that's going to unnecessarily cause a conflict between

7  those two jurors, which might affect deliberations.

8        THE COURT:  All right.  Go ahead.

9        MS. GOLDER:  Can I say something, Judge?

10        THE COURT:  Sure.

11        MS. GOLDER:  Judge, what we have is one juror

12  complaining about another juror so far.  I don't hear a

13  foreperson in here saying one person is being disruptive and

14  sending out a note saying, Judge, we're having problems with a

15  juror being disruptive to our deliberation.

16        I think until we get to that point, you know, I don't

17  think the Court should interfere at this point if what we're

18  dealing with is a personality conflict.

19        THE COURT:  Well, I agree that if there's a

20  personality conflict, that's not for the Court to be involved

21  in.  That's clear.  But I think this description goes beyond a

22  personality conflict.

23        What I understood her to say was that this one

24  particular juror was not taking her duty seriously and was not

25  really involving herself in the deliberations.  Now, I think we

 1    can all agree that if that were true, that could be a problem.

 2    Are we in agreement on that?

 3              MR. GILFARB:  Yes.

 4              MS. GOLDER:  Yes.

 5              THE COURT:  All right.  And since I don't have any way

 6    of knowing whether that's true, it seems to me that I can do

 7    one of basically two things.  I can bring in that juror and

 8    question her specifically and tell her about the importance of

 9    proceeding seriously and make sure, to all our satisfaction,

10    that she is capable of doing so and that she will do so, or I

11    can instruct them generally.  But I'm not just going to leave

12    this.

13              But I do think that the instructions probably needs to

14    come from the Court because apparently this juror has already

15    attempted to impose peer pressure, if you will, appropriate

16    peer pressure if the events are the way she described them and

17    it doesn't seem to be working.  So, I mean, I'm open to other

18    ideas.

19              MR. GILFARB:  I think --

20              MS. GOLDER:  Is the Court aware of something we're

21    not?

22              THE COURT:  No.  I just heard what you heard.

23              MR. GILFARB:  I think, Your Honor, that we don't

24    really know the extent -- we heard the complaint.  I think the

25    Court should ask this juror, who felt strong enough to stay

1    behind, and you can tell -- let the record reflect, she

2    appeared very agitated -- that just ask her if -- if she's

3    playful and not paying attention.  If you want to ask her even

4    ex parte, what does that mean?  Does that mean that this juror

5    does not have enough knowledge to participate or is just

6    refusing to participate or any of those things so that we get a

7    better idea of what we're dealing with so that we can make a

8    more informed decision about whether to bring in the jury as a

9    whole or to admonish her individually or to substitute her.

10   Because --

11            THE COURT:  All right.  Let's do this.  I don't have

12   want to have her have to wait any longer.  Let's bring her in.

13   I will follow up questioning her and then I'll dismiss her.

14   We'll decide what we are going to do.  We can't do anything

15   further with respect to the jury or this other juror until

16   Monday anyway.  And we'll decide after we excuse her.

17            MR. GILFARB:  Yes, Your Honor.

18            THE COURT:  I'll ask the parties if they have any

19   questions for her in particular if I don't cover it.  All

20   right?

21            MR. GILFARB:  Yes, Your Honor.

22        (Juror in at 5:17 p.m.)

23            THE COURT:  All right.  Welcome back.  First of all, I

24   want to thank you for binging this to our attention.  We take

25   this very seriously as you can tell from the proceedings over

1    the last week, and we expect the jurors to take it seriously,

2    as you have.

3         I would like to just ask a few more questions so we

4    can get a better sense of exactly what is going on that you're

5    talking about.  The -- what do you mean exactly when you said

6    she is playing games?

7         THE JUROR:  She doesn't have any recollection of --

8         THE COURT:  Okay.  I'm sorry.  Let me stop you for a

9    second.  You do not mean she's playing actual like computer or

10   phone games or anything like that?

11        THE JUROR:  Well, she was on the phone, on the

12   cellular phone most of the time.

13        THE COURT:  During your deliberations?

14        THE JUROR:  Yes.

15        THE COURT:  All right.  And so she did not participate

16   in your deliberations?

17        THE JUROR:  She did.  A lot.  But it was kind of a

18   joke for all of us because we are taking this seriously and

19   she's not.  She doesn't have a job.  So, she's enjoying being

20   here because she's getting paid.  And she made that comment

21   before.  And it is always a joke even we are trying to vote,

22   she raises both hands because this is a joke.  I'm not here to

23   play games.

24        THE COURT:  All right.  Let me ask the parties if they

25   have any follow-up questions that they would like to ask.  And

1    let me, before they ask those questions, let me just make sure

2    I explain a little bit to you.  It is very important that you

3    not reveal to us in answering any of these questions anything

4    about your deliberations or your votes or anything of that

5    nature.  Do you understand what I'm saying?

6            THE JUROR:  Yes ma'am.

7            THE COURT:  Okay.  Very good.

8            MR. GILFARB:  Thank you.  Ma'am, without telling us

9    any specifics, when there's a -- when there are deliberations

10   and you say she is taking it as a joke, you also mentioned that

11   she -- that you believed she was sleeping and you also said

12   just now that she has no recollection of a lot of events.

13           Is it your opinion that she is not -- well, is it your

14   opinion that she does not have sufficient memory or

15   recollection of any of the events in order to meaningfully

16   participate?

17           THE JUROR:  I would say yes.

18           MR. GILFARB:  Okay.  So, I guess, are there things

19   that you as the jury are talking about that the jury is talking

20   about in general that everybody recollects except her?  She has

21   no idea what's happening?

22           THE JUROR:  We constantly have to remind her of the

23   events.  I have to look at my notes and tell her it again.  And

24   right now, the reason why I asked to talk to the Judge, I was

25   really upset because I had to tell her this is not a joke.  We

1    are here on something very seriously.  We have a

2    responsibility, and I totally lost with her.

3            MR. GILFARB:  Does she have the ability to deliberate

4    and reach a verdict based upon the evidence or lack of evidence

5    or does she not have enough recollection of the events to make

6    an informed decision one way or the other?

7            THE JUROR:  I don't think she has ability to be

8    sitting here, to pay attention to anything or have any

9    recollection.  I don't think she has any notes either.

10           MR. GILFARB:  And when she was on the phone, was she

11   talking to somebody?

12           THE JUROR:  No, not talking to somebody, but

13   constantly the phone is plugged in and she's doing something;

14   then she comes back to the table.  Do something and comes back

15   to the table.

16           MR. GILFARB:  Those are all the questions I have.

17           THE COURT:  Ms. Golder, do you have any questions?

18           MS. GOLDER:  Has the jury, as a whole, issued any kind

19   of formal complaint about her?

20           THE JUROR:  I don't know.  I did not confer with

21   anybody before I came here.  I decide to come by myself.

22           MS. GOLDER:  This was just your decision, not a

23   decision of all of the other jurors?

24           THE JUROR:  Absolutory not.  Nobody even knows

25   anything about it.

```
 1              MS. GOLDER:  Okay.

 2              MR. GILFARB:  Well, are the other jurors showing, in

 3    your opinion, the same frustration?

 4              THE JUROR:  I think so, but we are not supposed to

 5    talk about it, you know.

 6              MR. GILFARB:  Without telling us what's going on back

 7    there, in your opinion, are other jurors feeling the same

 8    frustration you are?

 9              THE JUROR:  I believe so.

10              MR. GILFARB:  And for the same reasons?

11              THE JUROR:  I believe so.

12              THE COURT:  All right.  Now, let me ask you something.

13    You're not saying that she is not intellectually capable of

14    participating, right?  You're just saying that you think that

15    she's not taking it seriously, so she is choosing not to

16    participate?  Is that what you're saying?

17              THE JUROR:  As far as intellectual, I'm not sure.  But

18    it seems like she's joking most of the time.  But

19    intellectually, I don't know.  I'm not sure if she's capable or

20    not.

21              THE COURT:  All right.  And really, the big problem

22    here is, as you perceive her conduct, she seems not to be

23    taking it seriously, to be taking it lightly and to be joking,

24    right?

25              THE JUROR:  Yes, ma'am.
```

1          THE COURT:  All right.  We're going to talk about how

2     we're going to address this, but I want to ask you a few more

3     questions if you don't mind.

4          THE JUROR:  Yes.

5          THE COURT:  Would you have any problem if we decided

6     to, and I don't know that we're going to, you wouldn't have any

7     problem with my addressing the jury as a whole or her

8     individually and explaining the importance of this and the need

9     to take it seriously, would you?

10         THE JUROR:  I think at this point, it would be

11    necessary.

12         THE COURT:  All right.  Thank you.

13         All right.  Very good.  Anything further from the

14    parties?

15         MR. GILFARB:  Are you afraid that that's going to

16    create a conflict, she knows that you're the one complaining?

17         THE JUROR:  At this point, I think she knows.

18         MR. GILFARB:  Do you think that will create an

19    unresolvable conflict between you?

20         THE JUROR:  I really don't care if she thinks I am not

21    because I already voiced my opinion to her.

22         THE COURT:  All right.  Let me thank you very much.

23    We really appreciate it.  We know it is not easy to come

24    forward in this kind of a situation.  We appreciate that you're

25    taking it seriously and that you brought this to our attention,

1   and we are going to address it.  I want to make sure that you

2   understand that.  And in the meantime, we hope you have a great

3   rest of your week and see you on Monday.

4          THE JUROR:  Thank you.

5          THE COURT:  Thank you.

6          MR. GILFARB:  Thank you.

7       (Juror out at 5:23 p.m.)

8          THE COURT:  All right.  It is still my intention

9   either to speak to them as a whole or take her aside.  I can do

10  it either way.  Let me hear from the parties.

11         MS. GOLDER:  Well, first of all, we don't even know

12  which juror it is, I don't think.

13         THE COURT:  I'm pretty sure I know which juror it is.

14         MR. GILFARB:  Yeah, we do.  The juror in the front.

15  She said the juror in the front who has been falling asleep.

16  There's only been one female juror in the front.

17         THE COURT:  She hasn't been falling asleep, though.

18         MS. GOLDER:  She has never fallen asleep.

19         THE COURT:  That's exactly right.

20         MR. GILFARB:  I don't know that she has fallen asleep,

21  but she certainly does -- well, it doesn't matter.  It is not a

22  matter of record.  But anyways --

23         THE COURT:  Let me say this.  For the record, I know

24  she has not been falling asleep because I've been watching very

25  carefully all of the jurors.  And when it looks like anyone is

1  starting to get a little sleepy, we take a break.

2          MR. GILFARB:  Okay.

3          THE COURT:  Or we do a stretch or whatever.  And I

4  have seen her taking notes, as well, or scribbling something in

5  the pad.

6          MR. GILFARB:  She is scribbling something.  This juror

7  says she has no notes.

8          THE COURT:  Well, how would this juror know?  This

9  juror is not looking at her notepad presumably.

10          MR. GILFARB:  I don't know.  My concern is -- has

11  several levels to it.  First, that she is using a telephone

12  during deliberations for whatever.  She's accessing it.

13          THE COURT:  Well, I agree.  That's easily remedied.

14  We can take it away.

15          MR. GILFARB:  Okay.  The other issue is something that

16  hasn't been addressed, which is that, according to this juror

17  and this juror's opinion of the consensus of the rest of the

18  members is that this juror does not have a sufficient

19  recollection to engage in meaningful deliberations.

20          THE COURT:  Well, let me tell you why, although I can

21  appreciate what you're saying, I don't think that that is a

22  reason to dismiss her.  First of all, this juror admitted, this

23  juror being the one who came in and spoke to us, admitted that

24  she hasn't discussed it with others.  And even if she had

25  discussed it with others, it is not something that she should

1    have been discussing with others.

2          MR. GILFARB:  Of course.

3          THE COURT:  Because they can only deliberate while

4    they're all there.

5          MR. GILFARB:  Yes.

6          THE COURT:  So, she hasn't discussed it with others.

7    So, this is based solely on what she thinks, which is clearly

8    colored by the way she feels, which is understandable, but

9    nonetheless, I think we can all agree that her point of view is

10   colored.  She's also not an expert witness.  I mean --

11         MR. GILFARB:  Of course.

12         THE COURT:  -- she's not a psychologist, she's not a

13   psychiatrist, she is not there to analyze or offer an opinion

14   on the competency of another juror or the other jurors' opinion

15   of a juror.

16         So, to me, the issue is a very limited one.  It is

17   whether this juror, the problem juror, the allegedly problem

18   juror, right, is participating in the deliberations as she

19   should be and is taking this seriously.  And the phone is

20   another issue.

21         Of course, I think we can address all of those things

22   by bringing her in here separately, explaining and reinforcing

23   to her the importance of this and the need to take it

24   seriously, taking the phone away, and at that point, I think

25   that should cover it.

1          If there are ongoing problems, then we'll address

2     those as they arise.  But there are always going to be

3     conflicts among jurors to a certain extent.  I mean, that is --

4     you've got to get 12 people to agree to something and the room

5     starts to feel pretty small after a while.

6          So, you know, the thing that's troubling to me is if

7     she's not actually participating, if she's not taking this

8     seriously, obviously, Mr. Madison's life is on the line here.

9     So, I want her to take this seriously.  I expect her to take it

10    seriously, and if she's not taking it seriously, then she needs

11    to be removed.  But I think we need to -- we have one juror's

12    opinion.  We're not in there.  We haven't seen it.  I think

13    what we need to do is bring this juror in, explain the

14    importance of what she is doing, make sure she understands what

15    the ground rules are, and take away anything that causes her

16    temptation to break those ground rules.

17          MR. GILFARB:  I would suggest -- first of all, I don't

18    know and I'll ask, when she came out, when that jury came out,

19    she came out laughing.  As a matter of fact, I even said to

20    Mr. Dispoto, who is she laughing at or why is she laughing.

21          THE COURT:  But laughing in and of itself doesn't mean

22    anything.  Jurors frequently laugh.  I mean, it doesn't mean

23    that they're laughing at what's going on in the case.  But you

24    have to -- I mean, were all human beings.

25          MR. GILFARB:  Judge, all I'm saying, I just want to

1    make it -- since I need to make a record, I think I just want

2    to put on the record that's what Mr. Dispoto and I observed and

3    that it was inappropriate in the sense that there was nothing

4    here funny, nothing that was going on, no other individual.  I

5    don't know what happened.  She came out giggling and laughing

6    and things like that.

7           Now, what I would suggest as opposed to bringing her

8    individually is to bring the jurors as a whole and admonish

9    them as a whole, so that she doesn't feel like one juror has

10   ganged up on her and the Court is instructing everybody to take

11   it seriously because we don't know what's going on back there.

12          Maybe this juror, the problem, quote/unquote, juror is

13   the only one taking it seriously and she feels that the other

14   ones are not listening to her.  So, I would ask that everybody

15   be instructed as a whole and that they also be instructed that

16   if there is an issue with somebody refusing to deliberate, that

17   they can bring that to the Court's attention.

18          THE COURT:  No.  I'm not going to do that second part

19   of it.  That's inviting people to bring up problems with people

20   who disagree with them, which is not the same thing as not

21   deliberating.

22          MS. GOLDER:  Right.

23          THE COURT:  And I'm not aware of that instruction ever

24   being given to anyone, plus there's absolutely -- it is

25   absolutely clear to me that at least the juror who came in is

1    not in any way going to shy away from telling us if the

2    problems persist.  So -- and I think we can all agree because

3    were laughing.  I don't see the need to give that second part

4    of the instruction.

5         What -- Ms. Golder, what is your position with respect

6    to instructing the jury as a whole?

7         MS. GOLDER:  Okay.  First, I just want to say, I

8    noticed her when she came in, too, and I didn't see her

9    giggling and laughing.  I did see her look over at the

10   prosecutor and smile, which caused me a little concern, and she

11   looked at the Court and looked over at us and smiled.  It may

12   just -- so I didn't take anything from it.  I didn't take it as

13   laughing and giggling.

14        I think, Judge, if you just talk to the jury, make

15   sure everybody is taking it seriously, just let them know that,

16   you know, that's their obligation and that they are obligated

17   to deliberate and participate.  And, you know, let them -- a

18   lot of times jurors can handle it by themself.  I'm a little

19   concerned.  It is like children tattling on one another.  I'm

20   concerned about a juror who comes without anybody else and just

21   says I have a problem with another juror.

22        THE COURT:  Well, I hear what you're saying, but I

23   don't think it would have been appropriate for her to talk to

24   other folks and, you know, figure out and gang up on someone

25   either.  I mean, that's not -- you know, that raises the

1    specter of other things going on that shouldn't be going on.

2          I think what she did is the appropriate thing.  She

3    didn't come in and say the juror doesn't agree with me and I

4    can't get along with her because she doesn't agree with me.

5    She came in and she said the juror is on the phone, the juror

6    is not taking this seriously, the juror is laughing.

7          MR. GILFARB:  And raising both hands when there is a

8    vote.

9          THE COURT:  Right.  And that's a joke.  I mean,

10   clearly that's not -- it is not a question at that point of

11   whether the jurors aren't getting along.  It is a question of

12   whether that juror is upholding her duty, and that's a very

13   different issue from whether the jurors are getting along.

14         When you have a situation like that, I do think it is

15   appropriate to instruct the jury or the juror, and it sounds

16   like everybody is in agreement that I should instruct the jury

17   as a whole.

18         MS. GOLDER:  Yes.

19         THE COURT:  And remind them of their obligation to

20   take this seriously, that there shouldn't be any game playing,

21   that people shouldn't be on their telephone, that people

22   shouldn't be on their -- sending e-mails or texts or anything

23   of that nature, that their entire and complete attention needs

24   to be given to the deliberations while they are deliberating.

25   And that's what I intend to do.

1        Is there anything further that anybody thinks I need
2   to address other than what I've just described?
3        MR. GILFARB:  No.
4        MS. GOLDER:  I don't believe so, Judge.
5        THE COURT:  All right.  So when we bring them back on
6   Monday, I'll bring the whole jury in and I will give them that
7   instruction and, hopefully, things will get better from there
8   on out.  If they don't, I have every confidence that this juror
9   will advise us.
10        All right.  Is there anything further we need to
11   address?
12        MR. GILFARB:  No, Judge.  Mr. Dispoto brings up a good
13   point.  You want us here for that?
14        THE COURT:  Yes.
15        MR. GILFARB:  Okay.
16        THE COURT:  Yes, I do.  Sorry to make you come over,
17   but I think it is a good idea and that way if I miss anything,
18   we can address it right then and there and we don't need to
19   bring you back over.
20        MR. GILFARB:  So 9:00 o'clock Monday.
21        THE COURT:  Yes.  Again, my intention will be, I'm
22   just going to give the instructions and then I may call you
23   guys up sidebar, make sure I didn't miss anything, but I want
24   the instruction to come from me and then further instruct if
25   necessary; otherwise, release them to continue their

129

1    deliberations.

2           MR. GILFARB:  Yes, Your Honor.  Thank you for your

3    patience.

4           THE COURT:  No problem.  Thank you.

5           MR. DISPOTO:  Thank you.

6           THE COURT:  Have a great rest of your week.

7        (Recess at 5:33 p.m., until 9:00 a.m., August 13, 2012.)

8

9               C E R T I F I C A T E

10       I, Karl Shires, Registered Professional Reporter and

11   Federal Certified Realtime Reporter, certify that the foregoing

12   is a correct transcript from the record of proceedings in the

13   above-entitled matter.

14       Dated this 23rd day of September, 2012.

15

16   _____

     Karl Shires, RPR FCRR

17

18

19

20

21

22

23

24

25

**$**

**$600,000 [1]**   69/24
**$7.98 [1]**   48/5

**-**

**-v [1]**   1/6

**1**

**10 [5]**   3/1 3/6 17/7 37/6 101/9
**10-minute [2]**   40/25 103/14
**10/1 [19]**   10/18 10/22 10/22
  13/4 13/13 13/13 13/14 16/17
  20/21 21/17 21/19 27/17 29/19
  31/23 39/2 39/3 98/20 98/23
  100/14
**10/17 [1]**   32/25
**10/22 [1]**   32/25
**10:00 [2]**   64/12 64/14
**10:23 [1]**   63/19
**10:30 at [1]**   63/19
**10:32 [1]**   41/3
**10:33 [1]**   41/22
**10:45 [2]**   41/2 41/21
**10:49 [1]**   41/24
**10:52 [1]**   63/19
**11 [5]**   37/10 37/10 37/12 38/1
  39/5
**11-60285-CR-ROSENBAUM [1]**   1/2
**11:15 and [1]**   33/14
**11:16 [1]**   33/14
**11:42 [1]**   33/12
**11:43 [1]**   33/12
**11:51 [1]**   39/17
**12 [5]**   17/10 105/3 105/8 105/9
  124/4
**12:01 [1]**   39/17
**12:04 [1]**   37/7
**12:15 [1]**   37/7
**12:16 [1]**   37/10
**12:18 [1]**   38/24
**12:30 [1]**   101/13
**12:31 [1]**   101/19
**12:37 [1]**   33/2
**12:38 [2]**   33/3 33/4
**12:40 [1]**   101/10
**12:41 [1]**   33/2
**12:43 [1]**   101/20
**12th [1]**   32/25
**13 [4]**   101/16 104/11 105/9
  129/7
**13:58 from [1]**   89/4
**13th [1]**   32/25
**14 [1]**   33/1
**144 [1]**   83/4
**15 [1]**   52/12
**16 [1]**   47/1
**16th [1]**   33/1
**17 [8]**   13/3 20/21 27/16 32/25
  37/14 38/13 100/12 107/1
**17th [2]**   44/20 79/1
**19 [2]**   17/11 66/2
**1961 [1]**   5/13
**1998 [3]**   29/12 82/20 83/4
**19th [1]**   33/2
**1:00 [2]**   63/12 84/16
**1:10 [1]**   103/11
**1:15 [1]**   108/1
**1:43 [1]**   34/12
**1st [18]**   43/24 50/19 51/3 54/6
  59/25 60/8 60/10 60/14 61/5
  65/3 65/7 65/8 67/19 67/22

69/13 71/17 72/17 72/25

**2**

**2/4 [1]**   21/18
**20 [3]**   50/24 50/25 81/12
**2000s [1]**   94/12
**2003 [1]**   97/20
**2004 [2]**   29/17 29/22
**2005 [22]**   14/7 14/18 14/20
  18/24 29/23 30/6 30/8 30/13
  31/5 51/7 68/21 68/22 68/23
  69/11 70/18 72/9 94/15 95/2
  95/3 95/21 100/2 100/4
**2008 [1]**   68/18
**2009 [1]**   68/18
**2010 [14]**   31/6 38/10 43/24
  44/22 50/12 54/24 72/12 85/14
  87/17 96/15 96/17 97/8 97/10
  100/6
**2011 [3]**   60/11 97/3 97/3
**2012 [3]**   1/8 129/7 129/14
**205 [1]**   30/2
**20th [1]**   33/11
**21 [1]**   33/13
**22 [3]**   30/6 32/25 69/11
**22nd [1]**   30/8
**23rd [1]**   129/14
**243756 [1]**   1/20
**25 [8]**   31/12 41/17 63/12 93/1
  93/18 93/21 95/17 95/21
**258 [1]**   1/24
**25th [5]**   54/24 56/1 58/25
  62/11 71/14
**26 [22]**   13/3 15/22 17/12 22/7
  23/10 36/13 36/17 36/20 86/11
  86/13 86/18 87/4 88/18 90/7
  92/23 93/13 93/20 93/20 94/1
  95/16 95/19 100/11
**26th [16]**   34/2 34/11 36/21
  44/20 50/22 51/2 59/6 59/12
  61/9 61/14 62/11 63/22 64/12
  66/3 78/25 85/14
**28 [2]**   21/21 69/14
**29th [1]**   33/24
**2:00 [2]**   63/22 64/5
**2:02 in [1]**   90/2
**2:15 [1]**   63/13
**2:15 in [1]**   63/18

**3**

**30 [2]**   50/24 50/25
**33132 [1]**   1/19
**33401 [1]**   1/25
**33424 [1]**   1/21
**35C [1]**   106/8
**35D [1]**   106/8
**35E [1]**   106/8
**364 [1]**   5/12
**3728 [1]**   1/24
**3:00 [3]**   23/14 28/6 90/25
**3:03 [1]**   91/1
**3:26 [1]**   87/7
**3:27 [1]**   87/7
**3:30 [2]**   73/13 87/17
**3:40 [1]**   88/3
**3rd [1]**   44/22

**4**

**404 [3]**   2/20 29/7 88/25
**4240 [3]**   24/2 24/3 64/7
**4th [1]**   1/18

**5**

**5/25 [6]**   31/12 93/1 93/18
  93/21 95/17 95/21
**5/28 [1]**   21/21
**514-3728 [1]**   1/24
**56 [1]**   24/10
**561 [2]**   1/24 24/18
**57 [1]**   48/7
**587 [1]**   5/13
**5:06 [1]**   108/11
**5:10 [1]**   110/13
**5:12 [1]**   112/2
**5:17 [1]**   115/22
**5:23 [1]**   121/7
**5:33 [1]**   129/7

**6**

**67 [1]**   39/19
**69 [1]**   39/19
**6:00 [1]**   28/7

**7**

**7/10 [1]**   17/7
**7/12 [1]**   17/10
**7/19 [1]**   17/11
**7/21 [1]**   33/13
**7/25 [1]**   63/12
**7/26 [22]**   13/3 15/22 17/12
  22/7 23/10 36/13 36/17 36/20
  86/11 86/13 86/18 87/4 88/18
  90/7 92/23 93/13 93/20 93/20
  94/1 95/16 95/19 100/11
**7001 [13]**   22/21 24/3 24/3 31/8
  35/23 63/11 86/4 86/5 86/12
  86/14 89/19 91/11 92/3
**701 [1]**   1/24
**704 [1]**   12/23
**737 [1]**   83/4
**747 [1]**   83/4
**748 [1]**   83/4

**8**

**800 [1]**   88/23
**8A [2]**   106/23 106/24

**9**

**9/10 [1]**   37/6
**9/17 [7]**   13/3 20/21 27/16
  37/14 38/13 100/12 107/1
**92 [1]**   106/5
**95 [1]**   15/15
**98 [2]**   47/13 47/14
**99 [1]**   1/18
**9:00 [5]**   88/11 108/18 109/25
  128/20 129/7
**9:00 o'clock [3]**   88/14 109/20
  112/4
**9:01 [1]**   1/9
**9:06 [1]**   88/16
**9:14 [1]**   88/17
**9:15 [1]**   2/22
**9:23 [1]**   6/13
**9:30 [1]**   109/22
**9:30 at [1]**   65/15
**9:34 p.m [1]**   65/20
**9:50 [2]**   88/22 88/22
**9:50 a.m [1]**   64/10

**A**

**a.m [7]**   1/9 6/13 41/3 41/22
  41/24 64/10 129/7
**abandoned [5]**   85/17 89/9 89/15

**A**

**abandoned... [2]**   89/19 90/19
**abandoning [1]**   55/13
**abetting [3]**   60/25 79/14 79/24
**ability [5]**   61/25 85/11 112/20
   118/3 118/7
**able [12]**   6/5 16/12 17/24
   32/17 43/9 54/4 65/5 65/19
   92/23 95/8 101/5 102/22
**above-entitled [1]**   129/13
**absence [1]**   102/14
**absolutely [12]**   24/1 24/9
   36/17 46/8 56/2 57/18 72/2
   72/3 74/7 75/15 125/24 125/25
**Absolutory [1]**   118/24
**absorb [2]**   101/8 102/4
**acceptable [2]**   4/12 105/21
**accessed [1]**   56/11
**accessing [1]**   122/12
**accident [2]**   59/15 70/8
**accommodate [1]**   109/6
**accomplish [3]**   76/24 77/5 83/2
**Accord [1]**   72/10
**account [2]**   13/10 29/9
**accurate [1]**   43/13
**accurately [2]**   43/6 108/17
**accusations [1]**   45/12
**accused [4]**   45/17 74/18 80/2
   80/14
**acknowledged [2]**   53/8 68/20
**acknowledges [1]**   96/2
**acquired [1]**   78/8
**act [12]**   3/5 5/19 77/19 78/5
   78/5 78/14 78/21 78/22 79/25
   82/18 82/24 105/17
**acting [1]**   31/3
**action [1]**   78/20
**actions [4]**   73/10 73/22 74/5
   78/12
**activated [1]**   62/14
**active [1]**   64/9
**activity [2]**   64/15 65/19
**acts [4]**   3/6 3/9 76/13 80/4
**actual [3]**   78/10 111/20 116/9
**add [6]**   2/13 37/10 37/12 38/1
   39/5 83/23
**additional [2]**   2/4 90/21
**address [13]**   22/14 26/15 28/15
   28/16 103/15 109/8 120/2 121/1
   123/21 124/1 128/2 128/11
   128/18
**addressed [1]**   122/16
**addressing [3]**   42/17 92/5
   120/7
**admissible [1]**   4/8
**admit [10]**   25/22 38/7 47/21
   47/22 48/1 58/3 68/17 88/19
   88/20 91/3
**admits [1]**   96/15
**admitted [19]**   14/25 16/19
   20/16 29/4 30/18 31/12 47/25
   47/25 53/6 58/12 68/17 68/18
   96/18 106/17 107/12 107/13
   107/14 122/22 122/23
**admitting [1]**   76/10
**admonish [2]**   115/9 125/8
**advance [2]**   28/17 93/21
**advances [2]**   77/19 77/20
**advertisement [1]**   11/19
**advise [1]**   128/9
**affect [1]**   113/7

**afraid [1]**   120/15
**Africa [1]**   8/16
**afternoon [11]**   13/17 63/13
   63/18 72/25 73/13 73/14 85/7
   85/22 86/19 90/2 90/25
**agent [19]**   15/16 16/5 16/16
   17/5 17/22 17/22 20/12 22/17
   23/5 23/7 25/3 25/12 25/14
   25/17 26/9 28/21 33/8 51/10
   58/19
**agents [6]**   21/17 23/1 49/21
   49/23 63/5 67/1
**agitated [1]**   115/2
**ago [3]**   45/9 52/11 52/12
**agree [21]**   48/2 62/9 76/23
   76/24 77/4 96/5 98/24 106/12
   106/14 107/15 109/21 109/24
   109/24 113/19 114/1 122/13
   123/9 124/4 126/22 127/3 127/4
**agreeable [1]**   105/22
**agreed [8]**   5/5 77/9 77/11
   77/25 79/22 80/12 82/23 105/12
**agreement [5]**   75/24 107/17
   107/21 114/2 127/16
**ahead [10]**   4/18 6/11 102/9
   102/11 102/16 103/1 103/9
   106/13 107/22 113/8
**aiding [3]**   60/24 79/14 79/24
**ain't [1]**   87/21
**Alabama [2]**   25/15 25/16
**alerted [1]**   65/7
**all ---those [1]**   22/1
**allegedly [2]**   4/3 123/17
**allowed [1]**   38/21
**alternate [1]**   103/6
**altogether [1]**   8/12
**Alvarez [1]**   12/19
**amazing [1]**   46/17
**AMERICA [5]**   1/4 29/18 37/3
   75/3 85/20
**analyze [1]**   123/13
**angle [1]**   111/17
**answer [6]**   17/3 17/4 21/8 46/6
   65/11 74/3
**answered [3]**   21/9 24/8 74/2
**answering [1]**   117/3
**answers [4]**   62/7 62/8 73/24
   73/25
**anti [1]**   12/9
**anti-Einstein [1]**   12/9
**Antonio [1]**   15/25
**anybody [17]**   6/18 24/7 44/11
   55/21 57/25 72/2 81/18 90/24
   92/22 108/20 108/22 108/25
   110/5 112/12 118/21 126/20
   128/1
**anybody's [1]**   64/2
**anymore [2]**   36/23 80/16
**anyway [3]**   68/9 93/9 115/16
**anyways [1]**   121/22
**apartment [1]**   31/1
**apologize [1]**   28/17
**apparently [3]**   92/10 93/3
   114/14
**appeal [1]**   6/9
**appear [2]**   27/1 109/20
**Appearances [1]**   1/15
**appeared [2]**   26/19 115/2
**appears [1]**   35/14
**applied [1]**   14/1
**apply [2]**   14/3 21/5
**appreciate [9]**   5/1 6/15 103/7

   103/15 110/3 111/5 120/23
   120/24 122/21
**appropriate [4]**   114/15 126/23
   127/2 127/15
**approved [1]**   83/6
**approximately [2]**   37/7 73/14
**April [1]**   62/14
**Arbor [1]**   39/19
**area [14]**   15/14 15/15 15/15
   23/21 24/11 37/13 64/5 64/16
   65/14 65/21 85/21 85/24 88/25
   89/14
**argue [3]**   7/5 22/5 35/11
**argued [2]**   35/10 92/1
**argues [3]**   92/24 94/3 95/3
**argument [6]**   5/21 42/5 80/17
   86/5 93/16 95/13
**arguments [3]**   6/21 92/4 94/7
**armed [3]**   30/14 30/15 58/9
**armored [14]**   55/22 56/3 59/4
   68/23 69/5 69/7 69/23 70/16
   70/23 77/12 77/14 77/23 79/9
   95/1
**arrest [6]**   50/7 58/24 59/2
   59/6 61/9 71/14
**arrested [17]**   15/23 29/22 32/6
   56/1 56/17 57/15 58/6 58/14
   59/13 60/10 62/18 64/13 66/12
   67/6 89/2 91/13 93/24
**arresting [1]**   21/21
**arrived [2]**   6/11 33/2
**Art [1]**   26/23
**articulate [1]**   26/19
**aside [1]**   121/9
**asked [15]**   12/11 21/6 21/10
   23/3 23/6 24/4 25/9 42/22
   44/21 51/22 53/2 53/4 53/8
   70/20 117/24
**asking [1]**   67/14
**asks [2]**   87/5 89/25
**asleep [8]**   88/9 111/3 111/14
   121/15 121/17 121/18 121/20
   121/24
**aspect [1]**   102/19
**assailant [1]**   68/25
**assistance [2]**   49/1 76/11
**Assistant [1]**   1/18
**associated [4]**   4/10 62/23 63/8
   80/5
**associating [1]**   77/16
**assume [5]**   20/13 27/9 27/10
   48/6 52/17
**assuming [1]**   20/10
**Atlanta [5]**   13/12 23/7 29/7
   73/17 73/18
**atmosphere [1]**   74/20
**attempt [3]**   78/14 78/15 78/19
**attempted [5]**   71/15 78/4 78/24
   86/19 114/15
**attempts [1]**   87/24
**attended [1]**   97/19
**attention [13]**   35/2 40/23
   42/12 55/9 87/6 103/5 112/10
   115/3 115/24 118/8 120/25
   125/17 127/23
**attorney [1]**   44/13
**attorney/client [1]**   44/13
**attorneys [5]**   1/18 110/15
   110/17 110/18 110/20
**August [2]**   1/8 129/7
**authored [1]**   5/14
**automatically [2]**   12/16 77/20

**A**

**avoid [1]**   100/14
**awake [1]**   87/11
**aware [2]**   114/20 125/23
**Awfully [1]**   69/16
**awhile [1]**   11/25

**B**

**babies [3]**   46/21 46/23 47/1
**back [82]**   3/22 4/1 6/14 7/9
 7/19 10/8 14/10 20/16 21/11
 28/24 30/12 30/13 31/1 31/3
 33/13 34/22 34/23 34/24 35/14
 39/11 41/1 41/2 41/25 44/17
 48/3 50/2 50/12 50/13 51/9
 51/14 53/7 54/15 55/22 57/24
 61/7 62/21 63/22 64/6 65/13
 65/14 65/18 65/20 65/21 67/9
 68/14 74/10 74/16 75/1 76/8
 80/19 81/7 82/6 82/8 88/1
 94/11 95/2 96/17 97/9 99/18
 100/4 100/7 101/10 101/21
 102/2 102/5 105/20 106/15
 107/1 107/11 107/16 108/6
 108/12 108/17 108/18 111/25
 115/23 118/14 118/14 119/6
 125/11 128/5 128/19
**backdrop [2]**   7/17 9/4
**bad [11]**   2/8 3/9 25/4 25/6
 25/7 27/24 36/20 74/12 76/13
 76/14 87/19
**bail [6]**   28/11 28/20 29/2 29/3
 58/18 86/9
**bailout [2]**   23/11 23/16
**balancing [1]**   27/3
**ballistic [1]**   55/20
**ballsy [1]**   69/16
**bank [22]**   15/15 29/13 29/17
 29/18 32/23 32/24 33/4 33/5
 33/7 33/11 33/13 34/1 34/8
 37/3 37/6 54/2 54/5 59/17
 85/19 85/22 85/24 86/19
**banks [2]**   72/3 100/9
**barber [3]**   25/23 25/24 26/1
**barbershop [10]**   31/1 31/2 51/9
 51/14 54/14 57/23 58/16 59/1
 62/21 91/16
**bargaining [3]**   76/1 76/2 76/4
**Barry [1]**   109/3
**base [1]**   7/1
**based [3]**   83/24 118/4 123/7
**basically [5]**   55/14 76/19
 80/13 81/2 114/7
**basis [3]**   43/9 50/24 66/10
**Beach [2]**   1/21 1/25
**beat [1]**   13/13
**bed [1]**   43/21
**beginning [2]**   9/18 104/20
**begins [1]**   69/15
**behaves [1]**   65/8
**behaving [1]**   65/7
**behold [1]**   37/7
**beings [1]**   124/24
**believable [1]**   71/11
**believe [36]**   7/5 12/14 12/16
 19/5 19/6 21/6 25/17 26/13
 27/4 27/6 27/22 28/12 32/10
 33/18 33/18 44/1 44/10 49/11
 89/22 92/10 94/9 95/18 95/19
 95/20 95/21 96/8 97/18 98/7
 100/17 100/18 102/10 106/22

113/6 115/9 119/11 128/4
**believed [5]**   12/2 12/13 40/20
 71/12 117/11
**believing [1]**   36/1
**Bell [1]**   15/23
**belong [1]**   8/24
**belonging [1]**   16/11
**belongs [2]**   33/9 86/14
**bench [1]**   82/12
**benefit [2]**   49/25 99/21
**Berlin [1]**   12/11
**best [4]**   28/3 43/17 92/24
 101/2
**better [7]**   4/17 5/5 60/8 102/3
 115/7 116/4 128/7
**beyond [11]**   7/20 7/21 46/3
 46/10 61/19 74/25 75/13 78/1
 79/3 80/22 113/21
**bias [1]**   40/3
**big [10]**   9/6 44/9 44/24 46/14
 46/16 55/8 61/23 65/7 66/25
 119/21
**bills [1]**   62/19
**binging [1]**   115/24
**birthday [2]**   44/23 44/23
**bit [9]**   5/24 32/25 37/25 39/14
 54/23 101/2 102/4 109/22 117/2
**bizarre [3]**   59/9 62/6 62/6
**black [2]**   13/22 32/20
**blend [1]**   55/6
**blooded [1]**   43/18
**blowup [1]**   38/1
**blue [2]**   54/15 87/6
**Blues [6]**   31/1 31/3 51/9 51/14
 57/24 62/21
**Bob [1]**   50/22
**bobby [66]**   1/7 3/14 25/19
 31/11 36/15 42/11 44/11 48/16
 48/18 49/16 49/17 51/15 51/22
 53/3 53/4 53/5 53/9 53/9 54/18
 54/24 55/24 56/1 57/19 57/21
 58/5 58/7 58/11 58/11 58/18
 58/18 58/24 58/24 59/3 59/18
 60/16 62/16 64/3 64/7 64/22
 65/12 66/17 66/21 67/13 67/23
 68/14 68/18 68/19 68/19 68/25
 69/4 69/5 69/6 70/3 70/20 71/9
 71/10 71/15 72/24 73/21 76/14
 77/22 78/3 80/1 81/2 81/8
 100/2
**Bobby's [5]**   66/5 66/8 70/3
 73/3 74/4
**Bolivian [1]**   6/11
**bond [1]**   22/13
**bondsman [9]**   22/14 28/20 28/25
 29/2 29/3 58/17 58/17 58/21
 86/9
**book [1]**   8/4
**books [1]**   76/21
**bore [1]**   80/15
**Boss [1]**   86/6
**bother [2]**   52/12 52/13
**bought [4]**   8/21 47/9 48/11
 62/16
**Boulevard [1]**   63/20
**box [2]**   1/20 8/9
**Boynton [1]**   1/21
**break [8]**   40/25 84/8 84/10
 100/25 102/13 102/14 122/1
 124/16
**briefly [3]**   10/13 11/5 47/7
**bright [2]**   55/16 71/19

**bring [22]**   23/15 23/18 23/25
 24/24 88/11 88/13 94/19 94/20
 108/6 108/16 110/17 112/4
 114/7 115/8 115/12 124/13
 125/8 125/17 125/19 128/5
 128/6 128/19
**bringing [4]**   88/5 89/24 123/22
 125/7
**brings [4]**   37/19 90/25 100/6
 128/12
**Brink's [15]**   14/6 17/13 17/19
 17/20 29/14 29/17 29/20 32/24
 34/13 37/6 38/13 39/4 86/21
 100/4 100/9
**Bro [1]**   28/23
**broken [2]**   38/9 96/10
**brook [1]**   8/17
**brought [6]**   42/18 45/11 74/10
 74/15 88/20 120/25
**Broward [2]**   15/3 15/3
**brown [145]**   3/15 4/4 13/16
 16/24 16/25 16/25 17/2 17/3
 17/8 17/10 18/7 18/11 18/11
 18/12 18/16 22/13 22/18 22/21
 23/14 23/17 23/17 23/24 24/2
 24/3 24/4 24/23 24/23 24/25
 26/10 26/11 28/1 28/4 29/16
 29/22 29/24 30/1 30/4 30/17
 30/19 30/23 31/6 31/9 31/17
 31/19 31/20 32/6 32/18 34/18
 35/25 36/1 36/22 36/22 37/4
 37/9 38/19 38/25 39/5 39/6
 45/16 48/15 49/9 49/11 49/13
 49/14 50/18 50/23 50/23 51/4
 51/24 51/25 55/3 56/7 58/17
 58/18 58/22 62/16 64/2 64/8
 64/15 65/9 65/9 65/11 66/2
 66/6 66/10 69/12 69/15 69/16
 69/17 69/18 69/21 69/22 69/23
 70/21 71/2 73/4 73/12 73/12
 73/13 73/20 74/3 75/15 80/9
 81/24 86/6 87/13 87/25 88/1
 88/4 88/5 88/10 88/13 88/17
 88/20 89/11 89/23 89/24 90/1
 90/5 90/8 90/8 90/11 90/23
 90/23 91/1 91/15 91/24 92/16
 93/5 93/5 93/7 94/11 94/13
 94/18 94/22 94/25 97/18 97/20
 97/22 98/1 98/9 99/4 99/9
 100/1 100/5
**Brown's [22]**   16/14 16/17 16/21
 16/23 22/16 24/15 26/4 29/1
 63/5 63/16 64/3 64/7 65/6 65/8
 65/15 65/24 70/25 70/25 72/25
 73/8 74/2 97/20
**Bruce [1]**   17/12
**buddies [2]**   66/6 70/25
**buddy [4]**   43/17 80/8 100/2
 100/3
**Buick [6]**   11/8 11/9 11/10
 11/11 11/13 11/22
**bulletproof [1]**   31/11
**burden [2]**   45/23 75/12
**burglarizing [1]**   96/3
**burgundy [1]**   72/14
**burn [2]**   55/12 60/7
**bus [1]**   74/10
**business [8]**   17/17 62/24 66/19
 67/18 80/8 98/4 98/10 98/11
**busted [2]**   71/25 72/20
**buy [2]**   32/4 48/15
**buys [1]**   31/7

**C**

**cagey [1]**   81/15
**calendar [1]**   84/16
**call [33]**   2/1 5/8 5/10 13/8
13/15 23/8 23/18 23/19 26/9
28/5 33/8 35/24 38/25 44/17
58/19 58/21 63/23 64/7 77/14
78/4 79/4 88/3 88/4 88/16
88/17 88/23 89/3 90/3 94/19
108/2 109/14 109/19 128/22
**Callanan [2]**   5/12 6/1
**called [34]**   10/14 10/19 11/4
12/19 12/20 13/5 14/5 14/19
15/4 15/21 15/23 15/25 16/5
16/13 16/16 16/20 16/23 16/24
17/2 17/3 17/5 17/14 17/22
18/4 18/15 27/5 44/19 45/3 55/2
64/18 88/2 88/13 89/23 99/23
**calling [30]**   17/10 17/10 23/14
23/19 23/20 23/21 23/23 24/2
24/3 24/3 24/7 24/18 35/25
36/1 36/2 36/3 58/21 65/2 88/6
89/7 89/11 90/1 90/5 90/12
90/13 90/13 90/14 90/14 90/15
90/18
**calls [20]**   17/7 17/8 23/16
39/5 50/18 50/19 50/21 63/6
73/25 87/5 87/7 87/7 88/24
89/2 89/21 90/3 90/15 90/17
90/21 91/19
**Camry [6]**   34/6 34/9 34/12
36/22 72/13 72/15
**capabilities [1]**   98/2
**capable [3]**   114/10 119/13
119/19
**capacity [1]**   112/22
**car [126]**   14/6 14/21 14/23
14/24 15/1 15/8 15/22 15/22
16/4 16/4 18/12 20/21 23/11
27/14 28/11 30/16 30/20 30/22
31/12 31/21 31/25 32/2 32/3
32/13 32/15 33/14 33/15 34/5
34/6 34/7 34/18 34/19 34/21
34/22 34/24 35/2 35/4 35/18
36/13 36/20 36/21 36/23 39/15
39/20 47/21 49/8 50/15 54/10
54/22 54/24 54/25 55/8 55/12
55/13 55/14 55/16 55/18 55/22
56/2 56/3 56/22 56/23 56/24
56/25 57/5 57/7 57/8 58/6 58/8
58/8 58/11 58/14 59/3 59/4
59/16 68/23 69/1 69/5 69/7
69/23 71/5 71/10 71/15 71/18
71/19 71/19 71/21 72/5 72/11
72/19 77/12 77/14 79/9 85/19
85/20 87/16 89/8 89/15 89/16
89/19 90/9 90/11 90/19 93/2
93/3 93/5 93/6 93/7 93/9 93/12
93/14 93/14 93/18 93/21 93/23
94/11 94/19 94/23 95/1 95/9
96/13 96/15 96/18 97/8 97/9
100/9
**care [3]**   48/20 107/20 120/20
**cared [1]**   52/13
**carefully [1]**   121/25
**Carlton [1]**   13/11 13/12
**Carolina [8]**   29/13 29/20 30/24
69/13 69/13 69/15 70/19 97/21
**carried [3]**   40/6 79/10 79/11
**carrying [3]**   40/5 79/7 79/19
**cars [45]**   28/10 30/16 30/19

31/18 31/19 31/20 31/22 32/21
37/15 38/19 49/9 49/10 49/15
54/2 54/4 54/9 54/12 54/16
54/22 54/25 55/1 55/6 55/6
55/15 56/16 57/10 58/7 58/12
58/13 59/16 59/22 59/23 60/2
60/3 70/17 71/4 71/13 72/7
73/6 77/23 94/7 94/12 94/13
96/3 96/3
**case [81]**   1/2 4/7 5/14 5/16
5/17 6/25 7/8 7/18 9/3 10/11
17/22 17/23 18/25 25/5 25/7
26/2 26/13 27/21 29/11 30/21
32/9 39/21 40/5 40/18 43/22
44/15 45/17 45/22 46/25 47/5
47/8 47/11 51/18 52/22 52/23
52/24 55/10 60/14 60/20 71/2
71/7 76/4 76/7 76/13 77/11
80/1 80/3 80/22 82/9 82/20
83/3 83/7 85/6 85/8 85/10 86/2
95/15 96/19 96/21 96/22 97/8
97/15 97/21 97/22 98/13 98/18
99/5 99/8 99/19 99/21 99/21
99/24 101/11 102/18 102/19
102/19 103/15 108/19 108/25
109/1 124/23
**cased [2]**   33/11 34/1
**cases [2]**   44/3 76/2
**cashing [2]**   29/13 29/14
**caught [13]**   9/18 24/2 31/25
32/1 33/20 36/7 46/23 54/22
54/24 58/7 75/11 81/1 89/8
**cause [1]**   113/6
**caused [2]**   82/14 126/10
**causes [1]**   124/15
**causing [1]**   78/10
**caution [1]**   75/22
**cease [2]**   8/13 8/15
**celebrity [2]**   11/8 11/18
**cell [1]**   81/19
**cellphone [3]**   35/23 37/8 98/10
**cellular [1]**   116/12
**cents [1]**   48/7
**certain [10]**   5/6 17/20 17/21
40/8 51/23 55/6 76/13 76/15
77/17 124/3
**certainly [8]**   5/7 5/21 52/17
85/2 93/8 103/2 104/2 121/21
**certificate [1]**   13/24
**Certified [1]**   129/11
**certifies [1]**   48/25
**certify [1]**   129/11
**challenge [2]**   5/17 14/13
**chance [1]**   41/5
**change [5]**   9/1 31/16 37/16
84/10 106/9
**changes [3]**   51/4 106/5 106/13
**charge [3]**   77/3 79/5 79/6
**charged [8]**   5/18 7/23 40/5
40/8 70/4 78/3 96/17 98/21
**Charger [10]**   16/1 16/2 32/19
37/8 38/14 38/15 39/1 39/4
39/7 54/13
**charges [3]**   4/6 4/7 79/6
**charging [1]**   6/7
**chasing [1]**   89/17
**cheapest [1]**   48/8
**check [6]**   3/10 29/12 29/14
38/23 52/13 107/11
**checked [4]**   61/11 82/19 83/15
111/18
**Chevy [2]**   33/7 39/12

**child [3]**   8/23 17/1 20/11
**children [2]**   8/6 126/19
**choice [1]**   47/13
**choosing [1]**   119/15
**chop [12]**   30/20 30/21 30/22
31/13 94/6 94/8 94/9 94/14
94/15 94/16 94/20 94/23
**chosen [2]**   86/1 86/15
**circling [1]**   33/15
**Circuit [2]**   82/20 83/4
**circumstances [1]**   40/9
**Civic [1]**   72/17
**claimed [2]**   57/20 59/5
**claims [6]**   53/6 55/19 56/15
58/5 59/11 98/11
**Clark [1]**   29/12
**clear [6]**   98/17 99/15 99/24
107/8 113/21 125/25
**clearly [5]**   39/12 68/2 99/16
123/7 127/10
**Clematis [1]**   1/24
**clerk [1]**   25/16
**client [3]**   44/12 44/13 92/11
**client's [1]**   92/4
**close [4]**   33/22 63/14 63/16
66/22
**closing [8]**   2/7 6/21 41/1 42/5
82/13 86/5 92/1 94/6
**closings [1]**   50/18
**clothing [4]**   18/25 35/19 61/6
61/15
**club [8]**   29/4 29/4 86/6 86/6
86/6 86/7 98/4 98/8
**clue [1]**   111/4
**cocaine [1]**   96/4
**coconspirators [1]**   86/20
**Coconut [1]**   31/22
**code [2]**   88/25 109/19
**code-a-phone [1]**   109/19
**coincidence [3]**   14/3 30/3
35/16
**coincidentally [1]**   39/1
**cold [1]**   43/18
**cold-blooded [1]**   43/18
**colleagues [1]**   8/3
**color [4]**   9/8 9/11 9/14 71/18
**colored [2]**   123/8 123/10
**column [2]**   71/25 72/20
**combined [2]**   106/13 106/23
**come [21]**   23/15 23/17 23/18
23/25 24/24 25/20 49/21 74/8
75/1 82/8 87/20 97/13 108/18
110/11 110/20 114/14 118/21
120/23 127/3 128/16 128/24
**comes [8]**   28/24 48/17 96/2
96/14 100/5 118/14 118/14
126/20
**comfort [1]**   11/23
**coming [2]**   28/6 80/18
**commenced [1]**   103/11
**comment [3]**   49/12 50/5 116/20
**commerce [3]**   17/16 78/13 78/16
**commission [1]**   30/23
**commit [7]**   57/6 68/4 68/6
72/22 77/12 78/15 82/24
**committed [5]**   68/21 69/23
70/23 79/9 81/21
**committing [4]**   71/8 78/18
78/21 78/23
**common [6]**   51/13 59/5 62/15
66/21 70/6 77/17
**communications [1]**   66/9

## C

**compare [1]**  8/3
**compared [1]**  38/10
**compelling [2]**  37/11 88/8
**competency [1]**  123/14
**complaining [3]**  112/21 113/12
120/16
**complaint [1]**  114/24 118/19
**complete [1]**  127/23
**completely [5]**  91/22 91/23
95/14 97/23 98/13
**complex [1]**  99/20
**comply [1]**  101/22
**complying [1]**  42/3
**computer [1]**  116/9
**concept [1]**  46/7
**concepts [1]**  45/22
**concern [2]**  122/10 126/10
**concerned [2]**  126/19 126/20
**concerns [1]**  68/14
**concluded [2]**  6/1 6/24
**conclusion [1]**  4/20
**conclusions [3]**  27/20 43/9
65/22
**conduct [6]**  69/16 76/11 102/9
103/10 109/2 119/22
**confer [1]**  118/20
**conferring [1]**  5/3
**confessed [1]**  22/11
**confidence [1]**  128/8
**confident [2]**  40/18 111/20
**confirm [3]**  53/22 53/23 62/1
**confirmed [3]**  16/7 51/24 58/20
**confirming [1]**  66/5
**conflict [7]**  109/17 113/6
113/18 113/20 113/22 120/16
120/19
**conflicts [1]**  124/3
**confronted [5]**  47/13 49/19
75/7 113/3 113/4
**connect [2]**  28/23 71/14
**connection [1]**  28/22
**connections [1]**  28/2
**consensus [1]**  122/17
**consider [3]**  4/5 43/1 70/7
**considered [1]**  3/16
**consistent [3]**  33/11 92/4
93/17
**conspiracies [1]**  60/25
**conspiracy [14]**  5/18 6/2 20/23
27/18 76/22 77/3 77/18 77/19
82/14 82/17 82/19 85/9 85/25
86/22
**conspirator [1]**  77/21
**conspiratorial [2]**  82/25 83/1
**conspirators [1]**  14/3
**constantly [3]**  62/21 117/22
118/13
**constituted [1]**  30/4
**construction [5]**  10/1 10/4
18/15 18/25 70/14
**consulting [1]**  4/19
**contact [2]**  16/25 86/12
**contacted [1]**  58/17
**contacts [2]**  98/4 98/6
**contains [1]**  106/25
**context [1]**  10/20
**continue [6]**  26/16 100/7 100/9
102/22 102/25 128/25
**continued [1]**  95/1
**contradicts [1]**  69/19

**Contrast [1]**  98/14
**control [3]**  12/24 40/13 79/21
**conversations [1]**  50/25
**convict [5]**  25/6 46/7 75/20
76/9 76/12
**convicted [6]**  47/20 75/6 96/1
96/3 96/5 96/6
**conviction [1]**  5/20
**convictions [1]**  81/6
**convince [2]**  65/10 111/3
**convinced [3]**  8/1 8/1 92/15
**cooked [1]**  19/22
**cooperate [1]**  22/23
**cooperating [1]**  22/19
**cops [2]**  59/18 73/11
**copy [5]**  101/4 102/1 102/2
102/6 107/3
**corner [1]**  59/15
**correct [3]**  105/20 107/9
129/12
**corrected [1]**  53/7
**correction [2]**  105/4 105/20
**corrections [2]**  104/17 105/25
**corroborate [3]**  14/20 21/1
48/14
**corroborated [4]**  16/7 18/21
78/17 99/7
**corroborates [3]**  30/10 39/22
50/22
**corroboration [1]**  69/6
**counsel [2]**  5/3 103/12
**count [3]**  6/3 104/19 105/5
**Count 4 [1]**  105/5
**country [3]**  11/7 75/3 76/21
**counts [2]**  40/22 78/24
**county [2]**  12/22 38/8
**couple [7]**  8/23 8/24 41/4
42/17 67/8 95/25 98/15
**course [18]**  6/4 6/8 6/9 48/9
52/7 52/21 57/3 62/12 67/11
70/3 87/20 108/20 108/24 109/2
109/21 123/2 123/11 123/21
**court [37]**  1/1 1/24 2/1 3/17
5/10 5/13 21/21 22/3 22/4 22/8
22/18 22/22 23/9 37/16 37/18
37/21 45/12 49/18 58/19 58/22
65/4 84/17 85/1 96/2 96/14
96/23 97/11 108/2 108/15
110/18 113/17 113/20 114/14
114/20 114/25 125/10 126/11
**Court's [2]**  25/16 125/17
**courthouse [2]**  73/15 103/14
**courtroom [1]**  80/19
**cousin [1]**  24/19
**cover [4]**  8/9 8/9 115/19
123/25
**covering [2]**  35/24 39/19
**covers [1]**  24/14
**CR [1]**  1/2
**crazy [4]**  28/2 28/6 28/8 36/18
**create [2]**  120/16 120/18
**creates [1]**  78/5
**credibility [7]**  2/13 42/22
43/14 76/16 95/23 96/6 96/8
**credible [1]**  20/13
**Creek [1]**  31/22
**crew [13]**  18/7 30/4 36/14
54/15 54/18 55/5 70/11 70/12
70/16 71/8 94/12 95/1 100/1
**crime [24]**  14/20 38/2 58/13
68/4 68/6 71/2 72/22 76/21
77/1 77/2 77/22 78/3 78/16

78/16 78/18 79/8 79/9 79/11
79/12 80/6 80/7 80/11 81/17
82/2
**crimes [4]**  75/7 76/19 76/20
81/20
**criminally [2]**  79/25 80/4
**critical [1]**  86/24
**cross [15]**  9/10 9/16 9/20
10/25 14/11 14/14 15/18 16/23
18/10 21/12 33/6 86/25 96/13
96/14 104/7
**cross-examination [9]**  9/16
9/20 14/11 14/14 15/18 16/23
18/10 33/6 96/13
**cross-examined [4]**  9/10 10/25
86/25 96/14
**cross-examining [1]**  21/12
**crowd [5]**  51/16 51/17 51/17
62/21 62/21
**crucify [1]**  53/16
**Crum [2]**  15/2 15/2
**cumulative [2]**  6/5 6/6
**cumulatively [1]**  5/20
**curb [1]**  55/11
**curiosity [1]**  56/6
**current [1]**  41/9
**custody [3]**  17/1 29/23 30/24
**customer [2]**  29/9 29/10
**cut [9]**  27/17 30/25 48/24
54/14 68/1 68/3 68/7 76/7 81/7

## D

**Dade [1]**  36/25
**dangerous [2]**  76/21 77/3
**Daryl [30]**  4/4 4/10 13/25 14/4
30/11 30/12 37/24 38/6 45/15
50/20 51/1 51/1 51/20 52/1
53/5 63/15 65/3 66/2 66/4 66/6
66/9 73/16 73/16 73/19 88/25
91/3 91/5 91/11 91/12 91/16
**data [3]**  35/23 38/14 38/25
**date [8]**  17/11 23/10 43/24
53/12 64/1 64/13 79/1 93/22
**Dated [1]**  129/14
**dates [2]**  44/18 72/8
**David [2]**  16/13 22/14
**Davis [16]**  3/15 4/4 4/10 12/20
13/2 13/8 13/25 14/1 14/4
24/25 25/11 30/1 30/4 30/11
30/12 31/17 32/20 34/4 34/4
36/2 38/6 45/15 50/20 51/20
51/25 52/1 53/3 53/5 53/5 53/9
53/9 65/3 66/2 66/4 66/6 66/9
73/16 73/16 73/19 88/25 89/3
89/7 89/11 90/1 90/14 90/20
**Davis' [21]**  13/19 23/4 23/9
24/11 24/14 24/15 28/9 29/5
35/17 37/24 51/1 51/1 63/15
85/23 91/3 91/5 91/9 91/11
91/12 91/17 99/7
**day [31]**  17/6 17/8 33/13 36/4
37/21 42/14 44/24 45/7 46/12
48/11 49/14 50/15 50/19 53/14
57/14 57/17 60/16 60/19 62/7
63/12 64/1 65/5 65/7 69/1
73/22 85/15 88/19 91/17 100/15
100/16 129/14
**days [16]**  22/21 33/17 33/22
33/23 47/13 47/14 69/14 69/14
70/19 72/11 72/16 72/17 106/23
108/16 109/15 109/19
**deal [3]**  9/6 21/24 76/6

## D

**dealer [2]**   25/19 63/10
**dealers [1]**   62/22
**dealing [5]**   21/22 22/10 82/1 113/18 115/7
**debrief [1]**   21/8
**debriefed [1]**   56/21
**debriefing [1]**   60/11
**debriefings [2]**   49/23 50/4
**decide [13]**   12/14 27/6 42/22 43/2 43/3 43/4 48/22 49/2 80/19 80/21 115/14 115/16 118/21
**decided [5]**   19/19 26/8 93/19 100/2 120/5
**decision [7]**   5/13 10/6 15/16 115/8 118/6 118/22 118/23
**decisions [1]**   18/12
**Deerfield [2]**   64/16 65/14
**defendant [29]**   1/8 1/20 5/3 5/17 5/20 7/19 20/3 24/7 30/18 36/1 77/6 79/25 80/3 80/5 82/25 83/1 85/15 87/10 94/5 95/5 95/12 97/7 99/23 104/8 104/17 104/21 104/23 105/5 105/6
**defendant's [7]**   8/1 8/2 39/23 85/9 86/13 87/8 94/10
**defendants [3]**   104/16 104/22 104/24
**defense [11]**   18/4 18/5 22/4 27/23 41/1 42/6 84/20 85/10 92/18 106/17 107/6
**defense's [1]**   2/4
**defenses [1]**   45/19
**defined [1]**   83/10
**deflate [1]**   24/1
**delayed [1]**   78/12
**deliberate [10]**   99/19 102/12 102/22 112/20 112/22 112/23 118/3 123/3 125/16 126/17
**deliberating [2]**   125/21 127/24
**deliberation [5]**   101/11 102/9 110/1 110/9 113/15
**deliberations [17]**   102/14 103/10 103/11 108/19 109/12 111/23 113/7 113/25 116/13 116/16 117/4 117/9 122/12 122/19 123/18 127/24 129/1
**delivered [1]**   88/12
**delivering [1]**   88/1
**denied [4]**   20/11 22/25 22/25 25/25
**denies [1]**   25/10
**dent [2]**   38/5 38/5
**deny [1]**   6/7
**department [2]**   13/23 32/5
**depending [1]**   111/17
**deputy [1]**   15/2
**described [2]**   114/16 128/2
**description [2]**   35/9 113/21
**Descriptions [1]**   44/6
**desire [1]**   112/20
**desired [1]**   2/5
**despite [5]**   89/22 92/24 95/16 95/17 100/18
**detail [3]**   35/24 45/2 45/6
**details [2]**   25/14 25/15
**Detective [1]**   21/18
**determining [1]**   4/8
**devastating [1]**   36/17

**developed [1]**   17/23
**devil [1]**   43/22
**didn't [52]**   7/13 7/14 8/9 10/21 13/2 14/12 14/12 14/18 15/8 18/23 21/2 21/4 21/13 21/19 22/4 22/22 26/21 32/16 33/23 43/7 49/13 50/3 50/13 52/12 52/13 55/11 55/20 56/10 58/7 59/19 60/2 64/24 67/12 68/17 69/3 69/4 69/18 73/23 74/3 81/15 86/21 91/24 93/20 97/8 99/1 99/3 99/9 126/8 126/12 126/12 127/3 128/23
**difference [4]**   37/9 38/7 104/3 106/24
**different [17]**   3/17 4/23 8/25 25/11 25/12 36/7 36/9 38/9 51/3 63/7 81/24 81/25 91/23 91/23 112/12 112/25 127/13
**difficult [4]**   44/15 45/10 62/25 80/18
**diligence [1]**   6/15
**direct [4]**   9/19 26/16 26/19 28/23
**directed [1]**   79/21
**directions [2]**   36/8 36/9
**directly [1]**   39/15
**directs [1]**   87/6
**dirt [1]**   89/8
**disagree [1]**   125/20
**disbelieve [2]**   12/18 32/10
**discontinued [1]**   98/6
**discount [1]**   94/10
**discovery [6]**   57/4 60/13 81/20 98/18 98/18 98/20
**discuss [9]**   19/7 72/4 82/7 102/17 108/5 108/8 108/19 108/25 110/12
**discussed [8]**   26/14 29/18 49/24 54/19 101/16 122/24 122/25 123/6
**discussing [3]**   77/17 85/7 123/1
**discussion [2]**   34/16 93/9
**disguises [1]**   70/14
**disgusting [1]**   66/16
**disk [4]**   106/25 107/1 107/3 107/4
**dismiss [2]**   115/13 122/22
**dispense [1]**   100/16
**disposal [1]**   98/22
**DISPOTO [7]**   1/17 2/25 41/16 84/23 124/20 125/2 128/12
**Dispoto's [1]**   10/9
**disprove [1]**   9/12
**dispute [1]**   53/24
**disruptive [2]**   113/13 113/15
**disseminate [2]**   102/18 109/1
**dissent [2]**   5/14 6/4
**distinction [1]**   77/2
**distributed [1]**   41/6
**distributes [1]**   103/21
**distributing [1]**   109/3
**distribution [2]**   51/13 54/16
**DISTRICT [1]**   1/1 1/1 1/13
**DNA [6]**   61/4 61/4 61/7 61/11 69/9 69/9
**document [1]**   29/6
**documents [3]**   13/21 71/1 98/20
**doing [28]**   2/23 9/24 18/12 31/13 51/2 51/3 54/7 55/3 56/18 64/21 66/3 70/11 70/13

70/16 74/12 76/18 77/2 77/25 80/9 81/12 92/8 97/16 104/16 111/14 112/8 114/10 118/13 124/14
**dollar [1]**   48/7
**door [5]**   38/5 38/5 73/24 74/1 74/2
**double [2]**   82/19 107/11
**double-check [1]**   107/11
**double-checked [1]**   82/19
**doubt [20]**   7/21 7/22 7/25 8/11 8/14 8/19 9/1 10/7 46/3 46/6 46/8 46/10 68/21 69/25 74/25 74/25 75/13 78/1 79/3 80/22
**downside [1]**   81/9
**dozen [1]**   49/23
**draft [1]**   2/8
**draw [5]**   27/19 35/2 43/9 55/9 65/22
**drawn [2]**   43/10 88/9
**dreadlocks [1]**   92/2
**dreads [5]**   35/14 50/8 50/8 50/11 50/13
**dressed [1]**   35/19
**dresses [1]**   34/2
**drive [4]**   11/9 33/21 38/21 55/14
**driver [15]**   27/15 27/16 39/3 58/9 59/4 69/1 80/14 85/18 86/11 89/15 89/20 91/15 95/4 95/6 95/11
**driver's [1]**   35/5
**drives [1]**   34/8
**driving [2]**   72/13 90/9
**drop [3]**   64/18 64/23 64/25
**dropped [2]**   82/18
**drove [5]**   30/13 34/23 54/12 54/17 65/18
**drug [13]**   16/9 20/23 25/1 25/19 28/21 31/4 51/13 52/8 52/23 54/16 62/22 62/24 63/10
**drugs [5]**   3/15 4/4 31/2 52/7 52/10
**drugstore [1]**   29/13
**dude [1]**   24/8
**dumbest [2]**   67/2 70/22
**dump [1]**   35/2
**dumped [1]**   39/20
**duplicate [1]**   104/7
**duplicated [1]**   103/25
**duty [3]**   109/14 113/24 127/12

## E

**e-mails [1]**   127/22
**earlier [2]**   85/20 89/23
**early [2]**   34/14 94/12
**earth [1]**   67/2
**easier [2]**   28/12 106/17
**easily [1]**   122/13
**easy [2]**   99/21 120/23
**eat [1]**   11/17
**effect [2]**   3/17 17/17
**effort [5]**   85/22 86/2 87/10 110/24 112/11
**efforts [2]**   85/11 92/24
**eight [9]**   48/8 60/8 60/11 60/13 61/3 68/7 81/15 89/2 90/3
**Einstein [8]**   12/1 12/1 12/2 12/2 12/5 12/8 12/8 12/9
**either [6]**   21/2 84/1 118/9 121/9 121/10 126/25

**E**

**elect [1]**  6/2
**element [4]**  32/9 104/11 105/11 105/16
**elements [4]**  15/19 77/13 79/4 84/3
**Eleventh [2]**  82/20 83/4
**else's [2]**  78/8 99/2
**embarked [1]**  85/11
**employed [1]**  66/24
**employer [1]**  12/20
**employment [3]**  13/1 13/2 99/7
**enabled [1]**  12/4
**encompassed [1]**  82/24
**ended [2]**  30/21 30/22
**endorsement [2]**  11/17 11/18
**endorsements [1]**  11/8
**enforcement [10]**  24/19 36/4 52/19 56/12 56/21 56/25 62/25 67/7 70/24 74/11
**engage [1]**  122/19
**enjoying [1]**  116/19
**ensure [1]**  39/24
**entered [2]**  61/7 106/4
**entire [2]**  85/10 127/23
**entitled [1]**  129/13
**episode [1]**  46/22
**episodes [1]**  46/17
**equipment [1]**  32/5
**errors [2]**  103/18 105/23
**escaped [1]**  10/17
**escaping [1]**  57/14
**especially [7]**  6/14 7/7 43/12 47/19 72/20 98/10 103/5
**ESQ [1]**  1/20
**establish [3]**  16/10 28/13 77/18
**established [5]**  29/1 29/3 29/5 29/8 31/4
**etched [1]**  64/1
**evaluate [1]**  99/14
**evaluating [1]**  4/9
**event [3]**  40/10 45/7 77/16
**events [5]**  114/16 117/12 117/15 117/23 118/5
**eventually [1]**  73/23
**everybody [17]**  6/17 32/17 32/19 32/20 41/5 54/12 54/17 61/1 66/20 99/2 99/4 110/4 117/20 125/10 125/14 126/15 127/16
**everybody's [1]**  35/17
**evidence [69]**  3/13 3/15 3/19 4/6 4/8 5/6 6/24 7/2 7/5 7/18 10/24 13/11 13/21 18/22 18/22 20/12 22/7 22/12 25/1 25/5 25/20 29/6 30/10 30/12 30/22 33/18 36/16 39/21 39/22 40/19 45/20 48/14 50/10 61/4 61/4 61/23 61/25 69/12 72/2 72/8 78/2 80/17 82/8 85/6 85/7 85/14 86/3 86/3 86/14 86/17 89/6 89/13 91/21 91/22 92/17 92/21 94/2 94/4 94/7 95/16 95/17 95/18 97/19 98/23 99/3 102/24 106/4 118/4 118/4
**ex [2]**  16/25 115/4
**ex-wife [1]**  16/25
**exact [4]**  12/22 50/20 69/15 95/4
**exactly [7]**  54/25 63/25 92/7

101/6 116/4 116/5 121/19
**examination [11]**  9/16 9/20 14/11 14/14 14/17 15/18 16/23 18/10 26/19 33/6 96/13
**examined [4]**  9/10 10/25 86/25 96/14
**examining [1]**  21/12
**example [2]**  75/8 106/7
**EXCERPT [1]**  1/11
**exchange [1]**  31/10
**excuse [3]**  21/23 106/25 115/16
**executed [2]**  43/18 75/9
**exercise [1]**  40/13
**exhibit [3]**  106/3 106/18 106/22
**exhibits [3]**  106/4 106/14 107/12
**existed [1]**  12/1
**expect [4]**  12/17 38/8 116/1 124/9
**expected [1]**  13/12
**expecting [1]**  43/20
**experience [1]**  8/20
**experienced [1]**  8/20
**expert [2]**  123/10
**explain [18]**  7/15 15/17 15/21 16/1 26/9 36/18 85/11 85/12 86/2 86/16 87/11 87/24 91/21 91/22 92/23 100/24 117/2 124/13
**explained [5]**  10/10 12/20 12/21 17/20 98/14
**explaining [1]**  120/8 123/22
**explanation [16]**  27/12 28/8 30/19 36/18 67/22 75/16 75/17 75/18 87/1 87/14 88/2 88/5 91/8 91/23 96/20 96/22
**exposed [1]**  15/18
**extensively [1]**  86/25
**extent [3]**  52/22 114/24 124/3
**extremely [1]**  31/15
**eye [5]**  26/25 27/1 95/5 95/7 95/12

**F**

**F.3d [1]**  83/4
**face [8]**  15/6 35/20 61/20 68/25 69/1 81/12 86/3 86/14
**Facebook [4]**  13/18 13/18 29/5 29/6
**faces [1]**  42/8
**facilitate [1]**  4/25
**fact [21]**  14/6 14/20 14/24 15/1 16/8 37/20 44/17 50/23 51/19 55/3 89/22 91/10 92/5 94/9 94/15 95/8 96/9 96/14 97/25 98/4 124/19
**facts [4]**  25/21 43/8 49/23 92/20
**fair [1]**  96/7
**fall [2]**  11/24 12/15
**fallen [2]**  121/18 121/20
**falling [4]**  111/14 121/15 121/17 121/24
**famous [1]**  39/7
**fan [2]**  46/16 89/8
**fantastic [1]**  12/6
**far [5]**  55/11 83/12 106/7 113/12 119/17
**farfetched [1]**  46/11
**Fargo [1]**  46/14
**fashion [1]**  19/21

**fast [1]**  103/21
**fate [1]**  80/19
**fault [1]**  59/12
**faulting [1]**  80/24
**FCRR [2]**  1/23 129/16
**fear [1]**  78/11
**February [5]**  14/7 30/6 30/8 69/11 69/14
**February 22 [2]**  30/6 69/11
**February 22nd [1]**  30/8
**federal [6]**  60/24 76/22 78/5 96/21 97/8 129/11
**feel [5]**  5/5 11/22 111/20 124/5 125/9
**feeling [1]**  119/7
**feels [2]**  123/8 125/13
**fees [3]**  69/18 69/22 69/23
**feet [1]**  13/13
**fell [1]**  111/3
**felon [3]**  47/20 96/1 96/5
**felons [1]**  96/6
**felt [1]**  114/25
**female [1]**  121/16
**fence [4]**  9/25 10/3 35/5 57/13
**fender [1]**  39/13
**fewer [1]**  68/3
**field [1]**  11/3
**figure [7]**  44/19 44/22 45/13 53/12 60/9 60/11 126/24
**figured [2]**  13/9 53/14
**fill [3]**  27/7 27/20 37/19
**finally [3]**  13/8 53/14 74/1
**find [10]**  2/16 3/11 22/20 32/17 34/11 39/25 46/8 65/12 77/4 79/8
**finding [2]**  79/25 80/3
**fine [4]**  84/11 104/4 110/19 110/21
**finish [1]**  107/18
**finished [1]**  2/7
**firearm [2]**  79/7 79/10
**firearms [1]**  77/24
**fired [1]**  9/13
**first [43]**  9/4 9/23 10/23 19/7 22/22 29/14 31/7 31/8 31/15 32/22 35/5 37/2 41/5 42/11 43/14 44/18 49/17 56/13 56/15 60/8 60/10 69/3 70/16 76/20 81/14 84/15 87/5 87/6 92/6 97/2 97/25 104/15 104/17 104/21 104/23 105/11 105/16 115/23 121/11 122/11 122/22 124/17 126/7
**fishing [1]**  66/22
**fit [4]**  3/2 7/14 61/21 81/13
**fits [2]**  7/16 65/15
**five [6]**  17/7 18/7 41/17 72/11 85/1 97/12
**five-minute [1]**  85/1
**fix [1]**  38/8
**flags [1]**  60/21
**flashlight [1]**  48/6
**flashy [3]**  55/8 93/2 93/3
**flat [2]**  6/15 23/10
**fled [2]**  89/16 100/13
**flexibility [1]**  109/22
**FLORIDA [7]**  1/1 1/8 1/19 1/21 1/25 13/11 13/23
**focus [1]**  35/3
**folks [3]**  87/15 87/21 126/24
**follow [5]**  42/1 52/14 102/5 115/13 116/25

**F**

**follow-up [2]**   52/14 116/25
**followed [1]**   6/17
**following [3]**   15/22 82/12
  84/17
**football [4]**   73/1 73/2 73/4
  73/12
**force [2]**   77/24 78/10
**foregoing [1]**   129/11
**foreign [1]**   12/7
**forensics [1]**   60/15
**foreperson [1]**   113/13
**forget [6]**   19/15 24/13 71/18
  89/16 95/19 95/20
**forgetting [1]**   40/4
**form [1]**   41/9
**formal [1]**   118/19
**formed [1]**   51/7
**forms [1]**   51/8
**Fort [2]**   1/8 66/20
**Fort Lauderdale [1]**   66/20
**forth [3]**   47/10 63/9 65/20
**forthcoming [1]**   74/16
**fortunately [1]**   100/13
**forward [1]**   120/24
**found [13]**   12/22 15/17 15/24
  18/24 19/20 35/19 38/2 47/1
  57/1 61/6 61/9 68/19 79/8
**foundation [1]**   16/5
**four [5]**   5/15 47/16 61/23
  72/17 109/3
**frame [4]**   20/14 20/18 89/1
  91/1
**frankly [2]**   14/13 84/2
**frantic [4]**   23/16 23/18 23/19
  36/2
**frantically [3]**   36/2 89/7
  90/19
**freak [1]**   94/18
**free [1]**   75/4
**frequently [2]**   66/24 124/22
**Freshly [1]**   31/21
**Friday [1]**   72/25
**friend [1]**   71/12
**friends [4]**   18/13 28/3 66/9
  70/25
**front [15]**   14/9 39/13 39/15
  44/1 59/19 73/8 73/9 73/11
  85/4 91/24 95/19 110/15 121/14
  121/15 121/16
**frustration [2]**   119/3 119/8
**full [5]**   17/6 84/16 112/4
  112/10 112/10
**function [1]**   76/3
**funny [4]**   13/8 46/12 48/4
  125/4
**further [9]**   40/14 61/19 108/19
  110/6 115/15 120/13 128/1
  128/10 128/24
**furtherance [2]**   79/7 79/12
**future [1]**   78/11

**G**

**gain [2]**   19/9 19/11
**game [7]**   73/4 73/13 112/7
  112/9 112/14 113/5 127/20
**games [7]**   73/2 73/2 112/17
  112/18 116/6 116/10 116/23
**gang [1]**   126/24
**ganged [1]**   125/10
**gap [2]**   88/8 88/24

**gaps [2]**   67/20 67/3
**Gardens [4]**   63/14 63/14 63/24
  65/13
**garments [1]**   61/11
**gathered [1]**   35/17
**general [3]**   25/13 82/17 117/20
**generally [2]**   27/11 114/11
**gentleman [1]**   15/25
**gentlemen [10]**   85/4 87/1 89/5
  91/11 92/17 95/18 98/12 99/17
  99/20 100/15
**German [1]**   46/20
**Germany [1]**   12/12
**getaway [14]**   10/18 14/9 27/15
  27/16 30/16 34/5 34/7 54/25
  58/9 59/3 72/11 80/14 85/19
  86/11
**getting [14]**   6/16 11/16 31/14
  44/7 55/14 55/19 57/15 72/4
  74/20 100/6 101/14 116/20
  127/11 127/13
**giggling [3]**   125/5 126/9
  126/13
**GILFARB [17]**   1/17 41/17 42/18
  50/11 50/18 51/6 51/21 62/10
  70/20 86/4 86/25 87/4 94/6
  95/23 96/13 96/16 98/14
**girl [1]**   111/3
**girlfriend [16]**   23/20 36/3
  86/13 87/8 87/25 90/4 90/4
  90/5 90/16 90/17 90/18 90/22
  90/23 91/19 91/19 91/20
**girlfriend's [1]**   36/3
**give [18]**   4/14 7/4 10/20 11/18
  16/20 22/14 31/10 40/7 68/1
  69/22 80/9 81/11 84/7 84/9
  101/10 126/3 128/6 128/22
**given [8]**   24/6 26/1 32/5 40/20
  74/17 86/9 125/24 127/24
**gives [6]**   11/23 30/19 31/9
  69/21 94/5 97/24
**giving [3]**   18/20 72/8 112/10
**glaring [1]**   48/9
**gloves [1]**   48/9
**go [60]**   2/18 4/18 6/11 7/9
  10/13 11/15 14/21 16/18 27/11
  28/10 28/10 28/14 32/2 32/4
  33/24 34/16 36/20 37/14 37/15
  37/16 37/18 39/2 39/25 41/5
  44/17 48/15 49/23 50/14 53/13
  55/11 56/13 59/19 65/14 67/9
  67/12 67/16 70/23 73/4 73/12
  79/15 80/19 82/6 84/5 91/16
  97/11 99/18 100/2 100/8 102/5
  102/9 102/11 102/16 103/1
  103/9 106/13 106/17 107/22
  108/10 110/18 113/8
**goal [3]**   77/23 83/1 83/2
**goals [1]**   77/17
**God [1]**   65/4
**goes [12]**   13/10 20/4 30/12
  30/24 65/6 65/13 66/20 66/23
  73/24 76/1 100/5 113/21
**going [162]**   2/22 2/25 3/21
  6/11 6/21 6/25 7/1 7/3 7/10
  7/13 8/21 8/23 9/17 10/10
  10/20 12/14 12/23 17/6 18/4
  22/5 22/13 23/15 23/17 23/18
  23/24 25/20 27/13 27/16 30/5
  30/11 31/13 31/19 34/5 34/6
  36/14 36/23 36/24 37/5 37/15
  37/23 38/7 39/2 39/11 40/7

  40/24 41/14 42/9 42/19 42/22
  42/24 43/20 43/25 44/8 44/24
  46/4 47/6 47/19 47/21 48/22
  49/5 49/12 50/25 55/8 55/9
  57/4 57/12 57/25 58/1 59/24
  59/24 59/25 60/6 60/9 60/12
  60/21 60/22 60/23 61/3 61/17
  61/24 62/24 67/25 68/6 71/20
  71/21 71/21 71/22 71/22 72/1
  72/2 72/19 72/21 72/22 73/3
  73/10 73/18 74/6 74/6 74/13
  74/21 74/22 74/24 74/24 75/1
  75/21 76/1 76/24 77/13 77/15
  77/25 79/13 80/20 80/20 81/10
  82/5 82/5 84/7 84/9 84/14
  88/11 88/13 88/18 91/13 91/14
  93/13 93/19 94/1 94/4 94/11
  94/22 95/24 97/9 99/18 99/19
  100/24 100/25 101/9 101/25
  102/8 102/16 102/20 108/14
  109/5 113/6 114/11 115/14
  116/4 119/6 120/1 120/2 120/6
  120/15 121/1 124/2 124/23
  125/4 125/11 125/18 126/1
  127/1 127/1 128/22
**GOLDER [14]**   1/20 9/9 21/12
  42/6 91/21 92/10 92/24 93/11
  95/3 98/16 98/25 108/8 118/17
  126/5
**Golder's [2]**   93/16 95/13
**good [25]**   6/23 10/11 11/12
  11/15 11/22 17/5 41/16 43/5
  43/8 43/8 52/19 56/8 56/13
  60/4 66/6 66/8 68/13 68/24
  101/7 101/24 107/19 117/7
  120/13 128/12 128/17
**goodness [1]**   22/24
**goofing [1]**   112/18
**government [34]**   1/17 6/2 6/5
  45/23 47/5 47/7 48/16 48/21
  48/25 50/5 50/17 53/21 53/21
  55/19 58/4 60/6 60/9 60/17
  63/3 71/14 73/16 75/24 76/6
  76/9 78/7 79/4 80/21 81/9
  84/19 84/19 84/20 98/23 99/22
  105/22
**Government's [7]**   43/16 49/4
  60/18 60/18 106/3 106/5 106/22
**grab [1]**   103/20
**gray [1]**   9/17
**great [4]**   81/5 110/7 121/2
  129/6
**green [4]**   9/17 32/18 37/23
  69/8
**ground [2]**   124/15 124/16
**group [25]**   16/8 29/15 31/15
  44/9 51/6 51/7 51/8 51/9 51/12
  51/18 51/20 52/9 54/25 55/12
  55/24 57/25 59/8 59/20 62/20
  62/20 67/21 67/24 68/11 77/25
  100/7
**guarantee [1]**   52/24
**guard [2]**   29/19 60/15 68/24
  75/9
**guess [7]**   24/22 30/2 43/17
  71/17 89/25 106/10 117/18
**guessing [1]**   7/9
**guilt [4]**   8/1 8/2 45/24 75/13
**guilty [23]**   7/20 7/21 21/22
  28/1 40/22 47/12 47/15 65/12
  71/2 71/4 71/7 71/7 73/11 77/1
  78/18 79/8 79/18 80/10 82/8

## G

**guilty... [4]**   96/18 96/23 97/10 97/15
**gun [21]**   9/8 9/10 9/11 9/12 15/8 15/17 15/18 15/19 15/24 37/14 37/23 40/6 40/6 40/8 40/14 40/15 40/17 79/16 79/17 79/19 80/2
**gunman [1]**   20/19
**guns [4]**   34/5 75/10 106/15 107/16
**guy [13]**   17/13 25/6 38/20 66/16 66/22 67/2 69/2 74/13 76/7 79/16 79/16 79/18 92/1
**guy's [2]**   63/7 79/16
**guys [4]**   34/24 89/17 89/18 128/23

## H

**hair [2]**   50/7 54/14
**half [2]**   49/22 73/9
**hand [5]**   6/18 42/2 101/23 110/6 111/19
**handcuff [1]**   74/8
**handcuffed [2]**   74/15 74/18
**handcuffs [1]**   74/10
**handed [1]**   81/1
**handle [1]**   126/18
**hands [7]**   6/20 26/18 40/17 42/3 101/24 116/22 127/7
**handwritten [1]**   105/19
**hanging [3]**   50/12 59/1 64/3
**hangs [1]**   91/16
**happen [14]**   14/18 21/2 21/4 21/15 21/16 22/5 22/22 24/20 46/18 46/24 57/11 71/23 80/20 100/24
**happened [36]**   10/3 10/5 14/7 16/16 27/6 27/8 27/8 29/11 31/11 34/10 35/3 35/22 44/24 45/14 46/16 47/9 47/9 47/24 51/22 52/4 53/20 56/4 60/14 60/19 62/7 62/8 63/25 65/5 69/3 75/17 75/19 94/21 98/25 99/25 100/21 125/5
**happening [6]**   23/12 23/13 31/4 33/23 66/16 117/21
**happens [13]**   27/9 33/12 34/2 35/1 47/14 56/15 60/11 61/5 64/9 67/5 72/6 76/10 77/19
**happy [3]**   4/21 4/24 109/6
**hard [8]**   43/18 46/7 60/15 63/3 63/25 75/6 102/6 112/9
**hard-working [1]**   43/18
**harder [1]**   63/9
**hardest [1]**   82/1
**harm [1]**   78/11
**Hasam [31]**   29/9 29/10 30/13 30/15 37/16 37/18 37/20 50/15 56/17 56/18 57/5 57/6 57/15 57/16 57/19 57/21 57/22 57/25 59/5 59/12 61/10 61/12 61/15 61/17 62/18 64/13 66/11 66/11 67/6 85/16 91/13
**head [4]**   79/18 83/17 100/14 107/22
**headed [1]**   35/6
**hear [16]**   4/21 4/24 10/22 17/14 24/7 37/20 40/25 42/5 55/20 60/23 73/13 103/2 110/22 113/12 121/10 126/22

**heard [38]**   3/7 3/13 7/16 9/8 20/15 21/22 23/21 25/16 28/20 34/12 34/20 37/20 44/8 44/12 48/8 51/4 51/15 52/8 55/13 56/6 57/8 62/20 63/5 68/15 70/12 70/21 72/24 76/13 76/15 92/25 97/19 97/21 99/5 99/5 99/8 114/22 114/22 114/24
**hearing [3]**   2/19 58/19 99/22
**hearings [1]**   107/18
**hears [1]**   74/1
**heart [1]**   22/24
**heck [1]**   18/9
**height [1]**   98/7
**held [3]**   29/23 82/12 84/17
**help [3]**   58/3 76/9 76/12
**helped [1]**   12/3
**helping [1]**   83/2
**hey [4]**   25/3 58/22 69/2 79/15
**hidden [1]**   42/8
**hide [1]**   32/16
**hide-a-key [1]**   32/16
**hiding [2]**   69/20 91/5
**high [5]**   20/9 54/15 73/1 98/1 98/2
**high-tech [2]**   98/1 98/2
**highlight [2]**   3/18 5/6
**highlighted [1]**   87/6
**hindsight [1]**   92/6
**history [2]**   58/12 58/13
**hit [1]**   89/8
**Hitler [3]**   12/9 12/11 12/12
**hitting [1]**   85/24
**Hobbs [7]**   5/18 78/4 78/5 78/14 82/18 82/24 105/17
**hold [1]**   75/10
**holding [3]**   79/17 79/18 89/19
**hole [1]**   37/19
**holes [2]**   27/6 61/11
**home [2]**   2/7 73/21
**homicide [1]**   72/18
**Honda [1]**   72/10
**Honor [12]**   6/22 41/7 41/11 101/17 105/24 108/7 109/9 112/13 114/23 115/17 115/21 129/2
**HONORABLE [1]**   1/12
**hoody [2]**   9/15 37/23
**hope [3]**   102/21 110/4 121/2
**hoped [1]**   11/14
**hopefully [2]**   19/1 128/7
**hopes [1]**   11/11
**hoping [1]**   76/6
**horrendous [1]**   75/8
**horrible [1]**   100/18
**host [1]**   19/1
**hotel [1]**   73/17
**hour [6]**   38/11 41/17 73/9 87/13 87/14 88/8
**hours [2]**   88/9 89/23
**house [18]**   24/11 24/15 24/15 24/15 28/5 28/10 35/17 63/15 63/16 64/3 64/14 65/6 65/14 69/21 72/25 73/25 91/11 91/12
**huge [3]**   20/14 20/16 60/17
**huh [1]**   83/22
**human [3]**   45/1 52/20 124/24
**hundreds [3]**   49/22 52/21 52/24
**hung [3]**   50/13 51/12 51/17
**hurt [1]**   21/1

**I'll [10]**   4/21 4/24 47/21

## I

**I'm [67]**   2/12 2/19 3/2 4/16 4/24 18/4 24/16 24/17 25/23 25/24 28/1 33/6 36/22 38/12 39/8 39/17 42/8 42/8 44/12 45/17 47/5 49/12 61/17 61/24 62/1 69/2 77/13 80/24 82/5 82/5 83/7 87/11 87/11 87/13 87/13 87/21 88/11 88/13 89/9 89/23 91/2 95/23 99/11 101/8 101/25 102/8 102/16 102/20 105/8 110/24 111/1 111/7 111/9 114/11 114/17 116/8 116/22 117/5 119/17 119/19 121/13 124/25 125/18 125/23 126/18 126/19 128/21
**I've [27]**   42/7 121/24 128/2
**idea [5]**   101/7 102/21 115/7 117/21 128/17
**ideas [3]**   18/16 101/8 114/18
**identical [1]**   84/2
**identification [1]**   14/19
**identifies [1]**   36/12
**identify [5]**   36/11 91/14 95/5 95/9 95/12
**identifying [1]**   81/18
**IHOP [1]**   59/17
**illegal [2]**   75/25 76/25
**imagine [3]**   6/17 26/16 62/3
**immediately [2]**   78/11 103/13
**impeach [1]**   21/13
**impeached [3]**   22/23 23/3 24/25
**impeachment [1]**   23/8
**implicate [3]**   19/20 20/21 20/25
**implicated [1]**   16/9
**implication [1]**   32/12
**importance [4]**   114/8 120/2 123/23 124/14
**important [23]**   7/8 7/14 9/20 9/21 10/12 10/12 13/19 15/5 15/6 15/10 15/10 16/2 22/19 33/25 33/25 42/16 45/7 45/22 78/20 98/5 111/11 112/15 117/2
**importantly [1]**   39/16
**impose [1]**   114/15
**inactivated [1]**   98/6
**inactive [1]**   65/24
**inappropriate [1]**   125/3
**inbound [1]**   91/19
**incapable [3]**   40/3 40/3 40/3
**incarcerated [1]**   94/22
**incentive [9]**   19/12 19/16 19/17 19/23 20/1 20/2 20/14 20/17 20/25
**incidences [1]**   98/24
**incident [9]**   49/10 53/10 67/4 72/12 72/15 72/16 72/23 85/13 88/18
**incidents [4]**   54/7 92/25 99/6 99/10
**includes [1]**   75/23
**including [4]**   51/13 55/24 68/10 71/5
**inconsequential [1]**   78/21
**inconsistent [3]**   21/14 52/8 92/18
**incredible [1]**   98/13
**incriminates [1]**   27/25
**independent [1]**   109/2
**indicated [2]**   101/25 109/4

**I**

**indicating [2]**  91/20 91/20
**individual [2]**  36/17 125/4
**individually [3]**  115/9 120/8
125/8
**inference [1]**  88/8
**Infiniti [10]**  31/23 32/15 34/5
34/8 34/23 36/21 36/25 38/18
71/24 72/14
**information [10]**  18/20 50/4
53/17 60/19 67/1 74/17 81/5
98/3 102/18 109/1
**informed [2]**  115/8 118/6
**initial [1]**  53/3
**initially [5]**  49/1 68/5 70/13
73/5 98/21
**innocence [3]**  45/25 46/1 75/2
**innocent [4]**  7/20 45/11 75/5
75/11
**inside [2]**  74/2 95/10
**insignia [1]**  39/13
**insisted [1]**  93/9
**inspect [1]**  94/20
**instances [1]**  99/1
**instruct [11]**  7/1 7/23 40/9
46/4 79/13 112/5 114/11
127/15 127/16 128/24
**instructed [4]**  4/5 102/7
125/15 125/15
**instructing [2]**  125/10 126/6
**instruction [35]**  2/4 2/13 2/16
2/17 2/20 2/23 3/6 3/8 3/11
3/13 3/19 4/13 4/17 4/24 42/25
77/15 79/24 82/14 82/16 82/17
84/15 101/10 101/15 101/15
101/22 102/1 104/22 105/3
105/8 108/23 111/15 125/23
126/4 128/7 128/24
**instructions [22]**  5/5 6/17 7/3
7/24 17/15 41/6 42/1 42/4
60/24 74/23 82/19 82/21 101/1
101/5 101/7 102/5 103/1 103/19
104/2 104/4 114/13 128/22
**instructs [1]**  40/12
**intellectual [1]**  119/17
**intellectually [2]**  119/13
119/19
**intend [1]**  127/25
**intended [2]**  40/13 78/15
**intent [3]**  78/17 93/18 93/22
**intention [2]**  121/8 128/21
**intentionally [1]**  80/5
**interest [3]**  13/25 67/7 77/17
**interested [1]**  56/7
**interesting [3]**  16/22 55/2
56/9
**interests [1]**  51/13
**interfere [1]**  113/17
**interpretation [2]**  89/6 92/20
**interrogated [1]**  15/3
**interrogation [2]**  15/4 15/6
**interstate [3]**  17/16 78/13
78/16
**interview [1]**  53/12 53/15
56/22 56/23
**interviewing [2]**  52/21 52/25
**interviews [1]**  53/3
**intimidation [1]**  77/24
**introduce [1]**  13/23
**introduced [5]**  7/2 13/2 13/7
17/20 29/25

**Inverrary [5]**  63/12 64/6 64/11
65/15 65/21
**investigate [1]**  102/19
**investigating [1]**  28/21
**investigation [2]**  52/22 109/2
**inviting [1]**  125/19
**involve [2]**  18/13 18/13
**involved [16]**  4/4 14/22 32/13
36/15 38/6 38/20 44/3 53/25
74/3 81/4 86/21 90/7 90/12
94/8 97/22 113/20
**involvement [4]**  85/9 86/18
97/2 97/20
**involving [2]**  18/15 113/25
**Irih [3]**  20/8 68/15 68/19
**irrelevant [3]**  9/10 9/14 9/15
**issue [14]**  5/16 5/23 5/24 6/6
19/8 20/13 28/16 28/18 80/10
122/15 123/16 123/20 125/16
127/13
**issued [1]**  118/18
**issues [4]**  26/6 26/7 96/6 96/8
**it's [16]**  11/12 11/19 19/2
20/14 24/24 39/25 42/15 57/4
58/3 62/6 65/9 65/9 82/21
102/3 105/19 110/10
**items [1]**  48/7

**J**

**jail [11]**  20/4 21/25 30/6 30/9
37/5 47/13 47/15 51/8 61/2
81/19 94/25
**jammed [1]**  8/24
**Jeep [6]**  14/9 14/12 14/12
30/14 69/8 72/9
**Jermaine [1]**  33/9
**job [3]**  60/4 80/18 116/19
**jobs [3]**  42/13 74/12 94/24
**Joe [1]**  28/20
**Johnson [30]**  15/25 16/3 16/4
16/11 17/11 28/24 29/25 30/4
30/5 30/8 30/24 30/25 31/9
31/17 32/19 33/3 33/23 37/13
38/16 38/22 39/18 51/7 58/15
58/18 58/19 58/22 69/21 89/18
90/14 99/4
**Johnson's [5]**  16/14 28/22
38/25 63/6 69/20
**joined [2]**  5/15 77/7
**jointly [1]**  40/16
**joke [7]**  111/1 116/18 116/21
116/22 117/10 117/25 127/9
**joking [3]**  112/25 119/18
119/23
**judge [45]**  1/13 2/6 2/21 3/12
4/12 4/16 5/1 5/4 7/1 7/3 7/23
7/23 38/12 40/7 40/9 40/12
42/19 46/4 47/25 48/23 48/25
60/24 74/24 75/21 76/1 79/13
84/24 85/1 97/14 99/13 100/22
103/17 105/11 107/7 107/19
108/9 109/10 113/9 113/11
113/14 117/24 124/25 126/14
128/4 128/12
**judgment [1]**  11/22
**July [30]**  32/25 32/25 33/1
33/1 33/2 33/11 34/2 34/11
36/21 44/20 50/22 51/2 55/15
55/18 56/4 59/6 59/12 61/9
61/14 62/11 63/22 64/12 66/2
66/3 67/6 71/16 72/6 72/12
78/25 85/14

**July 13th [1]**  32/25
**July 14 [1]**  33/1
**July 16th [1]**  33/1
**July 19 [1]**  66/2
**July 19th [1]**  33/2
**July 20th [1]**  33/11
**July 25th [1]**  62/11
**July 26th [15]**  34/2 34/11
36/21 44/20 50/22 51/2 59/6
59/12 61/9 61/14 63/22 64/12
66/3 78/25 85/14
**jump [2]**  9/25 55/10
**jumped [3]**  10/3 35/5 100/12
**jumping [1]**  57/13
**June [1]**  60/11
**juror [50]**  6/15 102/22 110/25
112/2 112/19 112/21 113/2
113/4 113/11 113/12 113/15
113/24 114/7 114/14 114/25
115/4 115/15 115/22 121/7
121/12 121/13 121/14 121/15
121/16 122/6 122/8 122/9
122/16 122/18 122/22 122/23
123/14 123/15 123/17 123/17
123/18 124/13 125/9 125/12
125/12 125/25 126/20 126/21
127/3 127/5 127/5 127/6 127/12
127/15 128/8
**juror's [2]**  122/17 124/11
**jurors [16]**  2/21 75/7 102/15
108/6 113/7 116/1 118/23 119/2
119/7 121/25 124/3 124/22
125/8 126/18 127/11 127/13
**jurors' [1]**  123/14
**jury [58]**  1/13 2/17 3/6 3/19
6/13 7/9 7/24 19/13 26/24
39/21 41/3 41/6 41/23 41/24
42/12 42/25 74/23 82/7 84/7
84/14 99/19 101/1 101/5 101/6
101/7 101/10 101/12 101/13
101/15 101/20 102/2 102/7
102/20 103/9 103/10 103/11
103/18 107/11 107/16 108/11
108/15 109/8 109/14 109/19
110/13 112/4 115/8 115/15
117/19 117/19 118/18 120/7
124/18 126/6 126/14 127/15
127/16 128/6
**justice [3]**  5/14 47/14 100/16
**justices [1]**  5/15

**K**

**keep [3]**  47/11 63/3 73/7
**kept [2]**  46/24 67/14
**key [3]**  32/16 66/25 71/25
**kick [1]**  59/20
**kicked [1]**  67/18
**kid [1]**  8/21
**killed [4]**  12/15 29/19 46/25
60/18
**killer [1]**  43/17
**killing [1]**  60/14
**kind [19]**  7/4 13/8 17/20 42/25
46/15 54/25 55/6 56/7 56/9
62/25 69/16 75/17 76/18 78/3
80/17 111/22 116/17 118/18
120/24
**knew [33]**  15/11 15/12 17/25
17/25 18/1 21/24 24/20 40/2
54/2 54/2 54/6 54/7 54/9 54/12
54/12 54/16 54/17 57/2 58/25
60/8 61/2 68/17 70/9 71/10

**K**

**knew... [9]**   73/10 77/6 77/9
80/7 81/20 82/25 82/25 97/22
98/25
**Knight [1]**   10/15
**knocked [1]**   73/24
**knocks [1]**   74/1
**know [173]**   3/14 4/16 4/20 5/1
7/12 7/13 7/14 8/7 8/8 8/15
8/17 10/2 10/18 11/9 12/7 15/8
18/11 18/24 19/24 22/20 22/20
22/25 25/9 26/2 26/5 27/9
28/19 28/22 29/1 32/23 33/25
35/3 35/22 36/6 36/8 36/13
36/25 38/24 39/2 39/16 39/18
42/12 42/15 43/11 43/21 43/23
44/6 44/14 44/16 44/23 44/25
45/3 45/15 45/19 45/20 46/12
48/12 48/16 48/19 49/10 50/2
51/23 52/18 52/21 54/11 54/23
56/19 57/9 57/18 58/2 58/14
58/16 60/7 61/13 61/19 62/2
62/13 63/25 64/4 64/8 64/10
65/3 65/6 65/19 65/20 65/23
66/12 66/14 67/10 67/10 67/22
68/13 68/13 69/2 69/17 70/1
73/1 74/4 74/5 74/16 74/22
75/4 75/8 75/14 76/6 77/18
77/23 80/1 80/8 80/9 81/1
81/17 81/23 82/2 83/17 85/8
85/22 86/8 86/10 86/11 87/15
87/15 87/16 87/18 87/22 88/1
88/1 89/9 89/13 91/8 91/10
91/13 92/7 92/9 94/18 99/1
99/2 99/3 99/9 103/17 104/6
106/10 108/25 109/6 111/16
112/15 112/16 112/16 112/17
112/18 112/23 113/16 114/24
118/20 119/5 119/19 120/6
120/23 121/11 121/13 121/20
121/23 122/8 122/10 124/6
124/18 125/5 125/11 126/15
126/16 126/17 126/24 126/25
**knowing [5]**   18/1 25/10 37/3
103/5 114/6
**knowingly [5]**   78/8 79/10 83/13
83/16 83/18
**knowledge [2]**   45/15 115/5
**known [3]**   58/25 71/10 84/21
**knows [15]**   11/13 15/14 15/15
24/20 24/25 44/5 56/25 57/4
57/12 58/14 58/24 74/18 118/24
120/16 120/17
**Kostrub [1]**   14/21
**Kostrub's [1]**   31/21
**Ku [1]**   14/22

**L**

**lack [1]**   118/4
**lacking [1]**   44/6
**LaCrosse [6]**   11/9 11/9 11/11
11/11 11/13 11/23
**ladies [11]**   61/15 85/4 86/25
89/5 91/10 92/17 95/17 98/12
99/17 99/20 100/14
**laid [1]**   16/5
**Lake [1]**   29/18
**Lamons [19]**   18/4 18/5 29/12
29/15 29/21 29/23 55/2 55/5
55/7 56/6 56/8 64/19 68/2 68/5
70/12 94/10 94/12 97/21 99/23

**Lamons' [1]**   55/12
**land [2]**   28/5 75/4
**language [1]**   84/4
**large [1]**   15/2
**lastly [1]**   16/10
**Lauderdale [2]**   1/8 66/20
**Lauderhill [2]**   22/12 63/20
**laugh [1]**   124/22
**laughable [1]**   81/11
**laughing [10]**   124/19 124/20
124/20 124/21 124/23 125/5
126/3 126/9 126/13 127/6
**law [22]**   7/24 24/19 33/9 36/4
40/10 40/11 46/17 46/22 52/19
56/11 56/21 56/25 60/24 62/25
67/7 70/24 74/9 74/11 76/22
77/1 82/4 96/10
**laws [2]**   79/14 79/14
**lawyer [1]**   45/18
**lawyers [2]**   21/8 61/3
**lay [1]**   91/15
**leader [1]**   20/24
**leading [2]**   29/16 78/20
**leaps [2]**   27/7 27/19
**learn [3]**   20/9 29/11 29/24
**learned [4]**   17/24 18/9 55/4
55/4
**leave [6]**   26/8 34/16 57/15
104/3 104/4 114/11
**leaves [1]**   110/12
**leaving [2]**   39/17 85/20
**Leesburg [1]**   13/11
**left [4]**   26/4 33/2 46/8 74/15
**legal [4]**   40/7 69/18 69/22
69/23
**legally [1]**   16/12
**length [5]**   11/1 11/6 17/12
95/23 96/12
**lengthy [1]**   101/2
**letter [1]**   106/6
**letters [2]**   109/3 110/5
**levels [1]**   122/11
**liberty [1]**   7/8
**license [2]**   16/7 31/23
**lie [24]**   19/8 19/8 19/9 19/13
19/14 19/15 19/18 19/24 20/2
20/5 20/25 21/17 21/19 22/3
24/12 24/16 26/25 27/1 27/2
27/25 43/4 52/17 62/10 75/25
**lied [17]**   19/15 21/7 21/9
21/17 21/18 21/20 21/20 21/21
22/4 22/8 23/8 23/10 25/21
26/3 26/12 49/25 49/25
**lies [1]**   22/1
**lieutenant [1]**   54/15
**lieutenants [1]**   31/3
**life [8]**   19/18 19/22 48/9 76/7
80/20 81/11 81/12 124/8
**lifeguards [1]**   52/1
**light [6]**   7/3 36/16 39/24
40/19 40/19 96/9
**Lighthouse [10]**   17/11 27/14
27/15 32/24 36/14 36/15 56/15
56/16 67/3 67/9
**lightly [1]**   119/23
**liked [2]**   11/12 26/18
**likes [2]**   11/15 11/22
**likewise [1]**   104/22
**liking [1]**   26/22
**limit [1]**   18/11
**limited [4]**   61/18 70/5 76/15
123/16

**line [2]**   28/5 124/8
**lines [2]**   71/3 71/6
**link [1]**   16/2
**linked [1]**   61/4
**lion [1]**   8/16
**Lisa [2]**   16/20 29/1
**list [1]**   106/18
**listed [2]**   28/23 53/5
**listen [3]**   11/21 101/7 102/4
**listening [3]**   80/17 82/13
125/14
**lists [1]**   53/3
**literally [1]**   112/17
**little [23]**   5/24 32/25 33/12
37/25 38/4 39/14 45/2 45/5
45/5 52/13 54/23 60/15 61/1
61/19 63/3 74/21 101/1 102/4
109/22 117/2 122/1 126/10
126/18
**lives [2]**   42/15 63/12
**lo [1]**   37/7
**loaded [1]**   32/17
**loading [1]**   13/15
**loaner [2]**   12/21 12/21
**located [1]**   91/4
**location [3]**   38/14 56/8 56/9
**locations [1]**   17/21
**Locka [1]**   51/14
**locked [2]**   32/17 100/1
**logical [2]**   27/7 27/19
**long [10]**   34/13 35/14 50/8
50/13 60/25 62/25 76/18 81/19
104/16 106/12
**longer [3]**   106/25 107/2 115/12
**look [44]**   7/10 7/17 9/3 9/21
11/20 13/14 15/17 15/19 19/12
22/21 23/6 26/25 26/25 37/24
39/5 39/9 39/10 39/25 44/17
45/21 48/5 52/16 53/17 61/24
61/25 65/25 67/15 68/8 68/24
69/17 71/1 71/13 72/7 73/22
74/7 82/7 87/2 90/20 91/18
95/21 110/4 111/18 117/23
126/9
**looked [7]**   46/25 95/4 95/6
95/11 107/1 126/11 126/11
**looking [6]**   9/24 28/11 50/9
81/19 111/13 122/9
**lookout [1]**   20/20
**lookouts [3]**   67/11 67/13 67/14
**looks [5]**   11/10 63/21 64/17
66/15 121/25
**lose [1]**   36/20
**lost [1]**   118/2
**lot [26]**   7/10 7/11 16/25 18/9
35/7 35/8 35/21 35/23 39/22
47/14 51/18 51/21 53/23 59/17
62/12 63/9 67/17 72/24 76/9
81/7 85/8 98/15 110/24 116/17
117/12 126/18
**love [1]**   2/6
**low [2]**   91/15 91/16
**ludicrous [1]**   46/15
**lunch [4]**   84/12 102/10 102/12
107/22
**lying [19]**   14/18 15/12 15/12
19/2 19/4 19/18 19/11 19/25
20/7 20/8 25/14 27/23 40/3
43/7 48/19 49/4 49/25 52/18
66/8

**M**

**M-E-A-N-S [1]**   105/14

**M**

ma'am [5]   41/19 109/13 117/6
117/8 119/25
mad [1]   68/20
MADISON [190]   1/7 3/14 4/2 4/3
4/6 4/9 4/19 10/25 14/19 14/24
15/1 16/8 16/17 16/18 16/23
17/3 17/3 17/7 17/9 17/11 18/3
18/8 19/6 19/10 19/10 20/1
20/16 21/5 21/16 22/1 22/3
22/9 22/16 23/6 23/17 24/1
24/2 24/4 25/4 25/6 25/19
26/14 26/18 27/3 27/14 27/16
27/22 28/5 29/4 29/4 30/1 30/5
30/13 30/17 31/7 31/11 31/17
31/19 31/20 31/25 32/1 32/5
32/6 32/9 32/13 34/8 34/17
34/19 34/21 35/15 35/21 35/23
35/25 36/6 36/13 36/15 36/21
38/21 40/5 40/13 40/21 42/23
44/11 44/13 44/19 47/8 47/20
47/24 48/17 48/18 49/6 49/7
49/16 49/17 49/20 49/24 50/1
50/2 50/3 50/7 50/9 50/11
51/16 51/22 51/24 51/25 52/7
53/4 54/18 54/21 54/24 55/24
57/19 57/21 58/6 58/7 58/11
59/11 59/11 59/14 59/18 60/16
63/12 64/22 64/25 65/1 65/4
65/12 65/18 65/25 66/17 67/20
67/21 67/25 68/14 68/23 68/25
69/4 69/6 69/7 70/3 70/20 71/9
71/10 71/15 72/24 76/14 77/6
77/22 78/3 78/8 80/1 81/2 81/8
86/1 86/6 86/7 86/10 86/10
86/15 87/5 88/9 88/11 88/19
89/22 90/6 90/7 91/2 91/14
92/8 92/8 92/15 92/22 93/6
93/7 93/24 94/16 94/24 95/16
95/22 96/16 97/3 97/9 99/4
99/14 100/3 100/8 100/11
100/12 108/4
Madison's [15]   16/24 29/2
47/12 49/20 50/22 51/2 58/24
59/12 62/13 64/14 65/14 92/24
96/20 98/13 124/8
mag [1]   48/6
Magnuson [2]   17/5 24/17
mails [1]   127/22
maintain [1]   62/24
maintenance [1]   52/1
make-shifting [1]   83/5
makeup [7]   13/24 14/1 14/3
15/6 18/15 34/4 35/20
making [6]   8/11 39/6 39/17
48/19 63/6 111/14
Mall [1]   29/18
man [9]   11/25 43/19 75/9 79/17
81/12 86/15 89/7 91/16 100/17
map [1]   63/16
maps [2]   18/19 35/6
March [3]   31/6 44/22 69/13
March 1st [1]   69/13
March 3rd [1]   44/22
marijuana [1]   96/4
MARK [1]   1/17
matched [3]   19/3 19/4 35/8
matches [1]   61/12
Matrix [1]   63/11
matter [13]   5/22 9/5 9/7 42/19
42/20 43/17 43/19 112/6 112/25

121/21 124/22 124/19 129/13
matters [4]   42/17 42/20 42/24
43/15
Maurice [1]   30/5
Maxima [1]   32/18
May 25th [4]   54/24 56/1 58/25
71/14
McCarthy [3]   29/16 29/21 29/23
McCarty [3]   16/20 24/7 29/2
McCormick [1]   15/21
meadow [1]   8/17
mean [29]   3/1 10/7 19/15 21/9
25/17 32/11 45/7 47/3 50/9
64/22 66/15 66/25 67/2 67/6
68/23 72/22 114/17 115/4 115/4
116/5 116/9 123/10 124/3
124/21 124/22 124/22 124/24
126/25 127/9
meaningful [1]   122/19
meaningfully [1]   117/15
means [13]   9/21 9/22 11/1
15/19 15/20 34/20 46/5 46/6
104/11 105/13 105/17 112/17
112/17
meant [1]   112/16
medalist [1]   11/16
meet [3]   49/21 67/1 91/16
meeting [8]   28/9 36/10 44/7
51/22 55/22 55/23 55/25 73/19
meetings [1]   72/4
member [2]   20/23 33/7
members [2]   39/21 122/18
memory [1]   117/14
mens [1]   83/13
mentioned [4]   47/5 47/7 95/25
117/10
mentions [1]   49/17
merely [1]   77/16
merger [1]   5/24
mess [2]   73/5 93/7
message [1]   11/21
messed [2]   38/21 59/21
messenger [5]   11/21 12/18
42/18 42/19 42/21
met [8]   15/7 15/9 21/18 49/23
51/25 52/2 52/5 81/14
Miami [7]   1/19 22/15 36/25
63/13 63/14 63/24 65/13
Miami-Dade [1]   36/25
MICHAEL [1]   1/17
middle [8]   87/8 87/12 87/18
87/20 87/22 87/23 88/6 98/8
mind [10]   7/19 23/17 28/2 46/9
47/11 64/2 65/11 73/11 112/18
120/3
mini [1]   48/6
minute [5]   3/10 40/25 84/25
85/1 103/14
minutes [13]   4/20 37/10 37/10
37/12 38/1 39/5 41/17 41/18
50/16 85/20 97/12 99/12 101/9
Miramar [2]   29/19 56/7
missed [2]   82/22 105/1
missing [3]   8/22 103/25 104/11
mistake [3]   53/2 53/6 70/8
mistakes [5]   52/20 52/25 53/10
53/15 53/19
misunderstood [1]   53/19
modus [1]   70/6
moment [5]   3/20 88/23 109/5
111/24 111/25
moments [1]   99/18

Monday [8]   108/18 108/21
109/21 112/5 115/16 121/3
128/6 128/20
money [11]   13/9 17/17 22/25
23/2 31/10 69/18 69/20 69/22
69/23 71/3 71/6
monitoring [1]   58/20
monitors [1]   42/8
months [22]   47/16 47/17 60/9
60/11 60/13 61/3 67/4 67/9
71/20 71/22 72/1 72/19 72/21
81/15 93/13 93/14 93/15 93/21
94/23 97/4 97/7 100/6
moon [1]   46/12
morning [23]   6/23 11/18 23/15
28/7 28/7 28/10 34/14 34/14
35/16 37/17 63/22 64/6 64/10
64/12 64/14 67/17 88/3 88/12
88/14 88/22 108/18 108/21
112/5
Moss [135]   10/4 10/16 10/20
10/21 11/4 11/5 12/15 14/1
16/7 17/7 17/8 17/8 17/10
17/10 17/24 17/25 18/17 19/5
19/8 19/17 19/22 20/4 20/7
20/14 20/18 21/6 21/12 22/3
22/4 26/13 26/21 27/3 27/14
27/23 27/23 29/25 30/1 30/5
30/10 30/14 30/14 31/2 31/9
31/18 32/2 32/7 33/21 34/3
34/8 34/9 34/13 34/18 34/23
35/17 35/18 35/18 35/21 36/6
36/21 36/22 36/23 37/14 37/20
38/19 38/22 39/23 40/20 42/23
43/16 43/25 44/2 44/10 48/15
48/22 49/8 49/11 49/11 49/15
50/16 52/3 53/3 53/11 53/22
53/24 55/21 56/14 56/18 56/20
57/23 58/2 58/14 58/24 59/5
60/6 60/8 60/8 61/2 61/4 64/18
64/23 67/11 68/10 68/16 68/21
69/5 69/19 69/25 72/9 81/1
81/4 85/23 86/10 89/17 90/13
91/15 91/25 92/2 92/3 92/3
92/15 93/4 93/8 93/17 95/20
98/14 98/15 98/16 98/19 98/21
98/22 98/25 99/11 99/17 100/3
100/19
Moss' [5]   16/15 28/19 28/23
61/7 99/14
mother [1]   33/9
mother's [1]   69/21
mother-in-law [1]   33/9
motion [3]   6/7 48/23 79/5
motivated [4]   21/3 23/1 26/5
26/7
motivation [4]   20/10 21/4
22/23 24/13
motivations [1]   81/5
motive [11]   19/7 19/8 19/9
19/13 19/14 19/15 19/24 20/5
20/5 20/7 75/25
Motorsports [9]   23/11 35/1
35/7 35/24 50/6 57/2 57/14
85/17 89/10
mouth [1]   39/24
movie [2]   46/14 46/15
moving [2]   111/19 111/19
Mr [18]   4/2 10/21 32/1 34/3
44/19 49/11 52/2 56/13 86/4
86/24 89/17 91/1 91/15 92/15
92/22 93/7 95/22 97/20

## M

Mr. **[266]**   2/25 4/2 4/3 4/3 4/6
4/9 4/19 6/11 10/9 10/17 10/20
10/25 11/4 11/5 12/15 12/20
13/2 13/8 14/1 14/5 14/19
14/24 15/1 15/4 15/5 15/12
15/21 15/24 16/3 16/16 16/17
16/18 16/25 18/3 18/4 18/5
18/8 18/17 19/5 19/6 19/8
19/17 20/1 20/16 20/18 21/5
21/6 21/12 21/16 22/1 22/3
22/3 22/4 22/9 22/13 23/14
23/17 23/24 24/1 24/2 24/4
25/4 25/6 25/11 26/13 26/14
26/18 26/21 27/22 28/4 28/5
30/8 30/10 30/14 30/14 31/7
31/25 32/9 32/18 32/19 32/20
33/3 33/21 33/23 34/2 34/3
34/4 34/4 34/8 34/8 34/9 34/13
34/17 34/17 34/19 35/15 35/17
35/18 35/20 39/23 40/5 40/13
40/21 41/16 41/17 42/18 42/23
42/23 43/16 44/2 44/10 44/13
47/8 47/12 47/20 47/24 48/22
49/13 49/14 49/15 50/7 50/9
50/11 50/11 50/18 51/6 51/21
55/2 55/5 55/7 55/12 55/21
56/6 56/8 62/10 70/20 77/6
78/8 81/1 81/4 84/23 85/23
85/23 86/1 86/8 86/10 86/10
86/10 86/11 86/15 87/4 87/5
87/13 87/25 88/4 88/5 88/9
88/10 88/11 88/17 88/17 88/20
89/2 89/3 89/4 89/7 89/9 89/11
89/11 89/15 89/18 89/22 89/23
89/24 90/1 90/1 90/5 90/6 90/7
90/8 90/11 90/13 90/14 90/14
90/20 90/23 90/23 91/2 91/9
91/14 91/15 91/24 91/25 92/2
92/3 92/3 92/8 92/8 92/15
92/15 92/24 93/4 93/5 93/5
93/6 93/7 93/8 93/17 93/24
94/6 94/10 94/11 94/13 94/16
94/22 94/24 94/25 95/4 95/6
95/8 95/16 95/20 95/23 96/13
96/16 96/16 96/20 97/3 97/9
97/18 97/20 97/21 97/22 98/1
98/9 98/13 98/14 98/14 98/15
98/16 98/19 98/21 98/22 98/25
99/4 99/4 99/4 99/7 99/9 99/11
99/14 99/14 99/17 99/23 100/1
100/5 100/8 100/11 100/12
100/19 108/4 109/3 124/8
124/20 125/2 128/12
Mr. **Barry [1]**   109/3
Mr. **Bolivian [1]**   6/11
Mr. **Brown [40]**   16/25 22/13
23/14 23/24 28/4 32/18 49/13
49/14 87/13 87/25 88/4 88/5
88/10 88/17 88/20 89/11 89/23
89/24 90/1 90/5 90/8 90/11
90/23 90/23 91/24 93/5 93/5
94/11 94/13 94/22 94/25 97/18
97/20 97/22 98/1 98/9 99/4
99/9 100/1 100/5
Mr. **Davis [12]**   12/20 13/2 13/8
25/11 32/20 34/4 89/3 89/7
89/11 90/1 90/14 90/20
Mr. **Davis' [4]**   35/17 85/23
91/9 99/7
Mr. **Dispoto [6]**   2/25 41/16

84/23 124/20 125/2 128/12
Mr. **Dispoto's [1]**   10/9
Mr. **Gilfarb [14]**   41/17 42/18
50/11 50/18 51/6 51/21 62/10
70/20 87/4 94/6 95/23 96/13
96/16 98/14
Mr. **Johnson [7]**   30/8 32/19
33/3 33/23 89/18 90/14 99/4
Mr. **Lamons [10]**   18/4 18/5 55/2
55/5 55/7 56/6 56/8 94/10
97/21 99/23
Mr. **Lamons' [1]**   55/12
Mr. **Madison [81]**   4/2 4/3 4/6
4/9 4/19 10/25 14/19 14/24
15/1 16/17 16/18 18/3 18/8
19/6 20/1 20/16 21/5 21/16
22/1 22/3 22/9 23/17 24/1 24/2
24/4 25/4 25/6 26/14 26/18
27/22 28/5 31/7 31/25 32/9
34/8 34/17 34/19 35/15 40/5
40/13 40/21 42/23 44/13 47/8
47/20 47/24 50/7 50/9 50/11
77/6 78/8 86/1 86/10 86/10
86/15 87/5 88/9 88/11 89/22
90/6 90/7 91/2 91/14 92/8 92/8
92/15 93/6 93/7 93/24 94/16
94/24 95/16 96/16 97/3 97/9
99/4 99/14 100/8 100/11 100/12
108/4
Mr. **Madison's [5]**   47/12 92/24
96/20 98/13 124/8
Mr. **McCormick [1]**   15/21
Mr. **Moss [57]**   10/20 11/4 11/5
12/15 14/1 18/17 19/5 19/8
19/17 20/18 21/6 21/12 22/3
22/4 26/13 26/21 30/10 30/14
30/14 33/21 34/3 34/8 34/13
35/18 39/23 42/23 43/16 44/2
44/10 48/22 49/15 55/21 81/1
81/4 85/23 86/10 90/13 91/15
91/25 92/2 92/3 92/3 92/15
93/4 93/8 93/17 95/20 98/14
98/15 98/16 98/19 98/21 98/22
98/25 99/11 99/17 100/19
Mr. **Moss' [1]**   99/14
Mr. **Rodriguez [1]**   86/8
Mr. **Starkey [1]**   4/3
Mr. **Thompson [1]**   10/17
Mr. **Toriano [1]**   16/3
Mr. **Verga [4]**   14/5 95/4 95/6
95/8
Mr. **White [1]**   16/16
Mr. **Williams [15]**   15/4 15/5
15/12 15/24 34/2 34/4 34/9
34/17 35/20 86/11 88/17 89/2
89/4 89/9 89/15
Ms **[7]**   10/15 42/6 91/21 92/10
98/25 108/8 118/17
Ms. **[16]**   9/9 9/14 9/23 10/16
14/21 21/12 24/7 31/21 92/24
93/11 93/16 95/3 95/13 98/16
102/17 126/5
Ms. **Golder [7]**   9/9 21/12 92/24
93/11 95/3 98/16 126/5
Ms. **Golder's [2]**   93/16 95/13
Ms. **Kostrub [1]**   14/21
Ms. **Kostrub's [1]**   31/21
Ms. **McCarty [1]**   24/7
Ms. **Plaza [2]**   9/23 10/16
Ms. **Plaza's [1]**   9/14
Ms. **Tucker [1]**   102/17
multiple **[4]**   29/25 94/21 96/5

96/6
multiple-time **[2]**   96/5 96/6
murder **[3]**   10/15 50/19 100/14
murderer **[1]**   20/19
muted **[1]**   55/1
Mutual **[1]**   29/17

## N

nails **[1]**   9/24
name **[2]**   46/20 46/21
names **[1]**   81/15
Nathaniel **[11]**   31/9 50/16
53/22 53/24 56/18 56/20 57/22
58/2 61/4 69/4 100/3
nature **[2]**   117/5 127/23
Nau **[1]**   15/16
Nazis **[2]**   12/10 12/11
NE **[1]**   1/18
near **[1]**   56/17
necessarily **[2]**   18/10 96/8
necessary **[3]**   2/5 120/11
128/25
need **[38]**   6/9 8/9 16/18 27/19
28/15 31/18 31/25 32/16 81/21
81/21 83/23 84/24 85/8 89/10
101/6 102/2 103/15 106/4
107/17 108/5 108/8 108/24
109/4 109/7 109/18 109/23
110/5 112/6 113/1 120/8 123/23
124/11 124/13 125/1 126/3
128/1 128/10 128/18
needed **[3]**   16/20 32/15 69/18
needs **[8]**   2/11 64/8 96/9 98/11
102/13 114/13 124/10 127/23
neighbor's **[1]**   73/25
net **[1]**   75/11
neutral **[1]**   55/14
never **[40]**   16/9 16/23 16/24
17/2 17/2 17/3 17/4 18/18 21/1
21/2 22/11 22/17 23/5 30/2
32/2 34/14 34/15 40/15 46/18
49/16 49/24 50/3 51/16 51/16
51/17 52/17 66/4 67/24 69/1
71/7 76/25 77/10 80/2 87/11
87/12 87/21 93/17 95/11 97/22
121/18
new **[3]**   30/4 38/20 101/14
newspapers **[1]**   75/5
nicest **[1]**   27/2
night **[14]**   2/3 41/6 63/19
63/19 65/15 72/10 73/18 87/9
87/12 87/18 87/20 87/22 87/23
88/6
nine **[3]**   46/22 97/3 97/7
ninety **[1]**   48/8
ninety-eight **[1]**   48/8
Nissan **[1]**   32/18
No. **[7]**   2/17 3/1 3/6 101/16
104/11 105/3 105/8
No. 10 **[2]**   3/1 3/6
No. 12 **[2]**   105/3 105/8
No. 13 **[2]**   101/16 104/11
No. 4 **[1]**   2/17
non **[1]**   20/13
non-credible **[1]**   20/13
nonaggressive **[1]**   113/3
nonissue **[1]**   48/1
noontime **[1]**   80/16
normally **[1]**   78/23
North **[2]**   13/10 69/13
Norwood **[4]**   24/22 51/25 63/15
65/18

**N**

note [2]   82/16 113/14
notebook [1]   106/3
notepad [1]   122/9
notes [10]   7/10 7/12 10/12
 19/1 29/9 102/3 117/23 118/9
 122/4 122/7
noticed [2]   111/13 126/8
notify [1]   107/17
nuclear [3]   12/3 12/4 12/5
number [27]   9/8 9/13 13/9
 13/19 13/20 16/11 16/14 16/14
 16/15 16/21 20/7 23/4 23/5
 23/9 24/10 28/19 28/22 28/23
 29/2 29/5 29/7 29/7 29/8 81/16
 81/16 86/8 88/23
numbers [8]   22/17 22/17 23/23
 24/10 28/13 29/1 103/13 106/9
numerous [3]   51/24 91/18 91/18

**O**

o'clock [17]   23/14 28/7 28/7
 63/13 63/22 64/5 64/12 64/14
 84/16 88/12 88/14 91/1 108/18
 109/20 109/25 112/4 128/20
Oakland [1]   63/20
objection [6]   11/2 14/15 83/11
 92/12 96/25 107/5
objections [1]   41/9
obligated [1]   126/16
obligation [2]   126/16 127/19
observation [1]   55/24
observationists [1]   43/5
observe [3]   43/6 43/8 43/12
observed [1]   125/2
obsessed [1]   11/7
obstructed [1]   78/12
obviously [5]   15/11 50/1 86/20
 112/5 124/8
Occam's [1]   27/5
occasion [2]   21/13 26/10
occasions [1]   94/21
occur [4]   10/15 14/20 32/22
 71/16
occurred [4]   38/3 53/15 85/13
 93/12
occurrence [1]   94/18
occurs [2]   67/5 69/11
October [20]   43/24 50/19 51/3
 54/6 55/15 56/5 59/25 60/8
 60/10 60/14 61/5 65/3 65/7
 65/8 67/19 67/22 71/17 72/16
 72/17 72/25
October 1st [11]   43/24 50/19
 51/3 54/6 60/8 60/10 60/14
 61/5 65/3 65/7 65/8
offense [3]   30/23 78/21 78/23
offenses [1]   5/18
offer [1]   123/13
offered [3]   10/14 10/24 25/5
Office [1]   15/3
officer [10]   14/6 15/2 15/23
 25/23 26/1 31/10 51/21 52/6
 52/18 97/2
Officer Crum [1]   15/2
Officer Starkey [2]   51/21 52/6
Officer Starkey's [1]   97/2
officers [6]   14/22 21/21 52/17
 52/19 53/16 59/20
Official [1]   1/24
oh [5]   52/6 59/14 64/23 64/25

91/6
okay [40]   11/4 26/23 42/7 48/1
 49/16 58/11 58/12 64/11 79/19
 82/13 82/15 82/21 83/21 84/5
 88/21 89/12 89/14 89/20 90/4
 90/24 96/1 96/11 97/5 98/21
 104/15 105/4 105/7 105/10
 105/18 107/24 110/7 111/5
 116/8 117/7 117/18 119/1 122/2
 122/15 126/7 128/15
older [1]   45/8
Olympic [1]   11/16
omission [1]   21/20
once [16]   53/15 61/13 66/5
 67/17 69/25 70/22 79/2 82/14
 89/1 91/1 95/13 102/15 107/8
 108/21 108/24 109/11
ones [5]   13/6 41/12 49/1
 104/14 125/14
ongoing [3]   52/23 109/16 124/1
Opa [1]   51/14
open [5]   23/6 56/11 84/17
 110/18 114/17
opened [1]   8/8
opening [5]   10/9 20/15 83/8
 84/19 84/22
operandi [1]   70/7
opinion [9]   117/13 117/14
 119/3 119/7 120/21 122/17
 123/13 123/14 124/12
opportunity [7]   43/8 84/20
 84/21 85/5 100/16 100/17 110/4
opposed [3]   59/3 106/11 125/7
opposite [2]   12/9 95/7
option [1]   4/14
order [8]   2/1 5/10 13/20 46/17
 46/22 81/6 108/2 117/15
ordering [1]   102/10
organization [5]   16/9 28/21
 31/4 44/7 54/16
organize [1]   55/22
organizing [1]   55/4
origin [1]   55/3
original [1]   84/22
Ott [1]   26/23
outbound [1]   91/19
outgoing [3]   88/4 88/16 88/17
outside [2]   34/17 111/24
overcome [2]   46/2 46/2
Overruled [2]   14/16 97/6
overwhelming [2]   39/22 40/19

**P**

p.m [12]   65/20 101/13 101/19
 101/20 103/11 108/1 108/11
 110/13 112/2 115/22 121/7
 129/7
P.O [1]   1/20
pad [1]   122/5
page [3]   104/17 104/18 104/21
pages [1]   104/12
paid [2]   60/22 116/20
painted [1]   31/22
pair [2]   61/21 62/2
Palm [1]   1/25
panic [1]   38/17
panicked [1]   23/22
pants [4]   61/21 61/22 62/2
 62/5
paragraph [1]   104/23
parent [1]   8/20
Parish [4]   16/4 38/20 38/22

39/3
Parish's [1]   33/9
Park [4]   51/25 63/15 63/20
 65/18
parked [1]   33/24
parking [5]   35/7 35/8 35/21
 35/23 59/17
part [33]   7/15 17/5 17/14 18/7
 24/9 44/16 48/17 51/16 51/17
 51/20 52/9 54/14 54/18 57/24
 59/7 60/23 64/18 67/21 67/24
 71/7 77/9 77/11 77/25 78/14
 78/15 79/22 85/25 86/24 106/19
 106/24 109/16 125/18 126/3
parte [1]   115/4
participants [1]   88/18
participate [10]   30/7 70/8
 80/12 80/13 115/5 115/6 116/15
 117/16 119/16 126/17
participated [4]   80/6 83/2
 85/21 112/24
participating [5]   79/22 112/24
 119/14 123/18 124/7
participation [2]   27/17 99/2
particular [4]   3/19 63/8
 113/24 115/19
parties [6]   106/12 107/9
 115/18 116/24 120/14 121/10
partly [1]   23/1
pass [2]   59/4 59/10
paste [1]   107/3
paternity [2]   20/11 21/20
patience [2]   84/18 129/3
pattern [3]   3/7 50/20 76/17
Paul [2]   29/12 29/16
pay [7]   48/3 59/24 59/24 59/25
 60/1 62/18 118/8
paying [7]   60/1 60/2 60/3 60/5
 73/15 73/20 115/3
peer [2]   114/15 114/16
peewee [1]   73/2
pen [2]   111/19 111/19
pending [2]   96/21 97/15
people [60]   9/14 9/25 10/3
 12/1 14/8 14/10 15/22 18/7
 18/13 23/19 25/10 27/2 27/11
 28/11 30/2 31/2 34/22 35/4
 43/3 43/4 43/11 43/14 45/17
 47/19 47/21 51/9 51/12 52/10
 52/21 52/24 68/2 68/3 68/5
 68/5 68/7 68/10 68/12 70/13
 75/5 75/11 75/23 76/23 76/23
 77/4 77/17 79/15 79/21 80/3
 81/3 81/23 89/14 95/10 109/3
 111/14 112/10 124/4 125/19
 125/19 127/21 127/21
people's [1]   63/6
perceive [1]   119/22
perception [1]   9/2
Perez [4]   16/5 28/20 33/8
 51/10
perfectly [3]   19/3 19/5 71/11
perform [1]   42/16
period [2]   65/24 66/3
periods [1]   66/5
Perjury [2]   81/11 81/11
persist [1]   126/2
person [31]   10/4 10/17 14/8
 24/20 35/4 35/13 35/14 36/10
 36/11 36/12 40/8 43/18 43/23
 45/11 48/3 50/6 50/15 63/9
 64/23 68/1 70/22 76/18 77/18

**P**

**person...** **[8]**   80/1 80/4 87/19
  90/10 96/7 97/18 97/23 113/13
**personal** **[2]**   64/20 64/24
**personality** **[3]**   113/18 113/20
  113/22
**persons** **[2]**   82/23 105/12
**persuasive** **[2]**   99/15 99/16
**phone** **[148]**   13/19 13/20 16/14
  16/14 16/15 16/23 16/24 17/6
  18/19 19/3 19/21 22/6 22/18
  23/6 23/15 23/18 23/25 24/5
  24/8 24/14 24/17 24/17 24/24
  27/25 28/1 28/23 31/8 32/12
  33/10 37/13 49/19 49/20 50/21
  50/22 51/1 51/1 51/2 51/3
  62/11 62/13 62/16 62/19 62/19
  62/24 63/2 63/2 63/2 63/6 63/6
  63/7 63/7 63/8 63/11 63/11
  63/13 63/18 63/20 63/21 63/22
  63/23 63/25 64/2 64/5 64/6
  64/7 64/7 64/7 64/8 64/9 64/10
  64/13 64/16 64/17 64/18 64/20
  64/25 65/1 65/2 65/7 65/8 65/9
  65/13 65/16 65/16 65/17 65/18
  65/19 65/24 65/25 66/1 66/1
  66/4 73/23 73/25 75/16 80/9
  81/22 85/12 85/15 85/23 85/23
  86/4 86/12 86/23 87/2 87/4
  87/5 87/7 88/1 88/5 88/7 88/10
  88/11 88/12 88/14 88/15 88/21
  88/25 89/2 89/3 89/3 89/4
  89/21 89/24 89/24 90/15 90/17
  90/21 91/4 95/20 98/1 98/2
  98/5 98/5 98/9 98/11 99/7
  100/8 103/13 109/19 116/10
  116/11 116/12 118/10 118/13
  123/19 123/24 127/5
**phones** **[14]**   28/6 28/15 40/4
  51/5 62/20 62/22 62/23 63/8
  64/24 64/24 81/23 81/24 81/25
  97/25
**photographs** **[3]**   16/6 49/22
  50/10
**photos** **[1]**   51/11
**physically** **[1]**   40/10
**physicist** **[1]**   12/7
**pick** **[3]**   26/1 57/10 103/17
**picked** **[7]**   14/4 23/22 24/11
  24/14 34/12 57/7 58/21
**picks** **[2]**   34/24 64/15
**pickup** **[1]**   39/19
**picture** **[8]**   8/13 8/15 8/16 9/2
  37/25 38/10 39/7 39/14
**pictures** **[1]**   50/7
**piece** **[8]**   3/19 5/6 7/4 8/3
  30/10 55/21 66/25 85/7
**pieces** **[9]**   8/10 8/12 8/14 8/18
  8/21 8/24 8/25 45/13 96/12
**PIN** **[1]**   13/9
**place** **[5]**   15/9 59/15 88/19
  93/20 94/1
**placed** **[4]**   87/8 88/4 89/21
  90/3
**places** **[1]**   15/7
**Plaintiff** **[1]**   1/5
**plan** **[11]**   28/9 34/23 37/4
  37/22 64/19 70/6 77/5 77/7
  77/11 95/1 100/9
**planned** **[1]**   30/6
**planner** **[1]**   20/20

**planning** **[3]**   44/7 72/4 77/9
**plate** **[2]**   16/7 31/23
**plausible** **[1]**   87/1
**play** **[4]**   10/6 61/19 73/1
  116/23
**playful** **[1]**   115/3
**playing** **[10]**   61/18 110/25
  112/7 112/9 112/16 112/17
  112/18 116/6 116/9 127/20
**Plaza** **[2]**   9/23 10/16
**Plaza's** **[1]**   9/14
**plea** **[3]**   75/25 76/2 76/4
**plead** **[2]**   47/15 97/10
**pleading** **[1]**   96/22
**please** **[16]**   6/18 41/23 41/25
  42/2 49/2 101/21 101/22 103/12
  106/1 108/3 108/12 108/25
  109/1 109/2 109/20 110/2
**pled** **[8]**   21/22 47/12 71/2 71/4
  71/6 71/7 96/17 97/15
**plugged** **[1]**   118/13
**plural** **[3]**   104/18 104/22
  104/24
**plus** **[4]**   52/23 63/5 81/12
  125/24
**poignantly** **[1]**   26/3
**point** **[36]**   5/4 5/6 5/23 17/12
  24/18 25/8 25/9 27/15 27/15
  32/11 32/24 34/17 34/21 36/14
  36/15 39/19 47/19 47/23 56/15
  56/17 57/2 58/20 62/5 63/21
  67/4 67/9 75/19 95/24 113/16
  113/17 120/10 120/17 123/9
  123/24 127/10 128/13
**pointed** **[2]**   24/5 24/10
**police** **[24]**   14/5 25/23 31/10
  32/5 34/18 36/9 52/16 52/18
  53/16 56/22 56/24 59/15 59/16
  59/16 59/20 62/4 67/15 67/16
  68/8 68/8 73/5 73/9 85/18
  89/16
**policy** **[1]**   12/7
**political** **[1]**   11/19
**pool** **[8]**   24/15 24/22 63/15
  64/3 91/7 91/7 91/8 91/10
**poor** **[2]**   31/21 68/23
**position** **[4]**   2/5 42/9 45/10
  126/5
**positively** **[1]**   65/10
**possess** **[1]**   40/16
**possessed** **[3]**   79/10 79/11 80/2
**possessing** **[1]**   79/7
**possession** **[2]**   40/12 79/14
**possibility** **[2]**   2/3 102/23
**possible** **[2]**   46/10 74/22
**possibly** **[4]**   18/24 46/24 75/18
  81/2
**potentially** **[1]**   21/4
**powerful** **[1]**   20/16
**practically** **[1]**   30/18
**precious** **[1]**   39/11
**predetermined** **[1]**   93/25
**predicated** **[1]**   85/10
**prefer** **[2]**   4/14 82/21
**preference** **[1]**   105/19
**prepared** **[1]**   49/18
**preparing** **[1]**   78/22
**presence** **[1]**   103/5
**present** **[9]**   10/10 44/3 77/16
  80/7 85/19 100/11 102/15
  108/21 110/2
**presented** **[5]**   89/13 92/18

  92/21 95/14 95/18
**preserved** **[1]**   6/9
**pressure** **[2]**   114/15 114/16
**presumably** **[2]**   88/10 122/9
**presumed** **[1]**   7/20
**presumption** **[1]**   46/1
**pretty** **[9]**   6/16 10/11 37/11
  54/15 66/16 68/16 92/8 121/13
  124/5
**prevail** **[1]**   45/22
**prevent** **[4]**   59/2 59/6 97/8
  102/21
**preventing** **[2]**   96/22 97/16
**previous** **[4]**   47/21 94/14 94/15
  100/1
**previously** **[3]**   23/1 41/12
  101/25
**prey** **[1]**   11/24
**prior** **[7]**   18/20 21/13 26/10
  37/5 54/6 99/6 100/13
**prison** **[2]**   19/18 100/5
**private** **[1]**   110/10
**privilege** **[1]**   44/13
**probably** **[16]**   9/5 9/6 10/9
  10/11 22/20 25/7 27/8 49/19
  53/20 68/22 68/22 76/20 79/5
  80/18 102/3 114/13
**probation** **[2]**   26/6 26/7
**problem** **[14]**   2/6 5/2 5/7 53/23
  111/22 114/1 119/21 120/5
  120/7 123/17 123/17 125/12
  126/21 129/4
**problems** **[4]**   113/14 124/1
  125/19 126/2
**proceed** **[2]**   84/23 102/14
**proceeding** **[2]**   111/11 114/9
**proceedings** **[5]**   1/11 82/12
  84/17 115/25 129/12
**Professional** **[2]**   13/24 129/10
**professions** **[1]**   25/25
**proliferation** **[1]**   12/3
**promptly** **[1]**   6/16
**pronounce** **[1]**   26/23
**proof** **[8]**   45/24 46/3 70/2
  74/25 77/18 79/3 80/5 80/6
**proofs** **[1]**   97/11
**propensity** **[1]**   81/24
**property** **[7]**   21/22 21/24 22/10
  47/8 78/8 78/9 96/4
**propose** **[3]**   2/14 112/3 112/4
**proposed** **[1]**   4/23
**prosecution** **[1]**   58/4
**prosecutor** **[1]**   126/10
**prosecutors** **[1]**   53/13
**protect** **[3]**   57/21 57/25 58/1
**prove** **[23]**   9/12 13/20 14/23
  14/25 17/15 17/24 18/6 32/8
  45/24 45/24 54/7 65/22 75/2
  75/2 75/13 78/2 78/7 79/4
  85/15 85/18 85/19 85/21 85/25
**proved** **[3]**   80/21 80/22 80/22
**proven** **[2]**   7/20 7/21
**proverbial** **[1]**   89/8
**proves** **[9]**   54/17 85/14 86/3
  86/4 86/14 86/17 86/18 86/18
  86/21
**provide** **[4]**   81/15 81/22 87/1
  103/13
**provided** **[3]**   16/14 98/19 99/16
**provides** **[2]**   91/22 100/8
**providing** **[2]**   101/4 102/6
**provisions** **[1]**   82/18

**P**

proximity [1]   63/15
psychiatrist [1]   123/13
psychologist [1]   123/12
punished [1]   5/20
punishment [1]   6/6
purpose [5]   4/8 14/13 67/15
  77/6 77/20
purposes [5]   5/11 51/13 62/17
  70/5 76/16
put [27]   2/19 5/25 8/7 8/7
  8/10 8/12 8/23 10/21 16/3
  35/23 42/13 45/10 45/13 49/24
  50/3 50/11 50/17 50/21 51/6
  60/7 60/16 70/4 80/15 97/11
  110/24 111/2 125/2
puts [3]   60/20 66/17 79/17
putting [2]   2/15 13/9
puzzle [7]   8/3 8/4 8/10 8/12
  8/21 8/23 8/25
puzzles [1]   8/6

**Q**

qualities [1]   26/22
question [12]   49/15 53/25 54/3
  56/16 65/10 76/2 109/12 109/13
  112/19 114/8 127/10 127/11
questioned [2]   22/16 96/16
questioning [3]   39/9 53/11
  115/13
questions [13]   21/8 21/9 62/8
  67/8 103/15 115/19 116/3
  116/25 117/1 117/3 118/16
  118/17 120/3
quick [1]   82/11
quickly [4]   47/6 50/5 56/11
  101/2
quite [1]   112/9
quote [1]   125/12
quote/unquote [1]   125/12

**R**

radius [1]   103/14
raise [5]   6/18 42/2 60/21
  101/22 110/6
raises [2]   116/22 126/25
raising [1]   127/7
ran [5]   3/15 35/22 51/16 85/17
  95/9
RANDEE [1]   1/20
rational [1]   89/6
razor [1]   27/5
rea [1]   83/13
reach [5]   87/25 90/7 90/8
  90/20 118/4
reached [1]   103/13
read [6]   16/21 74/24 75/5
  84/14 101/1 101/25
reader [7]   17/11 33/3 33/4
  33/20 34/12 34/24 57/7
readers [3]   33/16 33/17 57/9
readily [1]   96/15
ready [6]   2/2 31/14 37/15 42/6
  84/23 108/5
real [4]   64/9 68/13 103/21
  112/19
reality [4]   44/25 46/13 46/25
  47/2
realizing [1]   86/20
really [34]   5/23 9/6 10/6
  20/24 25/18 45/22 46/6 46/11

48/1 50/24 51/19 52/7 52/9
  56/19 59/9 66/13 67/2 70/8
  74/20 75/12 75/14 81/2 81/3
  85/8 91/7 91/10 97/18 104/3
  113/25 114/24 117/25 119/21
  120/20 120/23
Realtime [1]   129/11
reason [34]   7/7 10/19 11/7
  12/17 16/13 17/13 25/1 25/2
  26/8 36/7 43/4 50/2 50/23 57/7
  57/12 57/21 58/6 67/20 67/23
  68/11 68/13 74/8 75/12 76/9
  81/7 81/13 83/7 90/17 91/12
  97/14 97/18 110/14 117/24
  122/22
reasonable [20]   7/21 7/22 7/25
  8/11 8/14 9/1 10/7 26/20 46/3
  46/6 46/8 74/25 74/25 75/13
  75/17 78/1 79/3 80/22 89/6
  92/20
reasonableness [1]   59/10
reasons [5]   6/1 26/13 39/22
  40/19 119/10
rebuttal [6]   23/8 84/8 84/9
  84/21 96/25 97/5
recall [3]   4/3 15/16 108/15
recalling [1]   102/23
receipt [3]   48/4 48/12 54/19
receive [1]   27/17
receiving [1]   96/4
receptive [1]   2/19
recess [5]   41/20 41/22 101/19
  108/1 129/7
recognize [3]   8/13 69/2 69/4
recollection [6]   116/7 117/12
  117/15 118/5 118/9 122/19
recollects [1]   117/20
reconstitute [1]   31/14
reconstituted [1]   94/25
record [17]   5/11 5/25 6/8
  10/24 16/22 24/12 30/8 35/25
  55/23 106/2 106/20 115/1
  121/22 121/23 125/1 125/2
  129/12
records [41]   13/1 13/2 13/7
  13/10 13/11 13/14 16/12 17/6
  17/19 18/19 19/3 19/21 22/6
  24/17 27/25 29/6 32/13 33/10
  37/8 37/13 44/17 49/19 62/9
  62/11 62/11 65/25 66/1 81/22
  85/13 85/23 86/12 86/23
  87/2 87/4 88/7 90/21 92/5
  95/20 99/7 99/8
red [5]   14/23 55/16 71/19 81/1
  93/2
red-handed [1]   81/1
reduce [1]   48/23
reduced [1]   43/20
referred [1]   65/17
referring [1]   106/7
reflect [1]   115/1
reflected [1]   18/20
refusing [3]   112/22 115/6
  125/16
regard [3]   43/1 93/16 95/13
regarding [9]   20/13 92/21
  95/16 95/17 98/23 98/24 99/6
  99/9 109/13
regardless [1]   2/21
regards [2]   13/14 22/10
Registered [1]   129/10
regular [2]   50/24 66/10

Regulation [1]   13/24
reinforcing [1]   123/22
relate [1]   85/13
related [2]   72/23 98/20
relation [3]   4/6 4/7 79/11
relationship [2]   57/18 57/22
relative [1]   88/24
release [5]   102/9 102/20 103/1
  103/9 128/25
released [2]   100/6 103/7
relevant [3]   5/23 13/21 36/11
remaining [1]   41/18
remarkable [1]   14/2
remarks [1]   85/6
remedied [1]   122/13
remember [24]   10/9 13/8 20/11
  32/1 33/6 33/21 37/4 37/9
  37/25 39/9 45/2 45/5 46/19
  53/4 54/10 54/21 56/20 60/10
  61/5 67/12 69/14 70/18 93/4
  94/15
remembering [1]   45/9
remind [2]   117/22 127/19
reminded [1]   94/6
remove [1]   8/13 8/15 8/18
removed [2]   106/3 124/11
repeat [1]   95/24
repeated [1]   21/19
repeatedly [1]   111/13
replace [1]   67/25
replaced [2]   100/13 101/15
report [4]   53/5 53/7 53/11
  53/13
Reporter [4]   1/23 1/24 129/10
  129/11
reports [1]   98/19
represent [1]   44/11
reprint [1]   104/2
reprinting [1]   104/6
requesting [2]   2/4 50/14
require [1]   6/1
required [2]   82/9 83/14
requires [4]   77/4 80/4 82/4
  83/12
reservations [1]   73/17
residence [7]   13/17 16/17 26/4
  91/3 91/5 91/9 91/17
resolved [1]   76/2
respect [7]   2/5 4/9 5/8 6/8
  112/7 115/15 126/5
respectfully [1]   6/7
respond [1]   84/20
responsibility [1]   118/2
responsible [5]   61/1 75/10
  79/25 80/2 80/4
rest [6]   32/11 36/14 110/7
  121/3 122/17 129/6
restaurant [3]   23/21 36/4 90/4
result [1]   78/23
results [1]   81/6
resume [1]   108/18
retired [1]   14/5
return [5]   40/21 40/25 100/25
  101/9 103/2
returned [1]   65/17
reveal [1]   117/3
reveals [1]   35/25
review [5]   41/6 60/13 82/14
  101/5 109/5
reviewed [1]   5/12
RICKY [1]   1/7
rid [2]   38/17 38/18

**R**

**ride [3]**   75/9 89/10 90/20
**ridiculous [1]**   11/10
**right [114]**   2/10 2/23 2/24 3/1
3/20 3/22 4/1 4/18 4/22 5/7
6/20 8/4 11/5 11/8 12/6 13/16
22/11 22/19 26/25 27/1 33/4
35/6 37/2 37/18 39/17 40/24
41/4 41/13 41/16 41/20 41/23
44/1 58/25 59/18 59/19 59/23
67/16 69/9 79/17 82/11 83/6
83/19 88/13 89/1 90/9 91/25
93/2 93/13 95/5 95/6 95/11
95/19 96/15 97/3 97/6 97/10
97/10 97/13 98/2 98/3 100/24
101/8 101/14 101/18 102/8
103/12 103/20 104/9 104/19
104/20 105/2 105/7 105/25
106/12 107/5 107/8 107/18
107/25 108/5 108/10 108/12
108/24 109/11 109/12 110/9
110/11 110/17 111/7 111/25
112/3 113/8 114/5 115/11
115/20 115/23 116/15 116/24
117/24 119/12 119/14 119/21
119/24 120/1 120/12 120/13
120/22 121/8 121/19 123/18
125/22 127/9 128/5 128/10
128/18
**rise [3]**   41/23 101/12 103/10
**risk [2]**   60/17 68/4
**risks [1]**   19/19
**Ritz [2]**   13/11 13/12
**Riva [10]**   23/11 35/1 35/6 35/8
35/24 50/6 57/2 57/14 85/17
89/10
**rob [11]**   56/9 56/14 68/22
70/16 72/2 77/23 79/15 85/22
86/19 100/9 100/9
**robbed [5]**   29/12 68/24 69/5
69/7 100/4
**robber [2]**   59/7 71/10
**robberies [14]**   17/15 18/14
56/3 70/11 70/14 71/8 71/11
71/12 77/12 77/14 78/4 94/13
95/1 100/7
**robbers [2]**   71/15 95/10
**robbery [42]**   14/7 18/6 28/11
50/19 55/22 57/7 58/9 59/4
59/19 67/5 67/16 68/21 68/22
69/10 69/11 69/11 69/15 69/24
70/4 70/4 70/18 70/23 71/8
72/9 72/10 72/12 72/16 72/18
78/5 78/14 78/16 78/24 79/9
82/24 93/2 93/12 93/19 93/20
93/22 93/23 94/1 94/4
**robbery/murder [1]**   50/19
**Robert [1]**   68/2
**ROBIN [1]**   1/12
**Rodriguez [3]**   16/13 22/14 86/8
**roll [1]**   49/5
**Ronald [1]**   103/20
**room [9]**   7/9 82/6 82/7 99/19
101/6 102/2 107/11 107/16
124/4
**ROSENBAUM [3]**   1/2 1/12 46/4
**rotating [1]**   62/21
**RPR [2]**   1/23 129/16
**rubbing [1]**   35/20
**rules [2]**   124/15 124/16
**run [2]**   62/3 98/11

**running [14]**   4/4 8/17 23/22
25/1 35/8 35/21 50/6 52/7 52/8
52/10 57/13 89/10 90/11 90/18
**runs [1]**   98/10

**S**

**safeguards [1]**   75/4
**safety [2]**   34/3 37/22
**sake [1]**   77/13
**Sample [1]**   15/15
**sandwich [1]**   57/10
**sat [4]**   25/18 68/24 70/21
102/24
**satisfaction [1]**   114/9
**saw [22]**   4/19 9/25 10/15 10/17
11/11 13/6 14/12 16/6 16/16
24/20 32/18 35/21 45/6 50/7
51/11 55/15 56/22 56/23 63/16
95/9 104/1 107/1
**saying [24]**   12/15 24/8 25/24
25/24 25/25 37/20 40/17 61/7
64/8 74/14 81/4 89/23 91/25
111/6 112/21 113/13 113/14
117/5 119/13 119/14 119/16
122/21 124/25 126/22
**says [31]**   3/13 20/4 22/11
22/13 27/23 27/24 35/18 37/9
42/18 45/16 45/16 46/10 48/5
51/21 64/15 64/23 64/25 76/22
78/15 87/11 91/9 93/1 95/4
95/17 95/20 96/20 104/8 105/5
105/6 122/7 126/21
**scared [1]**   23/22
**scene [5]**   8/15 38/22 38/25
77/16 80/7
**schedule [2]**   93/20 93/24
**scheme [1]**   70/6
**school [1]**   73/1
**schoolteacher [1]**   110/25
**screen [2]**   50/17 51/7
**screw [2]**   20/18 59/21
**screw-up [1]**   59/21
**screwdrivers [1]**   48/8
**screwed [4]**   59/11 59/14 59/18
67/13
**screws [1]**   59/11
**scribbled [1]**   7/11
**scribbling [2]**   122/4 122/6
**scrutinized [1]**   96/9
**search [1]**   74/14
**season [1]**   98/8
**seated [4]**   41/25 101/21 108/3
108/13
**second [15]**   10/17 30/16 32/15
34/6 34/6 39/20 72/11 89/12
96/16 96/24 104/18 106/11
116/9 125/18 126/3
**seconds [1]**   50/24 51/1
**sector [8]**   24/14 35/24 39/18
85/24 89/18 90/10 91/2 91/8
**see [71]**   2/14 3/10 3/20 6/20
6/25 7/10 9/17 11/8 11/14
11/20 13/3 13/15 14/2 14/12
15/12 23/12 23/13 23/25 30/11
35/5 35/7 35/12 35/13 37/8
38/4 38/7 38/14 38/15 38/15
38/22 39/1 39/3 39/8 39/12
39/12 40/13 42/3 42/9 42/10
43/11 46/14 50/20 56/16 57/9
60/23 61/10 61/10 61/20 65/21
66/9 71/4 88/7 88/16 88/16
88/17 88/24 90/2 90/3 90/21

91/18 101/6 101/24 103/16
103/16 106/18 108/14 111/18
121/3 126/3 126/8 126/9
**seeing [1]**   42/8
**seek [1]**   6/5
**seen [10]**   8/22 18/18 30/2 42/7
43/13 57/2 85/20 111/16 122/4
124/12
**sees [1]**   73/5
**selecting [1]**   108/15
**selection [2]**   19/14 26/24
**sell [2]**   21/23 48/2
**selling [1]**   31/2
**sells [1]**   66/22
**send [6]**   84/12 101/11 105/20
106/14 107/11 107/15
**sending [2]**   113/14 127/22
**sense [15]**   37/18 58/9 58/10
59/5 59/10 62/15 62/15 67/17
67/23 71/17 73/3 73/23 93/12
116/4 125/3
**sentence [4]**   43/20 48/23 76/7
81/11
**sentencing [1]**   5/22
**separate [6]**   3/4 3/13 6/6
106/24 106/25 107/4
**separately [2]**   5/18 123/22
**separates [1]**   84/3
**September [11]**   12/22 44/20
55/15 56/4 59/14 62/14 67/12
71/16 72/15 79/1 129/14
**September 17th [2]**   44/20 79/1
**serious [2]**   79/6 112/6
**seriously [29]**   42/13 44/6
75/13 82/2 111/12 112/6 113/1
113/4 113/24 114/9 115/25
116/1 116/18 118/1 119/15
119/23 120/9 120/25 123/19
123/24 124/9 124/9 124/10
124/10 125/11 125/13 126/15
127/6 127/20
**service [1]**   42/16
**serving [1]**   103/6
**session [1]**   108/16
**sets [1]**   7/24
**seven [3]**   18/6 68/7 89/23
**shape [1]**   39/13
**Shaq [6]**   11/8 11/11 11/12
11/13 11/15 11/22
**share [1]**   17/1
**shared [3]**   22/18 40/15 77/5
**Sheriff's [1]**   15/3
**shift [1]**   33/12
**shifting [1]**   83/5
**shiny [1]**   9/9
**shooter [1]**   9/10
**shop [18]**   15/9 30/20 30/21
30/22 31/13 36/11 57/23 66/19
66/20 66/21 94/6 94/8 94/9
94/14 94/15 94/16 94/20 94/24
**short [2]**   83/5 100/25
**shorter [1]**   84/22
**shortly [2]**   59/1 72/22
**shot [2]**   9/11 75/9
**shots [1]**   9/13
**show [27]**   3/16 7/24 10/14 13/3
13/5 13/10 14/6 14/18 15/11
15/14 17/7 22/4 22/6 22/7 25/5
26/18 28/1 33/10 35/12 37/3
37/13 45/3 45/6 73/12 79/21
86/21 95/20
**showed [4]**   13/1 13/18 50/5

**S**

**showed... [1]**   72/24
**showing [5]**   13/12 13/16 25/11
40/3 119/2
**shown [6]**   18/19 18/19 20/5
21/7 21/14 21/16
**shows [10]**   7/6 13/7 13/19
13/25 15/5 30/8 33/18 35/10
62/12 63/11
**shuffled [1]**   81/23
**shut [1]**   63/2
**shy [1]**   126/1
**side [1]**   79/17
**sidebar [3]**   82/11 101/16
128/23
**signal [2]**   38/8 38/9
**significance [1]**   89/1
**significant [1]**   96/12
**signing [1]**   12/25
**silver [11]**   9/9 15/17 15/19
55/1 55/15 55/16 56/22 56/24
72/12 72/17 85/16
**similar [6]**   3/5 3/6 3/9 38/4
70/6 76/17
**simple [2]**   10/19 27/12
**simplistic [1]**   77/13
**simply [4]**   28/9 77/15 78/22
80/6
**single [7]**   24/6 30/20 55/23
55/23 55/24 59/21 79/3
**singular [3]**   104/17 104/21
104/23
**sink [1]**   9/24
**sit [9]**   2/10 47/16 69/17 70/24
71/21 72/21 75/14 81/19 102/3
**sits [3]**   73/8 73/11 73/21
**sitting [11]**   11/10 14/9 45/13
47/12 47/15 59/16 61/2 69/2
93/15 111/17 118/8
**situation [5]**   20/8 68/15 74/12
120/24 127/14
**six [6]**   18/7 52/11 69/14 70/19
88/8 96/1
**six-hour [1]**   88/8
**six-time [1]**   96/1
**sizes [1]**   61/23
**skinny [1]**   35/13
**Sky [1]**   29/18
**slapped [1]**   74/10
**sleep [1]**   80/15
**sleeping [3]**   111/18 111/20
117/11
**sleepy [1]**   122/1
**sleeve [1]**   34/20
**slept [1]**   68/18
**slides [2]**   28/14 50/11
**slow [1]**   37/10
**small [4]**   8/22 20/8 68/15
124/5
**smallest [1]**   20/25
**smartest [1]**   11/25
**smile [1]**   126/10
**smiled [1]**   126/11
**socialize [1]**   23/4
**socializing [1]**   25/10
**sold [1]**   47/9
**soldier [3]**   9/15 37/17 37/19
**solely [1]**   123/7
**somebody [27]**   12/16 15/7 19/14
24/6 24/8 26/25 35/7 40/15
40/16 46/7 60/17 60/20 61/15

70/8 73/10 74/5 74/20 74/21
75/10 76/5 78/8 79/15 98/10
112/21 118/11 118/12 125/16
**somebody's [1]**   53/6
**someone's [1]**   80/20
**someplace [1]**   2/19
**son [1]**   24/19
**son's [1]**   44/23
**soon [2]**   94/25 107/17
**sorry [13]**   9/24 36/22 39/8
39/12 39/17 91/2 99/11 105/8
105/9 111/19 111/10 116/8
128/16
**sort [6]**   4/25 5/24 57/6 70/6
92/23 102/17
**sotto [1]**   5/3
**sound [1]**   94/17
**sounded [1]**   26/20
**sounds [1]**   127/15
**sources [1]**   29/25
**South [7]**   29/13 29/20 30/24
69/13 69/15 70/19 97/20
**SOUTHERN [1]**   1/1
**speak [3]**   43/21 110/21 121/9
**speaking [2]**   26/11 95/3
**special [1]**   42/25
**specific [1]**   44/18
**specifically [6]**   3/13 22/7
24/4 64/25 102/25 114/8
**specifics [1]**   117/9
**specter [1]**   127/1
**speculate [2]**   18/5 89/25
**spend [1]**   61/24
**spent [2]**   17/5 62/11
**spoke [2]**   95/23 122/23
**Sports [1]**   35/8
**spot [2]**   56/13 90/19
**spotted [1]**   34/19
**stage [1]**   26/18
**stand [18]**   9/11 10/21 12/19
14/5 14/25 16/19 23/12 23/13
23/24 24/1 25/3 26/9 33/8
43/19 68/17 85/12 86/1 86/16
**standing [1]**   74/18
**stands [1]**   62/5
**stared [2]**   68/25 68/25
**Starkey [12]**   4/2 4/3 17/22
21/18 21/20 22/17 23/5 25/3
25/12 25/18 51/21 52/6
**Starkey's [1]**   97/2
**start [8]**   6/12 42/17 65/2 75/1
84/8 84/9 91/14 104/20
**started [5]**   10/11 29/16 81/18
92/5 108/4
**starting [4]**   2/22 29/12 92/25
122/1
**starts [3]**   43/24 69/12 124/5
**state [6]**   71/3 71/6 73/14
96/23 97/11 97/11
**statement [13]**   3/16 10/10 11/6
20/15 25/12 25/13 41/1 52/14
82/13 83/24 84/19 84/22 96/7
**statements [3]**   18/2 21/14
36/10
**STATES [6]**   1/1 1/4 1/18 5/12
75/3 83/3
**statute [1]**   78/5 83/12
**stay [6]**   26/5 26/7 62/4 93/6
103/14 114/25
**stayed [1]**   22/12
**stays [1]**   19/18
**steal [20]**   18/13 21/23 28/10

30/19 31/20 32/2 38/19 54/22
55/18 58/7 58/8 59/23 60/3
71/19 71/19 72/19 72/21 93/1
93/14 100/8
**stealing [17]**   54/22 54/24 56/1
58/6 58/8 58/12 58/13 58/14
59/3 60/2 71/4 71/5 71/15 96/3
96/13 96/18 97/9
**steering [2]**   71/25 72/20
**step [3]**   78/18 78/20 111/24
**Steve [1]**   12/19
**Stewart [1]**   5/14
**stick [1]**   107/20
**stills [3]**   18/19 35/12 107/2
**stipulation [3]**   30/7 61/7
106/6
**stipulations [3]**   69/12 72/8
107/10
**stole [19]**   27/14 30/16 30/22
31/12 31/19 32/2 36/21 36/22
49/9 49/15 54/10 54/11 72/7
87/17 93/18 94/12 94/13 96/15
97/8
**stolen [33]**   14/22 14/23 15/9
21/22 21/25 22/10 28/11 31/18
31/22 31/23 31/24 32/21 34/19
47/7 47/10 48/2 49/11 54/9
54/10 55/16 57/10 59/22 71/13
71/20 72/5 72/10 72/11 72/13
72/16 72/17 87/17 94/23 96/4
**stop [2]**   74/10 116/8
**store [3]**   29/13 29/14 66/23
**stories [2]**   46/18 53/22
**storing [1]**   98/3
**story [11]**   46/15 46/16 46/19
54/21 56/24 59/4 66/5 66/12
67/17 94/5 94/9
**strange [4]**   47/2 47/2 58/5
75/18
**strangling [2]**   46/21 46/22
**strategic [1]**   5/8
**street [5]**   1/18 1/24 33/24
33/24 76/8
**stress [1]**   43/12
**stretch [1]**   122/3
**strong [3]**   32/12 75/24 114/25
**strongly [1]**   78/17
**struck [1]**   76/5
**stuff [5]**   21/23 21/24 37/11
57/3 61/8
**stupid [2]**   64/24 65/1
**stupidest [1]**   64/23
**subject [3]**   9/19 9/19 74/6
**submit [14]**   44/9 48/12 50/14
53/20 56/2 68/10 77/10 78/1
79/2 80/23 88/8 89/5 98/12
99/20
**subscribed [2]**   29/3 86/5
**subsequent [4]**   93/2 93/19
93/22 94/4
**substantial [4]**   49/1 76/11
78/18 78/20
**substantive [2]**   6/3 103/24
**substantively [1]**   5/19
**substitute [2]**   37/17 115/9
**successful [2]**   29/15 31/15
**successfully [1]**   100/4
**sudden [6]**   45/11 48/18 49/20
65/2 67/21 68/6
**suddenly [5]**   11/16 12/10 26/6
30/25 49/6
**suffering [1]**   46/19

**S**

sufficient [4]   109/5 110/5
117/14 122/18
suggest [10]   3/5 3/12 26/21
27/12 27/21 67/1 83/8 91/4
124/17 125/7
suggested [1]   19/2
suggestion [2]   93/25 112/12
suggests [1]   6/4
Suite [1]   1/24
summer [1]   98/8
sun [1]   39/14
SunPass [1]   13/15
supplied [1]   48/25
supply [1]   81/5
support [1]   54/20
supported [1]   94/1
suppose [1]   6/7
supposed [5]   14/17 48/10
107/12 107/13 119/4
supposedly [1]   66/2
Supreme [1]   5/13
sure [21]   33/6 34/11 44/12
80/25 81/3 82/22 92/9 95/9
104/12 107/12 111/14 113/10
114/9 117/1 119/17 119/19
121/1 121/13 124/14 126/15
128/23
surveil [1]   37/4
surveillance [6]   16/6 32/23
37/2 37/25 51/11 66/3
Sustained [3]   11/3 92/13 97/1
SUVs [1]   55/10
Swap [5]   15/9 36/11 66/19
66/20 66/21
swim [8]   29/3 29/4 86/6 86/6
86/6 86/7 98/4 98/7
switching [2]   28/6 62/22
syndrome [1]   46/20
system [2]   47/14 76/3

**T**

table [3]   106/16 118/14 118/15
tackle [1]   66/22
tag [10]   17/11 33/3 33/4 33/16
33/17 33/19 34/12 34/24 57/7
57/9
take [40]   4/19 7/8 10/18 12/24
27/19 39/11 40/25 42/13 61/17
75/12 86/1 86/16 87/2 88/19
93/20 94/1 94/19 100/25 102/3
102/13 107/20 109/4 111/8
111/11 112/6 113/1 115/24
116/1 120/9 121/9 122/1 122/14
123/23 124/9 124/9 124/15
125/10 126/12 126/12 127/20
taken [4]   19/19 38/10 82/16
106/18
takes [1]   98/9
talk [33]   9/4 10/8 10/21 11/1
11/5 12/23 16/12 17/12 18/3
18/17 19/5 19/16 20/7 27/4
43/25 44/13 44/18 45/18 53/8
54/23 57/8 62/9 69/10 71/9
72/1 74/23 74/24 85/5 117/24
119/5 120/1 126/14 126/23
talked [13]   2/3 5/24 19/13
26/24 37/24 47/8 49/8 49/8
51/18 67/3 67/11 94/18 96/12
talkies [1]   64/20
talking [13]   17/17 24/16 24/17

52/25 ~~76/18~~ 91/14 94/16 111/4
116/5 117/19 117/19 118/11
118/12
talks [5]   3/6 66/1 66/4 69/19
94/24
tall [1]   35/13
tape [1]   22/11
target [1]   31/21
tattling [1]   126/19
tech [2]   98/1 98/2
technical [2]   17/13 109/13
telephone [10]   16/10 16/21
18/22 28/13 28/19 29/9 55/23
62/9 122/11 127/21
tell [42]   18/17 19/12 19/16
19/17 19/23 20/2 20/6 21/8
21/19 25/3 42/20 44/1 44/4
50/3 58/22 60/9 60/12 61/14
64/2 65/17 68/2 70/2 74/4
74/20 74/21 75/21 76/1 77/15
79/24 87/21 88/6 96/11 97/14
100/17 111/1 111/12 114/8
115/1 115/25 117/23 117/25
122/20
telling [16]   23/15 26/19 43/2
49/2 62/1 66/13 66/14 81/10
83/7 88/11 92/14 101/8 112/25
117/8 119/6 126/1
tells [13]   14/1 20/3 23/24
24/13 26/3 27/14 42/25 64/7
66/11 85/8 97/17 97/24 97/25
temptation [1]   124/16
ten [1]   72/15
tend [2]   11/20 45/2
term [1]   83/10
Terrance [9]   4/4 31/6 45/16
58/17 69/12 73/8 73/20 75/15
81/24
Terry [5]   55/3 55/4 56/7 58/22
80/9
test [3]   59/5 59/10 59/10
tested [2]   61/5 61/12
testified [8]   4/2 4/3 23/7
43/14 51/10 92/8 94/11 95/11
testifies [2]   91/6 97/24
testify [2]   23/21 57/16
testifying [1]   76/5
testimony [28]   9/19 10/2 20/13
26/16 32/10 32/12 34/20 40/6
47/12 55/21 70/21 75/22 75/23
86/24 90/9 92/5 93/17 95/6
95/14 96/9 96/12 98/13 98/17
99/6 99/14 99/16 99/22 100/18
texts [1]   127/22
thank [42]   6/16 6/22 40/23
40/24 41/19 42/3 42/11 42/14
65/4 82/5 82/10 84/18 84/24
97/14 99/13 100/22 100/23
101/17 101/24 102/17 103/4
103/4 103/8 103/23 106/1 108/3
108/7 108/10 109/9 109/11
110/8 112/1 115/24 117/8
120/12 120/22 121/4 121/5
121/6 129/2 129/4 129/5
theft [2]   32/13 47/21
thefts [2]   20/21 49/8
themself [1]   126/18
theories [1]   40/7
theory [2]   12/4 27/5
thief [1]   58/11 71/11 94/11
thing [37]   2/24 9/13 11/24
12/6 19/7 26/15 28/12 33/25

44/1 45/5 46/12 47/2 47/2 48/4
51/23 56/15 56/23 57/18 58/5
59/9 61/1 62/10 64/19 66/21
69/20 70/2 70/15 71/25 76/18
82/1 83/8 92/6 106/2 106/19
124/6 125/20 127/2
things [62]   4/25 7/10 7/11
7/11 7/16 7/22 7/22 9/5 9/18
10/5 16/22 17/18 18/23 19/1
25/4 25/7 26/12 26/20 26/23
28/3 28/16 31/7 31/8 32/22
36/20 40/1 41/4 43/1 43/2
43/11 43/25 44/2 47/6 48/10
48/15 49/12 51/4 51/23 53/19
53/25 54/4 54/8 55/20 56/12
58/2 61/9 63/14 66/16 76/14
76/15 81/13 95/25 98/15 100/18
107/21 114/7 115/6 117/18
123/21 125/6 127/1 128/7
think [77]   2/11 2/17 2/18 2/19
3/4 3/5 3/18 5/4 5/22 8/2
11/17 18/15 19/18 21/11 27/12
28/1 34/18 44/21 44/21 46/5
46/20 46/21 51/5 51/5 52/2
52/16 52/19 74/11 75/6 78/25
81/16 81/18 82/2 83/18 83/25
84/1 84/4 89/11 96/5 96/7 98/1
104/2 104/7 106/16 106/17
112/11 112/15 112/19 113/16
113/17 113/21 113/24 114/13
114/19 114/23 114/24 118/7
118/9 119/4 119/14 120/10
120/17 120/18 121/12 122/21
123/9 123/21 123/24 124/11
124/12 125/1 126/2 126/14
126/23 127/2 127/14 128/17
thinking [4]   4/16 46/18 46/24
81/20
thinks [4]   81/10 120/20 123/7
128/1
Thompson [1]   10/17
thought [2]   9/6 76/22
threatened [1]   78/10
three [17]   9/25 10/3 14/8
31/10 47/16 47/16 61/23 63/14
68/5 68/5 76/19 83/1 84/3
95/10 108/16 109/14 109/19
threw [2]   49/6 49/7
throw [1]   32/11
thrown [1]   8/25
ticket [2]   73/15 73/20
tie [1]   16/1
tied [1]   35/14
tiger [1]   8/16
time [74]   2/7 7/13 9/23 13/16
17/2 17/9 21/11 22/22 23/20
23/23 24/6 25/11 25/22 28/4
28/17 29/24 31/15 31/20 33/12
33/13 34/13 36/3 37/9 38/2
39/11 40/23 42/13 42/15 44/19
48/16 48/24 49/7 49/17 51/5
54/14 56/21 58/18 59/11 59/22
61/18 61/18 61/24 62/12 62/25
65/21 65/24 66/3 66/5 66/23
67/3 69/3 73/3 76/18 81/7
81/14 82/6 85/16 88/8 88/24
89/1 91/1 93/23 96/1 96/5 96/6
100/20 102/16 103/9 109/18
109/22 111/2 111/3 116/12
119/18
timely [1]   110/2
times [7]   17/21 33/19 43/12

**T**

**times...** **[4]**  66/1 80/25 96/10
 126/18
**timing** **[3]**  69/10 69/11 109/17
**tire** **[1]**  6/15
**today** **[6]**  6/15 44/21 47/15
 100/15 100/16 102/21
**told** **[32]**  10/4 14/7 17/25
 18/14 18/23 22/1 22/11 25/23
 28/20 30/1 39/23 39/25 40/1
 44/2 47/24 48/16 49/16 55/7
 56/8 56/21 56/25 64/19 66/6
 66/21 68/5 93/5 93/5 93/6 93/6
 93/7 95/8 100/21
**tools** **[1]**  32/16
**top** **[1]**  83/17
**Toriano** **[12]**  16/3 16/11 31/8
 38/16 51/7 58/15 58/18 58/19
 58/21 63/6 69/20 69/21
**totally** **[2]**  49/4 118/2
**touch** **[4]**  28/3 47/6 50/23 86/9
**touched** **[1]**  40/16
**touting** **[1]**  11/8
**town** **[1]**  13/13
**towns** **[1]**  25/15
**Toyota** **[2]**  34/9 85/17
**track** **[2]**  65/5 65/20
**tracked** **[1]**  38/3
**traffic** **[5]**  2/8 30/15 34/3
 73/15 73/20
**trains** **[3]**  47/9 47/10 48/2
**transcribed** **[1]**  102/7
**transcript** **[2]**  1/11 129/12
**transponder** **[2]**  13/7 13/15
**transport** **[1]**  71/6
**transporting** **[1]**  71/3
**trap** **[1]**  12/15
**Traverse** **[9]**  16/7 33/7 33/9
 37/12 38/25 39/8 39/9 39/12
 54/13
**treated** **[1]**  74/7
**trial** **[27]**  1/11 3/7 6/24 7/3
 8/19 9/18 9/21 20/3 29/25
 43/13 47/17 48/18 49/19 50/1
 56/24 57/1 69/12 69/15 70/19
 70/20 70/24 97/19 109/16
 109/18 110/3 111/12 111/21
**tried** **[3]**  2/8 77/4 86/16
**tries** **[1]**  91/21
**trouble** **[1]**  45/8
**troubling** **[1]**  124/6
**truck** **[10]**  29/14 32/24 33/14
 34/14 37/6 38/13 38/15 39/4
 86/21 100/4
**trucks** **[1]**  100/10
**true** **[21]**  12/2 12/8 17/25 18/1
 18/24 19/20 20/11 20/14 28/3
 40/2 46/16 46/25 47/4 56/10
 75/18 87/16 87/16 97/16 97/17
 114/1 114/6
**truly** **[2]**  59/9 74/5
**trust** **[1]**  81/4
**truth** **[21]**  19/13 19/16 19/17
 19/23 20/2 20/3 20/4 20/6
 26/20 39/25 43/2 46/13 47/1
 48/20 49/2 49/3 50/3 66/13
 66/14 74/21 81/10
**truthfulness** **[1]**  4/9
**try** **[9]**  42/9 53/22 75/7 76/3
 76/25 81/13 101/7 102/3 109/6
**trying** **[13]**  4/25 27/5 36/18

45/13 53/12 55/9 62/3 71/14
 87/25 90/6 90/8 90/19 116/21
**Tucker** **[1]**  102/17
**turn** **[2]**  38/8 38/9
**turned** **[2]**  56/10 62/14 63/3
**turns** **[1]**  39/14
**TV** **[2]**  11/20 45/3
**twice** **[2]**  104/8 105/6
**two** **[57]**  14/10 15/22 20/7
 32/21 33/16 33/19 34/24 35/4
 35/18 38/18 44/20 45/9 45/22
 47/16 48/7 50/9 57/23 61/21
 64/9 65/25 66/4 67/4 67/9
 71/20 71/22 72/1 72/13 72/14
 72/17 72/19 72/21 76/23 76/23
 77/4 78/4 78/25 79/15 81/16
 82/17 82/23 82/24 84/3 88/18
 89/14 92/6 93/13 93/14 93/15
 93/21 94/22 95/10 99/12 100/6
 103/17 105/12 113/7 114/7
**type** **[2]**  93/8 94/5
**types** **[1]**  76/20
**typographical** **[3]**  103/18
 105/23 106/5

**U**

**U.S** **[1]**  1/13
**Uh** **[1]**  83/22
**Uh-huh** **[1]**  83/22
**ultimately** **[1]**  71/2
**uncle** **[2]**  24/18 36/5
**undermine** **[1]**  21/2
**understand** **[14]**  5/21 17/23
 17/23 24/23 28/14 32/8 33/17
 47/11 53/18 74/13 108/22 112/8
 117/5 121/2
**understandable** **[1]**  123/8
**understanding** **[1]**  5/16
**understands** **[1]**  124/14
**understood** **[2]**  41/14 113/23
**unexpectedly** **[1]**  15/8
**Unforgettable** **[1]**  45/4
**unfortunately** **[5]**  45/4 47/14
 70/17 75/11 100/15
**Union** **[1]**  29/14
**unique** **[1]**  70/15
**UNITED** **[6]**  1/1 1/4 1/18 5/12
 75/3 83/3
**unknown** **[1]**  93/23
**unlawful** **[3]**  77/5 77/6 77/11
**unnecessarily** **[1]**  113/6
**unnoticed** **[1]**  55/10
**unpersuasive** **[1]**  92/19
**unquote** **[1]**  125/12
**unresolvable** **[1]**  120/19
**unsupported** **[1]**  95/14
**untrue** **[1]**  97/23
**unusual** **[1]**  47/3
**upholding** **[1]**  127/12
**upset** **[3]**  111/2 111/7 117/25
**use** **[21]**  18/25 34/5 34/6 37/23
 40/14 55/6 55/10 59/13 62/15
 62/16 64/20 64/24 65/1 68/6
 71/24 81/24 82/21 83/6 93/18
 94/13 113/3
**uses** **[1]**  98/6

**V**

**van** **[14]**  12/21 12/24 13/6
 13/22 30/11 30/13 32/20 37/1
 37/24 38/11 38/2 38/6 38/6
 38/18

**vans** **[1]**  12/21
**Vassilakis** **[1]**  14/22
**vehicle** **[1]**  10/18
**vendettas** **[1]**  68/12
**verdict** **[5]**  7/1 40/21 82/6
 103/2 118/4
**verdicts** **[1]**  82/8
**Verga** **[4]**  14/5 95/4 95/6 95/8
**verified** **[1]**  52/3
**version** **[3]**  106/11 106/25
 107/2
**versions** **[1]**  101/15
**versus** **[2]**  5/12 83/3
**vest** **[6]**  10/4 14/9 14/10 34/3
 37/14 37/22
**Vesta** **[1]**  26/10
**vests** **[8]**  10/1 13/5 18/15
 18/25 31/15 31/11 55/20 70/14
**victim** **[2]**  78/10 78/11
**video** **[17]**  9/15 15/11 18/21
 19/21 35/1 35/10 35/11 36/8
 39/10 39/10 40/4 50/6 57/3
 61/17 61/11 66/17 106/24
**videos** **[3]**  16/6 19/4 106/23
**videotape** **[1]**  15/5
**videotapes** **[1]**  18/18
**view** **[3]**  75/22 80/17 123/9
**violated** **[1]**  74/9
**violence** **[5]**  77/24 78/10 79/9
 79/12 79/12
**violent** **[4]**  58/13 79/7 97/18
 97/22
**voce** **[1]**  5/3
**voiced** **[2]**  41/12 120/21
**voluntarily** **[3]**  83/1 83/9
 83/20
**vote** **[2]**  116/21 127/8
**votes** **[1]**  117/4

**W**

**Wachovia** **[2]**  29/13 29/17
**wacky** **[2]**  25/14 25/21
**wait** **[8]**  47/17 67/9 73/9 96/16
 96/24 108/3 110/11 115/12
**waiting** **[1]**  73/11
**walk** **[2]**  50/14 73/7
**walkie** **[1]**  64/20
**walkie-talkies** **[1]**  64/20
**walking** **[1]**  73/7
**walks** **[3]**  63/7 73/4 73/5
**wall** **[2]**  69/20 100/12
**Walmart** **[4]**  32/4 48/4 48/15
 54/19
**want** **[57]**  3/18 4/14 4/14 4/19
 7/15 10/21 11/5 19/7 21/11
 26/15 27/4 28/14 33/17 35/2
 37/22 39/10 39/10 42/11 42/14
 47/22 47/22 50/2 55/8 59/19
 62/23 74/11 74/14 74/16 75/10
 76/9 80/15 80/15 81/7 83/7
 83/9 84/12 95/24 103/2 103/20
 104/1 104/3 106/19 107/10
 109/17 109/21 110/18 115/3
 115/12 115/24 120/2 121/1
 124/9 124/25 125/1 126/7
 128/13 128/23
**wanted** **[1]**  5/25
**wanting** **[1]**  68/13
**wants** **[6]**  19/23 48/21 76/7
 76/8 76/8 98/7
**warning** **[1]**  85/3
**Washington** **[1]**  29/17

## W

**waste [1]**   111/2
**watched [1]**   45/3
**watching [2]**   15/11 121/24
**way [32]**   8/2 10/8 18/1 20/15
 21/1 24/12 24/23 28/24 34/18
 35/15 40/14 47/7 56/20 63/20
 63/21 65/8 66/15 68/16 70/17
 73/17 75/15 77/19 81/22 84/5
 113/3 114/5 114/16 118/6
 121/10 123/8 126/1 128/17
**ways [1]**   39/24
**we've [10]**   5/4 26/14 33/11
 39/2 40/20 43/13 51/18 54/19
 55/13 75/5
**weapon [1]**   12/4
**weapons [3]**   12/3 12/6 74/14
**wearing [5]**   9/15 61/14 61/21
 62/2 92/1
**wears [1]**   35/15
**week [5]**   45/9 110/8 116/1
 121/3 129/6
**weeks [5]**   47/16 47/16 52/11
 72/13 72/14
**weigh [1]**   99/13
**weird [1]**   26/1
**welcome [6]**   6/14 41/25 101/21
 103/3 108/12 115/23
**well [73]**   3/18 4/18 4/24 5/13
 7/25 11/12 11/15 12/2 12/5
 12/10 12/10 12/11 12/15 15/4
 20/9 21/7 22/10 23/5 24/5
 24/22 24/22 25/18 26/4 38/16
 38/17 39/10 41/2 42/19 46/12
 49/20 51/23 52/11 54/21 55/19
 55/20 60/6 60/22 62/17 65/1
 67/5 69/5 69/22 70/22 74/11
 76/17 81/16 87/24 90/2 90/6
 92/3 92/8 93/1 93/4 93/16 94/3
 94/22 95/21 96/21 96/24 104/1
 105/23 111/23 113/19 116/11
 117/13 119/2 121/11 121/21
 122/4 122/8 122/13 122/20
 126/22
**went [16]**   22/6 33/19 36/7 36/9
 47/25 48/24 49/22 52/9 52/22
 53/7 57/6 71/1 74/9 86/4 89/18
 107/1
**were [75]**   8/6 9/14 9/19 10/10
 10/13 10/14 10/18 10/25 13/6
 15/11 15/21 15/22 17/8 17/16
 17/19 17/24 18/23 19/2 21/25
 22/1 29/1 29/23 31/15 31/23
 32/17 33/18 35/25 36/14 40/1
 41/6 44/21 44/22 46/17 47/10
 48/10 48/10 49/9 49/10 49/10
 50/8 50/8 51/19 52/1 53/12
 53/15 54/6 55/1 55/5 55/19
 56/18 57/23 57/24 61/11 62/21
 64/19 70/13 70/15 72/13 77/9
 81/3 82/12 82/18 84/17 89/14
 90/3 94/7 95/10 95/10 96/17
 103/5 106/4 108/15 114/1
 124/24 126/3
**West [1]**   1/25
**Westlaw [1]**   82/20
**Wheaties [1]**   11/17
**white [8]**   12/21 16/16 30/11
 30/13 55/1 55/14 55/16 72/15
**wife [4]**   16/25 26/10 74/2 74/3
**willfully [7]**   77/7 83/10 83/10

83/13 83/15 83/18 83/19
**Williams [54]**   15/4 15/5 15/12
 15/24 16/4 23/19 29/9 29/10
 30/1 30/5 30/13 30/15 31/17
 34/2 34/4 34/9 34/17 35/19
 35/20 36/2 36/7 36/13 37/16
 37/18 37/21 50/15 56/17 56/18
 57/5 57/6 57/15 57/16 57/19
 57/21 57/22 57/25 59/13 61/10
 61/12 61/15 61/17 62/18 64/13
 66/11 66/11 67/6 85/16 86/11
 88/17 89/2 89/4 89/9 89/15
 91/13
**Williams' [3]**   29/8 36/10 59/6
**willing [2]**   44/4 57/16
**window [1]**   9/25
**wiping [2]**   15/5 61/20
**wiretap [2]**   58/20 63/1
**wiretaps [2]**   51/10 63/9
**wish [1]**   102/11
**witness [9]**   2/13 14/19 24/12
 24/16 43/2 55/2 94/10 95/22
 123/10
**witnesses [10]**   9/9 10/8 10/13
 40/2 42/23 42/24 43/11 51/24
 75/22 99/22
**Woerner [1]**   17/13
**woman [6]**   10/15 14/21 34/3
 35/19 46/19 46/25
**women's [2]**   18/25 35/19
**wonderful [2]**   42/12 110/7
**wondering [2]**   2/12 3/2
**word [5]**   98/2 103/25 104/11
 105/13 113/3
**word's [1]**   103/25
**words [1]**   95/4
**work [8]**   13/4 28/8 29/5 32/20
 53/18 66/23 73/23 112/7
**worked [5]**   25/23 25/24 52/4
 60/4 70/9
**worker [1]**   36/25
**working [7]**   2/7 43/18 51/25
 55/5 58/15 112/8 114/17
**works [1]**   49/3
**world [4]**   11/25 64/23 70/23
 81/13
**worse [1]**   45/8
**worst [2]**   24/9 79/5
**worth [2]**   48/13 48/13
**wrap [1]**   100/14
**wrapping [1]**   38/12
**write [1]**   104/10
**writing [1]**   10/11
**written [2]**   101/4 102/5
**wrong [5]**   12/11 12/12 74/9
 75/25 76/4
**wrote [3]**   7/12 7/13 9/5

## Y

**yard [4]**   9/14 10/16 10/16 73/9
**Yeah [1]**   121/14
**year [1]**   81/17
**years [5]**   44/20 45/9 50/9
 52/12 92/7
**yesterday [1]**   5/25